**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

**Case No. _____**

| | |
|---|---|
| U.S. STRUCTURAL PLYWOOD INTEGRITY COALITION, an unincorporated association,  COASTAL PLYWOOD COMPANY, a North Carolina corporation, SCOTCH PLYWOOD CO., INC., an Alabama corporation, VENEER PRODUCTS ACQUISITIONS, LLC, a Delaware limited liability company doing business as SOUTHERN VENEER PRODUCTS, SOUTHERN VENEER SPECIALTY PRODUCTS, LLC, a Georgia limited liability company, HUNT FOREST PRODUCTS, LLC, a Louisiana limited liability company, FRERES LUMBER CO., INC., an Oregon corporation, MURPHY COMPANY, an Oregon corporation, SDS LUMBER LLC, a Washington limited liability company, and SWANSON GROUP, INC., an Oregon corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FORESTWOOD INDUSTRIES, INC., a New York corporation, and AMERICAN ASSOCIATION FOR LABORATORY CERTIFICATION, INC., a District of Columbia non-profit corporation, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**<u>COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ..................................................................................................1

II.   JURISDICTION AND VENUE .........................................................................5

III.  PLAINTIFFS ...................................................................................................12

IV.   DEFENDANTS ...............................................................................................13

V.    BRAZILIAN PLYWOOD MILLS IN STATES OF PARANÁ
      AND SANTA CATARINA ..............................................................................14

VI.   HISTORY AND SIGNIFICANCE OF PLYWOOD IN THE UNITED STATES....16

VII.  THE IMPORTANCE OF A STRINGENT QUALITY ASSURANCE
      PROGRAM IN PRODUCING AN ENGINEERED WOOD PRODUCT
      LIKE PLYWOOD .............................................................................................19

VIII. PS 1'S STRUCTURAL STANDARDS ARE IMPORTANT TO HEALTH
      AN SAFETY IN AREAS PRONE TO HIGH WIND EVENTS, SEISMIC
      ACTIVITY OR HEAVY SNOW .......................................................................22

IX.   DEFENDANTS' FACILITATION OF MASSIVE FALSE ADVERTISING
      SCHEME BY BRAZILIAN PLYWOOD PRODUCERS ........................................26

      A.   The Brazilian Plywood Industry .....................................................26

      B.   Faced With Overwhelming Evidence that Their Licensee Mills
           Did Not Consistently Produce On-Grade Plywood, TPI and PFS-TECO
           Agreed to Terminate Their Brazilian Plywood Programs, Revoke their
           Brazilian client mills' PS 1 Certificates, and Support Plaintiffs'
           Package of Industry Reforms ..........................................................29

      C.   After TPI and PFS-TECO Agree to Terminate Their Brazilian Plywood
           Programs, FII Steps in to Seamlessly Continue Facilitating the Brazilian
           Mills' Massive False Advertising Scheme .......................................34

      D.   As FII's Accreditor, A2LA is also Responsible for Facilitating the
           Brazilian Mills' False Scheme ........................................................37

X.    SUMMARY OF THE CASE ............................................................................41

XI.   FIRST CLAIM FOR RELIEF – Contributory False Advertising in Violation
      of the Lanham Act .........................................................................................42

i

XII.  SECOND CLAIM FOR RELIEF – Direct False Advertising in Violation of the
      Lanham Act...........................................................................................................45

XIII. THIRD CLAIM FOR RELIEF – Negligence.........................................................47

      PRAYER FOR RELIEF .........................................................................................48

      JURY DEMAND.....................................................................................................49

## COMPLAINT

Plaintiffs U.S. Structural Plywood Integrity Coalition, Coastal Plywood Company, Scotch Plywood Co., Inc., Veneer Products Acquisitions, LLC, Southern Veneer Specialty Products, LLC, Hunt Forest Products, LLC, Freres Lumber Co., Inc., Murphy Company, SDS Lumber, LLC, and Swanson Group, Inc. (collectively "Plaintiffs") by and through their below signed attorneys, hereby file this Complaint against Forestwood Industries, Inc. and the American Association for Laboratory Accreditation, Inc. (each a "Defendant," and collectively "Defendants") stating as follows:

## I.      INTRODUCTION

1.      This case involves a counterfeiting scam of epic proportion. Fifteen companies operating 17 plywood plants in two states in southern Brazil (Paraná and Santa Catarina) are falsely stamping millions of square feet of structural plywood panels imported into the United States as meeting the U.S. Voluntary Product Standard PS 1 for structural plywood. The lynchpin of this scheme is the false PS 1 certificates and grade stamps that are issued to these mills by unscrupulous certification agencies despite overwhelming evidence that the Brazilian mills do not and cannot consistently produce on-grade plywood from the incredibly fast-growing, non-native tree species used in their manufacturing.

2.      For years, Timber Products Inspection, Inc. ("TPI") and PFS Corporation ("PFS-TECO") were the only certifiers of southern Brazilian plywood mills to the PS 1 standard. TPI, however, was forced in mid-2021 to revoke their client mills' certifications and terminate their Brazilian plywood programs in the face of a lawsuit by Plaintiffs alleging that the certification of these mills' plywood as conforming to the PS 1 standard violated the Lanham Act's prohibition against false advertising. *U.S. Structural Plywood Integrity Coalition et al. v. PFS Corporation*,

1

Case No. 19-CV-62225-RKA ("Related Litigation").  Plaintiffs' case against TPI and PFS-TECO was supported by overwhelming evidence – including extensive testing performed by no less than four separate laboratories (the APA, Clemson, Blackwater, and TPI) and the testimony of two highly qualified wood science experts (Ron Anthony and Dr. Todd Shupe) – demonstrating that the Brazilian mills' plywood failed PS 1's bending stiffness requirement at an alarmingly high rate. Plaintiffs' lawsuit against PFS-TECO is now nearly at its end, with a two-week trial set to begin on June 6, 2022.  For its part, TPI was dismissed from the lawsuit approximately one year ago pursuant to a settlement agreement that required it to revoke the PS 1 certification of all its Brazilian client mills and terminate its Brazilian plywood certification program effective August 31, 2021.

3.      The mountain of evidence presented during Plaintiffs' case against TPI and PFS-TECO, coupled with the Court's rulings in that case on key legal issues in its opinions denying defendants' joint motions to dismiss and PFS-TECO's motion for summary judgment, support two key conclusions. First, PFS-TECO and TPI's former Brazilian licensees do not and cannot consistently produce PS 1 compliant plywood from the non-native loblolly and slash pine that grows incredibly fast on plantations throughout the region and is the dominant resource that supports these mills' production. Second, any certification agency that assists these mills to import and sell off-grade structural plywood in the United States by issuing false PS 1 certifications commits false advertising in violation of the Lanham Act.

4.      Incredibly, just one year after TPI terminated its Brazilian plywood program, 15 of 18 former Brazilian licensees have been recertified as conforming to PS 1 by new certification agency, Forestwood Industries Inc.'s ("FII"). PFS-TECO's largest licensee, Guararapes, has also

2

obtained PS 1 certification from FII. More of PFS-TECO's client mills are sure to follow in the event the June 2022 trial goes against this defendant.

5.      FII's PS 1 certification program is (remarkably) even more deficient that PFS-TECO and TPI's. FII has no prior experience in the certification of structural plywood to the PS 1 standard. In fact, FII is not even accredited under ISO/IEC 17025 to perform the full battery of qualification tests that PS 1 requires. Nor is there any evidence that PFS-TECO and TPI's former licensees have suddenly begun producing on-grade plywood after years of a demonstrated inability to do so. To the contrary, the available evidence strongly indicates that FII has simply grandfathered the debunked qualification tests performed under TPI and PFS-TECO's defective certification programs as the basis for its certifications. In short, the PS 1 certificates issued by FII are a complete sham orchestrated by the Brazilian mills to continue their years-long fraud on American consumers. FII (which, like PFS-TECO and TPI, profits directly by licensing its PS 1 grade stamps) is a witting participant in this illegal scheme.

6.      Building codes adopted throughout the United States require that structural grade plywood panels incorporated into the roofs, floors and walls of residential and commercial buildings in the U.S. meet the PS 1 structural standards.  These same building codes require that each panel bear a stamp from an accredited certifying agency that identifies the certifier by name.  The stamp must also display the PS 1 grade stamp and the number of the plywood plant that produced the panel.  Following the forced market exit of PFS-TECO and TPI, FII is the only certifying agency issuing PS 1 compliance certificates authorizing PFS-TECO and TPI's former Brazilian client mills to stamp plywood panels as meeting the PS 1 structural grade.

7.      FII is accredited by the American Association for Laboratory Accreditation, Inc. ("A2LA") as a certification and inspection agency authorized to license PS 1 grade stamps

vouching for plywood panel quality.  The role and responsibility of A2LA as the accreditor of FII is to independently audit this building product certification and inspection body on a regular basis to verify that it is licensing PS 1 grade stamp for structural plywood in a professional manner that is designed to assure that the structural plywood produced by licensees of FII is consistently on-grade. But far from performing this function, A2LA accredited FII as a certifier of PS 1 plywood under ISO/IEC 17065, even though FII lacks the ability and accreditation to perform the full battery of PS 1 qualification testing. Like FII's certification of the Brazilian mills, A2LA's accreditation of FII as a PS 1 certifier is a sham and should be immediately revoked.

8.      A2LA certified FII as a certification body authorized to license Brazilian plywood manufacturers to the PS 1 structural plywood standard despite FII having absolutely no capability of performing the battery of eight to 10 laboratory tests required to qualify a plywood panel product under the PS 1 standard. Incredibly, FII appears to be relying on testing performed by a Brazilian laboratory in Curitiba, Brazil, which itself is accredited byA2LA to perform less than half of the qualification tests required by PS 1.

9.      FII's false certification of PFS-TECO and TPI's former client mills has allowed millions of square feet of falsely advertised off-grade Brazilian plywood to continue flowing into the U.S., where it is incorporated in structural applications in residential and commercial buildings.  As a result, U.S. residents who live or work in buildings constructed with off-grade Brazilian plywood are exposed to significant risk of serious injury or death, particularly in the event of a hurricane or significant earthquake.  Because it is impossible for PS 1 compliant structural grade plywood to be consistently or reliably manufactured from the extraordinarily fast-growing plantation pine species in southern Brazil, Plaintiffs seek preliminary and

permanent injunctions requiring FII to revoke the PS 1 compliance certificates that it has issued to 17 plywood plants operating in the states of Paraná and Santa Catarina in southern Brazil.

10.     As the newly minted certifier of 17 Brazilian plywood plants exporting PS 1 stamped plywood panels to the U.S., FII has seamlessly replaced PFS-TECO and TPI as the gateway into the United States for these falsely advertised panels. The only explanation for FII's sudden market entry and virtually overnight certification of at least 18 mills that do not consistently produce on-grade plywood is FII's intentional or negligent willingness to participate in the Brazilian mills' false advertising scheme in hopes of turning a quick profit. In the wake of the overwhelming evidence developed in the Related Litigation and the resulting revocation of the Brazilian mills' PS 1 certificates by PFS-TECO and TPI, FII's blatantly false re-certification of these same mills makes a mockery of the certification system designed to ensure the integrity of the U.S. structural plywood market and leaves no doubt as to FII's total disregard for the safety and welfare of U.S. consumers.

11.     This Court should immediately and permanently enjoin FII from falsely certifying its Brazilian client mills to the PS 1 standard. The Court should also immediately and permanently enjoin A2LA from accrediting FII as a PS 1 certifier because FII lacks the required testing capability and associated accreditations to perform PS 1 qualification testing.

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over Plaintiffs' claims brought under the Lanham Act, 15 U.S.C. § 1051 et. seq. (specifically, 15 U.S.C. § 1125) pursuant to 28 U.S.C. §§ 1331 and 1337, because those claims arise under the laws of the United States.  This Court also has supplemental jurisdiction over Plaintiffs' state law negligence claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal Lanham Act claim that they

form part of the same case and controversy under Article III of the U.S. Constitution. Specifically, all of the claims in this action arise from Defendants' common failure to competently uphold the quality assurance regime that they administer, and the resulting facilitation of massive quantities of off-grade Brazilian plywood into the United States.

13.     This Court has personal jurisdiction over all Defendants because Defendants have done and continue to do business in the State of Florida, have sufficient contacts within the State and in this judicial district, have purposely availed themselves within this district, have directed tortious conduct and false commercial statements at Florida causing injury in this state, or have certified as meeting structural standards for plywood panels produced in Brazil that have been disproportionately imported, sold, offered for sale and distributed in this judicial district.

14.     As to Defendant FII, following the market exit of TPI and PFS-TECO, every panel of off-grade Brazilian plywood panel that enters Florida's ports has or will bear a grade stamp that is directly authorized by FII that affirmatively (and falsely) represents to consumers in Florida that the panel meets the PS 1  grade. A photograph showing off-grade panels now in Florida bearing FII's grade stamps that are materially identical to those entering Florida and currently being marketed and sold to Florida consumers are reproduced below:



The above photograph shows the "FII" logo next to the PS 1 stamp placed on that panel by

Sudati, Mill # 116, which operates in Ventania, Paraná, Brazil. By licensing it PS 1 grade stamp

to be applied to panels that it knows are marked for import and sale in Florida, Defendant FII has

deliberately reached into Florida to assist its Brazilian member mills in defrauding Florida

consumers and causing the Plaintiff companies significant lost sales and market share in Florida.

Under these facts, the exercise of jurisdiction over Defendant FII in this case comports with both

federal due process and Florida's long-arm statute, Fla. Stat. § 48.193.

15.     Defendant A2LA has also directly defrauded Florida consumers and injured

plaintiffs in Florida. Specifically, A2LA maintains an interactive website through which builders

and consumers in Florida can and, on information and belief, do directly access and download

certificates that falsely represent FII as a competent certification and inspection body for structural use plywood panels. But for A2LA's false representations to Florida residents regarding the competence of FII as a certification body, the massive false advertising scheme that has completely corrupted Florida's structural plywood market could not continue following TPI and PFS-TECO's market exit. Under these facts, the exercise of jurisdiction over Defendant A2LA in this case comports with both federal due process and Florida's long-arm statute, Fla. Stat. § 48.193.

16.     Venue is proper in this District under 28 U.S.C. § 1391 because: (1) Defendants are subject to personal jurisdiction in this district at the time the action is commenced; (2) a substantial share of the events or omissions giving rise to the claims occurred in this district; and (3) a substantial amount of the falsely advertised plywood at issue was sold and is located in this district; and (4) Defendants transact business within this district and have engaged in business activities within this District.

17.     Specifically, the fact that a substantial share of the events or omissions giving rise to the claims occurred in this District is demonstrated by the large share of off-grade Brazilian plywood that is imported into Florida and sold to builders and consumers throughout Florida, and dangerously incorporated into structural applications in Florida's residences and commercial buildings.  Historically, the large majority of off-grade PS 1 plywood imported from southern Brazil into Florida was offloaded at Port Everglades.

18.     With respect to the massive quantities of off-grade Brazilian structural plywood falsely advertised as meeting the bending stiffness requirements of the PS 1  grade standard, both Defendants made false descriptions of fact through certifications, accreditations and licensing agreements that authorized 18  recently de-certified Brazilian plywood plants to continue to

export plywood into Florida that Defendants knew or should have known did not meet the PS 1 grade standard.  Defendants engaged in this misconduct in the face of extensive publicly available evidence filed in Plaintiffs' lawsuit against PFS-TECO and TPI that leaves no question that FII's licensees do not produce PS 1 plywood that is consistently on-grade.

19.    Defendants' misrepresentations of fact are material because they are very likely to influence purchasing decisions by Florida-based builders and consumers who rely on the PS 1 grade stamp as warranting the fitness of the plywood panel as meeting building code requirements for residential and commercial construction in counties throughout Florida. Defendant FII's false statements were made throughout the entire transit of the off-grade Brazilian PS 1  stamped plywood from the point of its departure from a port in Brazil, through its ocean transit, through its delivery to a Florida port and then in interstate commerce through delivery to retail outlets or distributors and then to the ultimate buyer, typically either a builder or consumer disproportionately located in this district.

20.    On its website, FII states: "We recently expanded our scope of operations to include certification to United States Department of Commerce Voluntary Product Standard PS 1-19, Structural Plywood." Plaintiffs' investigation to date reveals that defendant's current website was put up sometime after March 29, 2022.  An archiving service tracking website changes demonstrates that, as of March 29, 2022, the FII website listed no PS 1 licensees certified under PS 1. However, sometime after that date, defendant's website added a list of 18 Brazilian plywood mills that it has now certified under PS 1. A copy of FII's PS 1 "client" list is attached as Exhibit A. With this list, FII illegally contributes to fraud and confusion in the marketplace for structural plywood in the US because the list changes all of the mill numbers used by Brazilian mills in the past as a means of enabling consumers or inspectors to track

defective panels back to the actual manufacturer.   These mill numbers are supposed to remain with a plywood mill regardless of its certification agency.

21.   FII's certifications and licensing of the PS 1 grade stamp for use on panels that Defendants knew or should have known were off-grade resulted in significant diversion of sales from U.S. plywood producers to the Brazilian plywood producers who, but for the certifications and accreditations issued by Defendants and the grade stamp licensing agreements entered into by FII, would not have been authorized to export massive quantities of PS 1 stamped structural plywood into the United States, including substantial volumes through Florida's ports, following the revocation of these mills' false certifications that were previously issued by PFS-TECO and TPI.  As a direct and proximate result of Defendants' actions, the nine Plaintiff companies, each of which sells PS 1 structural plywood on a nationwide basis, suffered loss of sales of PS 1 plywood in Florida and throughout the U.S. that were diverted to the off-grade falsely advertised Brazilian plywood imports.

22.   Despite FII having no capability whatsoever to perform the product qualification testing that is the foundation of the PS 1 panel certification process under which manufacturers are licensed to produce structural grade plywood required by every building code in the United States, A2LA nonetheless accredited FII as a certification body authorized to license PS 1 grade stamps to Brazilian plywood producers. A copy of that certificate is attached as Exhibit B. Further, despite FII having absolutely no experience in the inspection of structural plywood, A2LA nevertheless issued a certificate to FII representing to the public at large that this defendant was qualified to serve as a PS 1 inspection agency. A copy of this certificate is attached as Exhibit C.

23.     In yet another display of its complete ignorance of how the PS 1 plywood certification, inspection and testing system is to function, A2LA has certified Forestwood Laboratorio De Analises De Compensados LTDA, a Brazilian laboratory situated in Paraná state in Brazil, one of the two states in southern Brazil where the entire Brazilian softwood plywood industry is located. According to its chemical testing accreditation from A2LA, this laboratory is accredited to perform only four of the eight to 10 laboratory tests required to qualify a panel product under the PS 1 standard. A copy of the laboratory's certificate and scope of accreditation is attached as Exhibit D.

24.     The two defendants in this case, who should be playing the role of watchdogs focused on ensuring the efficacy of the PS 1 certification, inspection and testing system, have instead collaborated with the Brazilian plywood industry, an industry known to operate as a cartel unencumbered by antitrust or competition laws, to stand up a fundamentally corrupt and totally dysfunctional quality control system. If this corrupt system is not promptly enjoined, the Brazilian plywood industry will have successfully replaced the highly deficient system abandoned in mid-2021 by TPI and being abandoned shortly by PFS-TECO, both pursuant to settlements in the Related Litigation, with a completely dysfunctional and corrupt system that bears no resemblance to what the PS 1 standard requires of its certification, inspection and testing agencies.

### III.    PLAINTIFFS

25.     Plaintiff U.S. Structural Plywood Integrity Coalition is an unincorporated association of the nine U.S. plywood producers who are named as Plaintiffs in this action.

11

26.     Plaintiff Coastal Plywood Company is a North Carolina corporation which owns and operates plywood plants in Havana, Florida and Chapman, Alabama.  The two plants employ 750 workers.

27.     Plaintiff Scotch Plywood Co., Inc. is an Alabama corporation which owns and operates three plywood mills in Beatrice and Fulton, Alabama and in Waynesboro, Mississippi. The three plants employ 425 workers.

28.     Plaintiff Veneer Products Acquisitions, LLC, which does business as Southern Veneer Products, is a Delaware limited liability company which owns and operates a plywood plant in Fitzgerald, Georgia.  Plaintiff Southern Veneer Specialty Products, LLC is a Georgia limited liability company that owns and operates a plywood mill in Moncure, North Carolina. The two mills employ over 400 workers.

29.     Plaintiff Hunt Forest Products, LLC is a Louisiana corporation which owns and operates a plywood plant in Pollock, Louisiana, a hardwood sawmill in Olla, Louisiana and is one of two owners of a joint venture sawmill, LaSalle Lumber Co., in Urania, Louisiana.  Hunt Forest Products, LLC is headquartered in Ruston, Louisiana and employs over 500 workers in its wood products manufacturing facilities.

30.     Plaintiff Freres Lumber Co., Inc. is an Oregon corporation which owns and operates two veneer plants, a plywood mill, a lumber mill, a cogeneration facility and a mass timber manufacturing plant in Lyons, Oregon.  These facilities employ a total of 475 workers.

31.     Plaintiff Murphy Company is an Oregon corporation that currently employs more than 900 workers who operate six wood products manufacturing facilities.  These include a plywood plant in Rogue River, Oregon, three veneer plants peeling logs in White City and Sweet

Home, Oregon and in Elma, Washington, a hardwood plywood mill in Eugene, Oregon and a laminated veneer lumber plant in Sutherlin, Oregon.

32.     Plaintiff SDS Lumber, LLC is a Washington limited liability company which owns and operates a plywood plant doing business as Bingen Plywood in Bingen, Washington as well as a sawmill, chipping facility, cogeneration plant, logging and trucking divisions.  SDS Lumber Co. employs over 300 workers.

33.     Plaintiff Swanson Group, Inc. is an Oregon corporation which owns and operates plywood plants in Glendale and Springfield, Oregon and a sawmill in Roseburg, Oregon.  These manufacturing plants employ 670 workers.

## IV.   DEFENDANTS

34.     Defendant Forestwood Industries, Inc. is a New York for profit corporation.  FII was first accredited to certify structural plywood on December 17, 2020. Currently, FII certifies 17 mills to the PS 1 standard, all of which are former TPI or PFS-TECO licensees located in the states of Paraná and Santa Catarina in southern Brazil.

35.     Defendant American Association for Laboratory Accreditation, Inc. is a District of Columbia nonprofit corporation that provides a wide range of accreditation services.  A2LA is the accrediting agency for FII in its capacity as a certification and inspection body authorized to license use of the PS 1 grade stamp to plywood mills.

## V.   BRAZILIAN PLYWOOD MILLS IN STATES OF PARANÁ AND SANTA CATARINA

36.     FII currently certifies the plywood mills listed below to the PS 1 standard, each of which is a former licensee of PFS-TECO or TPI located in Parana or Santa Catarina, Brazil.

37.     Compensados Relvaplac Ltda. is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates a plywood mill in Imbituva, Paraná, Brazil (Mill #354).  FII has illegally changed the mill number from 354 to FII-115.

38.     Industria de Compensados Guararapes Ltda. is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates plywood mills in Palmas, Paraná, Brazil (Mill #252), and Santa Cecilia, Santa Catarina, Brazil (Mill #352).  FII has illegally changed the Palmas mill number from 252 to FII-119 and the Santa Cecelia mill number from 352 to FII-200.  Inexplicably, these two mills remain on the PSF-TECO website as certified PS 1 licensees.

39.     Pinustan Industria e Comercio de Madeiras Ltda. is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates a plywood mill in Bocaiuva do Sul, Paraná, Brazil (Mill #391).  FII has illegally changed the mill number from 391 to FII-120.

40.     Compensados FivePly Ltda. is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1-09 structural grade that operates a plywood mill in Clevelandia, Paraná, Brazil (Mill #379).  FII has illegally changed the mill  number from 379 to FII-111.

41.     Conply Industria de Compensados LTDA is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates a plywood mill in Contenda, Paraná, Brazil (Mill #264).  FII has illegally changed the mill number from 264 to FII-201.

42.     Industria de Compensados Sudati LTDA is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates plywood mills in

Ibaiti, Paraná, Brazil (Mill #279), Ventania, Paraná, Brazil (Mill #297), and Palmas, Paraná, Brazil (Mill #256). FII has illegally changed all three mill numbers, changing number 279 to FII-118, number 297 to FII-116 and number 256 to FII-113.

43.     Industria e Comercio de Compensados Sul Paraná is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates a plywood mill in Irati, Paraná, Brazil (Mill #331).  FII has illegally changed the mill number from 331 to FII-110.

44.     Palmasola S.A. Madeiras e Agricultura is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates a plywood mill in Curitiba, Paraná, Brazil (Mill #370).  FII has illegally changed the mill number from 370 to FII-113.

45.     Itamarati Industria de Compensados Ltda. is a FII certified manufacturer licensed by FFI to stamp plywood as meeting the PS 1 structural grade that operates a plywood mill in Palmas, Paraná, Brazil (Mill #325).  FII has illegally changed the mill number from 325 to FII-105.

46.     Tableros Industria e Comercio de Panels LTDA is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates plywood mills in Palmas, Paraná, Brazil (Mill #263), and Cascavel, Paraná, Brazil (Mill #384).  FII has illegally changed the mill number from 263 to FII-107.

47.     Miraluz Industria e Comercio de Madeiras Ltda. is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates a plywood mill in Senges, Paraná, Brazil (Mill #365).  FII has illegally changed the mill number from 365 to FII-114.

15

48.     Madeireira EK Ltda. is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates a plywood mill in Mafra, Santa Catarina, Brazil (Mill #312).  FII has illegally changed the mill number from 312 to FII-106.

49.     G 13 Madeiras LTDA is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates a plywood mill in Lages, Santa Catarina, Brazil (Mill # 332).  FII has illegally changed the mill number from 332 to FII-103.

50.     Brasnile Industrial LTDA is a FII certified manufacturer licensed by FII to stamp plywood as meeting the PS 1 structural grade that operates a plywood mill in Três Barras, Santa Catarina, Brazil (Mill #259).  FII has illegally changed the mill number from 259 to FII-109.

## VI.     HISTORY AND SIGNIFICANCE OF PLYWOOD IN THE UNITED STATES.

51.      Plywood is an engineered wood product that is manufactured by using glue to bond layers of veneer to form a composite panel that is stronger and stiffer than the sum of its components.  The structural advantage of plywood is a function of the effect of cross-laminating layers of veneer (with each veneer layer running perpendicular to the next), which improves the structural durability of the wood panel by distributing along-the-grain strength of the panel in both directions.

52.     The origins of plywood or laminated wood are ancient, dating back to items found in the tombs of Egyptian pharaohs, furniture products made by the Chinese over 1,000 years ago and to cabinets, chests, desktops and doors made by the English and French in the 17th through 19th centuries.  Most of these items were typically made from decorative hardwoods.

53.     Construction grade plywood made from softwood species was first introduced in 1905 in Portland, Oregon, which was hosting a World's Fair as part of the 100th anniversary celebration of the Lewis and Clark Expedition.  Portland Manufacturing Company, a small

wooden box factory in Portland, used a veneer lathe to peel veneer that was then dried and laminated into panels.  The workers used paint brushes as glue spreaders and ordinary house jacks as presses.  This new panel product, which was called "3-ply veneer work," sparked interest from fairgoers that included door, cabinet and trunk manufacturers who placed orders.  By 1907, Portland Manufacturing had upgraded its manufacturing process with an automatic glue spreader and a sectional hand press that increased its production to 420 panels per day.

54.     For its first 15 years, the softwood plywood industry sold most of its production to door panel manufacturers.   There was a dramatic increase in demand in 1920 when the growing automobile industry in the U.S. started using plywood for running boards.  Increasing demand from the automobile industry generated steady growth in the softwood plywood industry and by 1929, there were 17 plywood mills in the Pacific Northwest.

55.     The technological breakthrough that dramatically expanded U.S. plywood production was the discovery in 1934 of a fully waterproof adhesive by Dr. James Nevin, a chemist at Harbor Plywood Corporation in Aberdeen, Washington.  While this new technology made plywood suitable for exterior exposure, growth of the plywood industry progressed slowly because the industry remained highly fragmented with grading systems and product quality varying widely from mill to mill.

56.     The holding power of this waterproof glue was rigorously tested.  The panels were boiled in water for seven hours a day for 15 days, with inspections at regular intervals after being cooled down to various temperatures.  Some panels were frozen and then put back into the boiling caldron.  Ultimately, the panels were put to and passed 100 different performance tests.

57.     To address the lack of uniform product grades and consistent quality assurance programs, the Pacific Northwest plywood industry established the Douglas Fir Plywood

Association ("DFPA") in 1933.  In 1938, this association was one of the first in the U.S. to take advantage of a 1938 law authorizing the registration of industry-wide trademarks, which enabled plywood to be sold as a standardized commodity rather than through multiple company brand names.  In late 1938, the Federal Housing Authority accepted exterior plywood for home construction based in part on DFPA standards that tied plywood grades to performance tests for both interior and exterior plywood.

58.     At the same time, the DFPA introduced a rigorous qualification and inspection program and established two laboratories to conduct continuous random testing of mill member plywood and to perform research.

59.     In the late 1930's and early 1940's, the use of plywood in home construction boomed with plywood used for subflooring, interior and exterior paneling, roofs, basements and garages.  The 31 plywood plants in operation in 1941 had trouble meeting the growing demand.

60.     With the onset of World War II, plywood was declared an essential war material and its production and distribution were under strict government control.  World War II became a proving ground for softwood plywood in the U.S.  Plywood sped up the construction of military barracks, built the Navy's high speed PT boats, was a primary construction material in the building of Liberty ships and tankers, built the Army's assault boats that made the historic Rhine River crossing and was used in thousands of war accessories from crating for parts to Seabee huts in the South Pacific to thousands of life boats.

61.     After World War II ended, the plywood industry geared up to meet the demands of the booming post-war economy.  In 1944, the industry's 30 mills produced 1.4 billion square feet of plywood.  This number grew to 101 mills by 1954 and production approached four billion square feet.  With this growing demand, five Canadian companies in 1950 founded a trade

association that eventually spearheaded the adoption of uniform grade standards adopted by the Canadian Standards Association in 1953.

62.     The American South followed suit shortly thereafter.  Research and development efforts in the late 1950's and early 1960's discovered how to effectively glue together veneer from southern pine species.  In 1964, Georgia-Pacific Corporation opened the first southern pine plywood mill in Fordyce, Arkansas.  The plywood production in the U.S. South expanded substantially over the next 50 years with approximately two-thirds of all U.S. plywood production now manufactured in the U.S. South including Florida.

## VII.    THE IMPORTANCE OF A STRINGENT QUALITY ASSURANCE PROGRAM IN PRODUCING AN ENGINEERED WOOD PRODUCT LIKE PLYWOOD.

63.     The APA-The Engineered Wood Association is a 501(c)(6) non-profit trade association that represents 66 plywood mills in the United States and Canada.  APA's corporate headquarters is located in Tacoma, Washington where it operates a 42,000 square foot research center and testing laboratory that performs year-round quality control testing of the plywood products produced by its members.  APA also operates a regional quality testing laboratory in Atlanta, Georgia.  APA was founded in 1933 as the Douglas Fir Plywood Association and renamed as the American Plywood Association in 1964.  The name change to APA-The Engineered Wood Association occurred in 1994.

64.     A central component of APA's mission is quality assurance, managing a stringently enforced quality inspection program designed to ensure that APA-member plywood mills such as the Plaintiffs' mills conform to all product standards.  One such standard is the PS 1  grade standard governing structural plywood sold in the United States.  Originally drafted by APA, Voluntary Product Standard PS 1  was adopted as a nationwide product standard by the National Institute of Standards and Technology ("NIST"), which is part of the U.S. Department

of Commerce. The PS 1 standard was originally published in 1966. The current edition of the standard published in 2019 covers the manufacture of structural plywood from some 70 wood species and superseded the Product Standard published by NIST in 2009.

65. As noted in the foreword to Voluntary Product Standard PS 1, the federal government has no authority to police this or any other of the voluntary product standards published by NIST. The relevant disclaimer is as follows:

> It must be emphasized that the Department of Commerce has no regulatory authority or enforcement power to police the provisions of this or other Product Standards; but, inasmuch as the Standard represents the consensus of the industry, its provisions are established by trade custom and are made effective through incorporation by reference in sales contracts, federal specifications, building codes, purchase invoices, advertising and similar means.

66. In the U.S., APA is accredited by International Accreditation Service as an inspection body pursuant to standards issued by the International Standards Organization ("ISO"), specifically ISO 17020. Through this accreditation, APA certifies U.S. plywood plants to produce multiple plywood grades that conform to product standards such as PS 1.

67. Throughout its more than 80 years of certifying U.S. plywood mills as consistently meeting the highly technical product standards of an engineered wood product like plywood, APA has utilized a well-trained and experienced staff of inspectors or quality auditors who regularly audit each mill's quality control system and procedures and make unannounced visits to each mill throughout every year to perform independent inspections and to take randomly selected panel samples for testing at APA's laboratories in Tacoma and Atlanta. The purpose of these stringent quality assurance inspections and procedures is to verify that each APA member plywood plant is producing plywood that fully complies with the defined technical criteria for each product being produced such as PS 1 structural plywood.

68.     APA' s quality management system includes testing and inspection of the finished plywood panel product for such critical attributes as bending strength and stiffness, dimensional stability, bond durability and impact resistance.   Test results are compared with established minimum performance criteria as set forth in performance standards such as PS 1.

69.     APA member plywood plants are required to record multiple categories of quality control data and to make that data available to the APA on a weekly basis.   In addition, APA auditors make twice per year random visits to each APA member mill to verify compliance with APA quality assurance requirements and to take a sample of at least ten panels to an APA lab for a battery of tests.   Because bending stiffness and bending strength are the most important properties for many plywood uses, the PS 1 samples taken by APA auditors from each member mill are tested to determine whether each panel meets the bending stiffness requirement of PS 1. If even one of the ten panels fails, that member mill is subject to additional inspections and additional reporting that is designed to ensure that whatever quality assurance issue generated the failure is promptly addressed.

## VIII.   PS 1's STRUCTURAL STANDARDS ARE IMPORTANT TO HEALTH AND SAFETY IN AREAS PRONE TO HIGH WIND EVENTS, SEISMIC ACTIVITY OR HEAVY SNOW.

70.     If plywood is used on the exterior walls or roofs of a residential home or commercial building in the U.S., local building codes uniformly require that the plywood panels are of a structural grade, specifically PS 1.   The structural plywood utilized in the U.S. must either be produced from so-called Group 1 species – which are the wood species that have tested to be the strongest – or panels manufactured from species that are performance tested and meet or exceed the strength properties of plywood manufactured from Group 1 species.

71.     If the plywood installed on the roof and exterior walls of a residential home has a bending stiffness and other strength properties that are below those required by PS 1, there is significant risk that the structural performance of that home will fail in a high wind, seismic or heavy snow event.

72.     One of the best ways to protect a home from damage in a hurricane is to install shutters over all windows and glass doors.  Over the last decade, Florida and specifically the counties in this district have been leaders in upgrading local building codes to prevent the type of structural failure in a hurricane that can cause injury or death and significant property damage. One of the most significant building code upgrades in Florida has been the requirement of hurricane shutters to protect glass openings in structures against the impact of flying debris in Wind-Borne Debris Regions, and High Velocity Hurricane Zones.

73.     Hurricane shutter design requirements in Florida are a good example of the importance of PS 1 plywood meeting its strict strength requirements.  The Florida Building Code requires shutters to meet certain specifications for both Wind-Borne Debris Regions and High Velocity Hurricane Zones.  In both cases, windows and glass doors must to be covered with sturdy shutters in the event of a hurricane.  The whole purpose is to prevent windborne debris from breaking a window or glass door, which will depressurize a house in a hurricane and likely result in a catastrophic failure of the entire structure.

74.     The figure below is a map of the wind-borne debris regions in Florida and the contours for determining the applicable level of hurricane shutter protection required by Florida building codes.



Wind-Borne Debris Region as Defined in Section R202

Designated areas where the basic wind speed, $V_{ult}$, is 140 mph or greater.

- - - - - - 130 mph, $V_{ult}$ and within 1 mile of the coast

Notes:
1) Values are $V_{ult}$ 3-second gust, wind speeds in miles per hour at 33 ft above ground for Exposure C category.
2) Linear interpolation between contours is permitted.
3) Islands and coastal areas outside the last contour shall use the last wind speed contour of the coastal area.
4) Mountainous terrain, gorges, ocean promontories, and special wind regions shall be examined for unusual wind conditions.
5) This map is accurate to the county. Local governments establish specific wind speed/wind-borne debris lines using physical landmarks such as major roads, canals, rivers and shorelines.
6) $V_{asd} = \sqrt{0.6} \times V_{ult}$

Source: Adapted from the 2010 Florida Building Code and Florida Building Code – Residential (Figures 1609A and R301.2(4), respectively).

75.      With respect to panel strength, the building codes for High Velocity Hurricane Zones require that the shutters deflect to no more than the shutter span in inches divided by 30. For example, a 40-inch span should not bend more than 40 inches/30 = 1.33 inches in the storm. The panels must also bend less than two inches maximum and should remain at least one inch away from the window under full wind force.

76.      Engineers rely on the mechanical properties included in the PS 1 standard when designing structural components such as storm shutters.  For example, the APA publishes a guide to constructing storm shutters for hurricane zones called "Hurricane Shutter Design

23

Considerations for Florida."  A three-quarter inch thick PS 1 plywood panel with a 48/24 span rating would deflect a maximum of 0.79 inches with a three second wind gust of 190 miles per hour.  Plywood shutters constructed from panels that fall substantially below the PS 1 bending stiffness requirement will deflect by two inches or more, which will fracture the window the shutter is designed to protect and cause a catastrophic loss.

77.     PS 1 plywood is all labeled on the face of the panel with a stamp that designates the certifying agency such as APA or FII, the Group 1 species or span rating, the PS 1 grade, the panel thickness and the number of the mill manufacturer.  The mill number is used to identify the panel manufacturer in the event of a panel failure.  A typical APA PS 1 grade stamp used by Plaintiff Freres Lumber Co. is reproduced below:



78.     The health and safety of millions of U.S. residents who live in residential homes or apartments constructed with PS 1 structural plywood is dependent upon a well-functioning quality assurance system that makes certain that all PS 1 stamped plywood panels meet or

exceed the strength and other performance requirements of this structural grade product.  For years, the quality assurance system formerly administered by PFS-TECO and TPI was so deficient that 75% or more of the 1.5 billion square feet of Brazilian PS 1 stamped plywood exported to the U.S. in 2017-18 failed to meet the most important property of structural plywood panels, specifically bending stiffness. Extensive testing in 2021 performed by Blackwater Technical Services confirms that even after years of litigation, Brazilian plywood manufactured by PFS-TECO and TPI's former (and soon to be former) licensees continued to fail PS 1 at alarming rates.

79.    Immediately after TPI's market exit and the anticipated permanent injunction against PFS-TECO, the same mills that produced this overwhelmingly off-grade plywood were recertified by FII, which lacks accreditation to perform any of the tests required to satisfy PS 1 qualification testing. With respect to the critically important component of qualification testing, the certification agency must have the capability of performing those tests. In other words, FII has stepped into the shoes of PFS-TECO and TPI as the new lynchpin of this massive counterfeiting scheme. Like PFS-TECO and TPI before it, FII lacks any legitimate basis to support its false statements that its Brazilian licensees meet the PS 1 standard. To the contrary, the publicly available evidence entered in the Related Litigation confirms that the mills FII has recertified do not and cannot consistently produce on-grade plywood and that FII is acting in blatant bad faith.

80.    Because Brazilian PS 1 plywood imports into the United States in 2021 and 2022 to date represent approximately 15% of total U.S. structural plywood consumption, this means that approximately 1.5 out of every 10 PS 1 panels installed in the United States during this period may be at serious risk of catastrophic failure.  In Florida, however, the penetration of

Brazilian PS 1 stamped structural plywood exceeds 75% of the Florida market for structural plywood, meaning that seven or more of every 10 panels sold in the state may fail to meet the stiffness requirements of the PS 1 grade standard.

### IX.  DEFENDANTS' FACILITATION OF MASSIVE FALSE ADVERTISING SCHEME BY BRAZILIAN PLYWOOD PRODUCERS

#### A.      The Brazilian Plywood Industry.

81.     In the early 1990's, the Brazilian government offered incentives to landowners in southern Brazil to plant loblolly pine and slash pine.  There are now over five million acres of these plantations, which has caused massive growth in the production of the softwood plywood made from these two species in southern Brazil.   In turn, this has generated a surge in Brazilian PS 1 exports to the United States.  In 2015, Brazil exported 285 million square feet of softwood plywood to the U.S.   That volume more than doubled in 2016 to 599 million square feet and increased to 721 million square feet in 2017 and 900 million square feet in 2018.   In 2021, Brazilian plywood made up an estimated 47% of foreign plywood panels nationally in the U.S. and a substantially greater share of Florida consumption. In 2022, through February, plywood imports from Brazil are actually up from the pace in 2021, growing to 42.17 million square feet in 2022 compared to 135.97 million in the first two months of 2021.

82.     The dramatic increase in Brazilian plywood exports to the United States coincided with an equally dramatic increase in the certification of Brazilian plywood plants by PFS-TECO and TPI.  TPI had no presence in Brazil prior to July 2016, but certified no less than 15 plants in that year.  TPI certified an additional six plants in 2018.  PFS-TECO certified 14 plants, the earliest of which dates back to 2002.

83.     In the early 2000's, PFS-TECO on behalf of its Brazilian plywood clients at the time proposed to the leading standards organization in the European Union that plywood panels

produced from loblolly and slash pine in southern Brazil be treated as having the same strength and mechanical properties as those same two species grown in North America.  In PS 1-09 (the immediate predecessor to PS 1 ), extensive testing of more than 50 North American species led to the classification of those species into groups one through five, with Group 1 having the highest level of strength properties and the relative strength properties of Groups 2 through 5 moving downward in order.

84.     At the time of the PFS-TECO request, there was test data showing that the strength properties for loblolly and slash pine grown in South America fell significantly below those for the same species grown in North America.  This is a function of the fact that loblolly and slash pine grow at extraordinarily fast rates in southern Brazil.  Veneer manufactured from these fast-growing plantations is less dense and therefore not as strong as the same veneer produced from a loblolly or slash pine grown in the southern U.S.

85.     Based upon the then available data, the European Committee for Standardization refused to grant PFS-TECO's request to treat South American grown loblolly and slash pine as having the same properties as those same species grown in North America.  This also resulted in a clarification of the PS 1 standard to make clear in the 2007 edition of the standard that the Table 1 classification of species clearly segregated the strength property groups one through five according to where the trees were grown, specifically whether they were in North America or were non-North American grown species.

86.     The 2007 edition of PS 1 also established a procedure for adding new species to the species classification Table 1 in the standard.  Appendix A lays out the procedures under which new species, following extensive testing, can be added to the appropriate one of five

groups in Table 1 and thus be incorporated into the manufacture of plywood that meets the PS 1 standard.

87.     Rather than subject the loblolly and slash pines grown in southern Brazil to the necessary testing to determine which species group those South American grown species should be placed in, PFS-TECO and TPI issued PS 1 compliance certificates to 36 Brazilian plywood plants under an alternative to the use of listed and grouped Table 1 species.  This alternative set out in the PS 1 standard is performance testing.  In other words, a plywood producer in Brazil can rely on actual tests of the quality and strength properties of its plywood panels to meet the PS 1 strength properties and other standards set out in PS 1.  However, PFS-TECO and TPI failed to require and audit plywood producers in southern Brazil (in Paraná and Santa Catarina) to ensure that their performance tests comply with PS 1.

88.     Both loblolly and slash pine are tree species native to North America.  In the southern Brazil states of Paraná and Santa Catarina, these two species (which are not native to South America) grow extraordinarily fast and, unlike loblolly and slash pine trees in the U.S. South, do not put on what is referred to as strength or compression wood each winter.  In North American grown loblolly and slash pine trees, each growth ring is characterized by a lighter colored zone of faster growing wood in the spring and summer followed by a darker, narrower and much slower growing zone of wood from the late fall and winter when little to no tree growth is occurring.  It is during this slow growth time when the darkened area of a growth ring is produced that gives the tree its strength because the wood fiber that the tree adds during the late fall/winter is much denser and thus much stronger than the fast growing spring/summer wood.

89.     The average annual temperature range in the Brazilian states of Paraná and Santa Catarina dedicated to loblolly and slash pine plantations is relatively narrow compared to the average annual temperature range in the U.S. South, which results in fast growth throughout the entire year in those two states and a lack of strength or compression wood in the late fall/winter. With the exception of those relatively rare micro-sites where elevation or other topographic features produce some compression or strength wood in loblolly and slash pine trees grown in the Brazilian states of Paraná and Santa Catarina, it is simply not possible for nature to produce loblolly and pine trees in those two states that have the strength properties that will allow for the consistent and reliable production of PS 1 compliant structural plywood.  The tests performed by the APA in 2018 and then by Plaintiffs in conjunction with a major university in 2019 and a well-regarded Florida testing agency in 2021 bear this out.

**B.      Faced With Overwhelming Evidence that Their Licensee Mills Did Not Consistently Produce On-Grade Plywood, TPI and PFS-TECO Agreed to Terminate Their Brazilian Plywood Programs, Revoke their Brazilian Client Mills' PS 1 Certificates, and Support Plaintiffs' Package of Industry Reforms.**

90.     As the certifiers, inspectors and licensors of 36 Brazilian plywood manufacturing plants in southern Brazil, PFS-TECO and TPI utterly failed to perform the independent testing and ongoing quality assurance inspections that these organizations should have conducted to make certain that the plywood panels produced by their former Brazilian clients in fact met the stiffness requirements of the PS 1  standard.

91.     APA-The Engineered Wood Association, which has long been the premiere plywood certifying organization in the world, had reason to suspect that it was impossible for plywood produced from loblolly and slash pine grown in southern Brazil to consistently meet the bending and stiffness requirements of the PS 1 standard.  This led the APA in 2017 and 2018 to

29

secure Brazilian PS 1 stamped panels from a variety of producers and to test whether those panels met the PS 1 requirements for bending stiffness and maximum deflection.

92.     In a Product Advisory issued in June 2018, the APA found that 100% of the Brazilian panels secured from nine mills operated by seven different Brazilian manufacturers failed both standards by significant margins.  The Brazilian panels failed the bending stiffness strength requirement by margins of 23% to 55% and failed the maximum deflection requirement by margins of 15% to 41%. PFS-TECO and TPI rejected the findings of the 2018 APA Product Advisory, published letters falsely defending their programs and their Brazilian client mills' PS 1 compliance, and even went so far as to recertify 29 Brazilian plywood plants in the first four months of 2019.

93.     PFS-TECO and TPI's conduct led to a major lawsuit, the Related Litigation, against them seeking preliminary and permanent injunctive relief. In the course of that lawsuit, which is currently near its end, plaintiffs developed and presented an overwhelming body of evidence demonstrating that the PFS-TECO and TPI's Brazilian licensees were simply incapable of consistently producing on-grade PS 1 plywood from the local plantation-grown pine species available to them. That evidence is briefly summarized in the following paragraphs.

94.     First, Plaintiffs commissioned Clemson University to perform testing of Brazilian PS 1 stamped panels for compliance with that standard. The testing performed by Clemson University involved over 100 panels from nine different plywood plants in southern Brazil operated by a total of six companies.  Of the nine plants, two were certified by PFS-TECO and seven by TPI. The two PFS-TECO certified plants were the Abrores Mill No. 296, where the testing showed a 75% failure rate, and the Guararapes Mill No. 52, which had a 56.25% failure

rate. The Brazilian plywood plants certified by TPI involved in the testing performed on behalf of Plaintiffs included the following companies, mill numbers and testing failure rates:

1. Conply Mill, No. 264 – 100% failure rate;

2. Madeireira EK, Mill No. 312 – 75% failure rate;

3. Miraluz Mill, No. 365 – 56.6% failure rate;

4. Miraluz Mill, No. 365 – 85% failure rate;

5. Sudati Mill, No. 297 – 73.6% failure rate;

6. Sudati Mill, No. 279 – 4.5% failure rate; and

7. Sudati Mill, No. 256 – 95% failure rate.

95.     Confronted with the Clemson and APA testing, TPI and PFS-TECO asserted various scientifically bankrupt criticisms including that these two laboratories lacked laboratory accreditation and that they supposedly performed the "wrong test." In response, Plaintiffs in 2021 commissioned another round of testing performed at a third independent laboratory, Blackwater Testing Services. This testing was specifically designed to address the challenges raised by PFS-TECO and TPI's hired experts, in order to determine whether the APA and Clemson test results would be corroborated after controlling for the alleged defects. The answer was a resounding yes. The Blackwater testing showed 50% failure rates on the uniform load test performed on a vacuum table to measure panel deflection.

96.     The unequivocal and unanimous findings of the APA, Clemson University, and Blackwater were further corroborated by extensive evidence produced by TPI and PFS-TECO during discovery. That evidence included the results testing performed by TPI on panels produced by two Brazilian mills (Sudati and Conply) and purchased from 84 Lumber in Florida in August 2018, that showed overwhelming failure rates consistent with those found by the APA,

Clemson, and Blackwater. It also included extensive email correspondence among top executives at both companies discussing a number of corrupt practices including granting interim approvals and permitting the Brazilian mills to game the qualification system by cherry-picking their own preferred panels for qualification testing. PFS-TECO and TPI's own evidence left no doubt that the qualification testing performed by these agencies and the resulting PS 1 certifications were completely bogus.

97.     After reviewing the voluminous evidentiary record, Plaintiffs' expert witnesses Ron Anthony and Dr. Todd Shupe opined unequivocally that PFS-TECO and TPI's Brazilian plywood programs were scientifically bankrupt, and that their licensee mills were incapable of consistently producing on-grade PS 1 plywood from non-native loblolly and slash pine. For example, Mr. Anthony, a wood scientist with 40 years of experience, opined unequivocally that:

> Brazilian plywood producers in the states of Paraná and Santa Catarina, Brazil, which make up 100% of the Brazilian mills certified and inspected by TPI and PFS-TECO, have consistently failed to produce PS 1-09-compliant plywood manufactured from the species from which they produce plywood for sale in the U.S. market.

98.     Likewise, Dr. Shupe, the most widely published expert on the mechanical properties of southern yellow pine, analyzed the literature on the density of pine grown in Brazil and concluded that the silvicultural practices and growing conditions in Brazil led to significantly less dense pine than those grown in the United States. From Dr. Shupe's opinion (which correlated strongly with his own experience), Mr. Anthony concluded that, given the nature of the resource in Brazil, Brazilian pine plywood generally would fail to satisfy the PS 1 standard at rates similar to those found by the APA, Clemson, and Blackwater.

99.     Faced with this mountain of evidence and an impending jury trial on Plaintiffs' Lanham Act claims, PFS-TECO and TPI ultimately were left with no reasonable choice but to

completely capitulate by revoking the false PS 1 certifications issued to their Brazilian client mills and terminating their Brazilian plywood programs. TPI terminated its program on August 31, 2021. PFS-TECO held out longer in hopes of defeating Plaintiffs' claims based on various technical but fatally flawed legal arguments. Shortly after this Court rejected every one of PFS-TECO's arguments in an exceptionally thorough 77-page opinion denying its motion for summary judgment, however, PFS-TECO stipulated to the entry of a permanent injunction requiring the immediate revocation of all of its Brazilian client mills' PS 1 certificates and terminating its Brazilian plywood program.

100.   In addition to their market exit, PFS-TECO and TPI both now support a package of industry reforms presented by Plaintiffs to the PS 1 Standing Committee to increase certifier oversight and mitigate the risk that the false advertising scheme facilitated by these two companies can continue undetected in the future. Among other things, these reforms include the creation of a new organization similar to the American Lumber Standard Committee created pursuant to the PS 20 Product Standard, which governs structural lumber in the U.S. This organization would be empowered, pursuant to contracts with each of its certification, inspection and testing agencies, to conduct unannounced field examinations at any of its agency's licensee plants or to facilitate and conduct surveillance check inspections in U.S. ports, storage facilities, distribution yards and retail establishments. The proposed injunction to which PFS-TECO has stipulated includes an express finding that the "creation of such an oversight accrediting agency is necessary to make the efficacy of the certification and quality control system supporting the PS 1 Product Standard governing structural plywood sold in the U.S. comparable to the PS 20 Product Standard governing structural lumber in the U.S."

33

**C.**    **After TPI and PFS-TECO Agree to Terminate Their Brazilian Plywood Programs, FII Steps in to Seamlessly Continue Facilitating the Brazilian Mills' Massive False Advertising Scheme.**

101.    The departure of PFS-TECO and TPI from southern Brazil should have marked the end of a years' long counterfeiting scheme that has corrupted the U.S. structural plywood and exposed countless American consumers to an unreasonable risk of property damage and bodily harm. Regrettably, however, the opportunity for a quick profit has proved sufficiently motivating to entice a new unscrupulous certifier to step into the vacancy left by TPI and PFS-TECO's departure. Like TPI and PFS-TECO, FII is a for-profit corporation, which is a very unusual characteristic for a U.S. organization acting as a certification and inspection agency certifying building products in the United States.

102.    Until recently, FII was a virtually unknown entity in the U.S. wood products industry. FII did not obtain accreditation under ISO/IEC 17065 to certify PS 1 plywood until December 2020. There is no evidence that FII had any prior experience with plywood whatsoever or that it had ever certified a single plywood mill before TPI's departure from Brazil as of August 31, 2021. FII did not even apply for a federal trademark on its grade stamp until September 2021. Yet in the past six weeks, FII has certified no less than 18 mills to the PS 1 standard – every one of which is located in the southern Brazilian states of Paraná and Santa Catarina and a former licensee of either TPI or PFS-TECO.

103.    The virtually overnight recertification of these 17 mills by FII is a transparent and complete sham. There is no evidence that FII has the ability or resources to independently perform any of the multiple tests required to qualify a plywood product as meeting PS 1's requirements. FII is not an accredited testing agency under ISO/IEC 17025. Instead, FII appears to have partnered with a laboratory, Forestwood Laboratorio De Analises De Compensados

LTDA located in Curitiba, Brazil. But this Brazilian laaboratory itself is not accredited to perform the majority of tests required to qualify plywood to the PS 1 standard. Rather, it is accredited to perform just four tests – Moisture Content, Glue Bond Vacuum Pressure Test, Glue Bond Boiling Test, and Flexure Testing – that are required for PS 1 *surveillance* testing.

104.    FII's lack of ISO/IEC 17025 accreditation and apparent reliance on a sister company laboratory that also lacks the required accreditation strongly indicates that FII issued PS 1 certificates to its 17 Brazilian client mills without performing any qualification testing whatsoever. Instead, FII appears to have simply "grandfathered" the qualification tests performed under TPI and PFS-TECO's unreliable and scientifically bankrupt certification schemes.

105.    Section 6.2.1 of ISO/IEC 17065 (the applicable standard that governs accredited certification bodies) provides that when a certification body performs testing activities with resources directly under its control, it shall "meet the applicable requirements of ISO/IEC 17065." In the alternative, under section 6.2.2, the certification agency may outsource evaluation activities only to bodies that "meet the applicable requirements of the relevant International Standards," which for testing include the applicable requirements of ISO/IEC 17025. Section 7.4.5 further provides that the certifier may "only rely on evaluation results related to certification completed prior to the application for certification, where it takes responsibility for the results and satisfies itself that the body that performed the evaluation fulfils the requirements contained in 6.2.2."

106.    As addressed above, both FII and FPLA lack the required ISO/IEC 17025 to perform the full battery of qualification tests. This shows that FII almost certainly relied on grandfathered qualification testing performed by TPI and PFS-TECO. This is a clear violation of

ISO/IEC 17065 Section 7.4.5 because, as explained in detail above and demonstrated by the evidence presented in the Related Litigation, there is no reasonable basis whatsoever to rely on qualifications performed by PFS-TECO and TPI under their defective programs. Indeed, TPI itself *expressly revoked* the PS 1 certificates it issued pursuant to the qualification tests that FII has apparently relied on to issue its own certifications. PFS-TECO's own certifications based on its qualification testing face imminent revocation as well.

107.    Defendant FII, despite knowing that its Brazilian plywood mill licensees secured their original certifications to produce PS 1 grade structural plywood from PFS-TECO and TPI through fraud, has actively facilitated the shipment of falsely advertised PS 1 grade Brazilian plywood into U.S. markets by simply ignoring damning evidence of below-grade production by their Brazilian plywood mill licensees.

108.    In addition, as an inspection body accredited by A2LA, FII is required to conform to International Standard ISO/IEC 17020.  Defendant FII is violating the ISO/IEC 17020 standard without A2LA penalizing it in any fashion. Specifically, ISO/IEC 17020 Section 4.1.2 requires an inspection body to be "responsible for the impartiality of its inspection activities and shall not allow commercial, financial or other pressures to compromise impartiality."  FII is in blatant violation of this standard because it is allowing its for-profit character to dramatically undermine its obligation to undertake the sort of rigorous inspection program that would assure that its Brazilian client mills were producing on-grade PS 1 structural plywood.

109.    In short, like PFS-TECO and TPI before it, FII has no reasonable basis to believe that its Brazilian licensee mills produce plywood that consistently meets the PS 1 standard. To the contrary, FII knows (or at minimum, in the exercise of reasonable care should know) that its client mills were improperly qualified in the first instance and are incapable of producing

structural plywood that is consistently on-grade. Like its predecessor certifiers, FII is knowingly participating in a scheme to defraud U.S. consumers and devalue plaintiffs' products by facilitating the continued influx of counterfeit PS 1 plywood from southern Brazil into the United States. The fraudulent PS 1 certificates issued by FII to its 17 client mills should be immediately revoked.

### D.   As FII's Accreditor, A2LA is Also Responsible for Facilitating the Brazilian Mills' False Advertising Scheme.

110.   A major contributing factor to the massive quality control failure is the fact that FII is accredited by A2LA, an organization that employs fundamentally deficient and weak procedures in its accreditation of certification and inspection agencies.  The failure of A2LA to exercise serious and rigorous oversight has enabled FII to knowingly facilitate false advertising by its 17 Brazilian licensees. As a result, huge volumes of off-grade structural plywood that is stamped as PS 1 compliant continue to enter the U.S. and specifically, the Florida market, both endangering human health and safety in an earthquake or hurricane and threatening the long-term viability of the U.S. plywood industry that consistently manufactures on-grade structural plywood.

111.   Upon information and belief, A2LA has no staff with any expertise in engineered wood products such as plywood, accredits FII every using minimal audit procedures, and does not perform any inspections of its own of the Brazilian plywood licensees of FII. Worse, A2LA accredited FII as a certifier of PS 1 plywood despite the fact that FII lacks the ability and accreditation to perform the full battery of PS 1 qualification testing.

112.   As an accreditation body, A2LA must conform to International Standard ISO/IEC 17011.  Section 6 of that standard requires A2LA to conduct the oversight function that underlies the accreditation process with reasonably competent personnel.  A2LA is in blatant violation of

the relevant ISO/IEC 17011 standards governing the competence of its oversight and accreditation personnel as alleged below.

113.    ISO/IEC 17011 Section 6.1.1 states:

The accreditation body shall have processes to ensure its personnel have appropriate knowledge and skills relevant to the accreditation schemes and geographic areas in which it operates.

Absent personnel on the A2LA staff with adequate knowledge of plywood manufacture in the U.S. or in Brazil, A2LA is in blatant violation of the above standard.

114.    ISO/IEC 17011 Section 6.1.3.3 states:

The accreditation body shall identify training needs and shall provide access to specific training to ensure all personnel involved in accreditation processes are competent for the accreditation activities they perform.

Upon information and belief, A2LA has blatantly failed to identify, let alone provide, the necessary training required to enable its personnel to competently perform their oversight function in accrediting FII a certifier of PS 1 structural plywood.

115.    On its website, A2LA promotes its accreditation services on a webpage that includes the following quotes:

Accreditation is synonymous with both the quality and competence of an organization, based on international standard(s). Accreditation refers to the recognition given to an organization by an authoritative body such as A2LA. It is a process by which an authoritative body gives formal recognition that a Conformity Assessment Body (CAB) fulfills specified requirements and is competent to carry out specific tasks.

And:

Accreditation is the most appropriate way to ensure an organization's competence to perform a specified task. By encompassing the human element of the CAB, end-users can be sure that their data is accurate and dependable. A2LA is a third-party body that performs accreditations to various international standards, ensuring an unbiased and objective evaluation of your organization's functions.

A2LA's accreditation procedures, at least as they pertain to FII, are so deficient that these certificates constitute false advertising of the competence and performance of FII as an inspection and certification agency to the detriment of visitors to the A2LA website including Floridians.

116.    The shockingly weak accreditation procedures of A2LA for product certification and inspection agencies like FII stand in stark contrast to the system that governs the production and sale of structural grade lumber sold in U.S. lumber markets.  Every one of the 17 inspection agencies licensing grade stamps and performing regular inspections of both U.S. and foreign producers of structural lumber bearing the relevant grade stamp is certified by the American Lumber Standard Committee, Inc. ("ALSC").

117.    ALSC is a nonprofit corporation that, unlike A2LA, maintains a significant staff that has deep knowledge of lumber production and the details of all of the lumber grades which ALSC's accredited inspection agencies inspect and certify through licensing agreements with U.S. and foreign sawmills.  The ALSC staff includes multiple experienced lumber inspectors.

118.    On a twice-per-year basis, the ALSC staff randomly selects a 10% sample of the sawmills certified by each of the lumber inspection agencies that it accredits such as Plaintiffs. Pursuant to ALSC policy, the randomized sample of 10% of each accredited inspection agency's mill members every six months is designed to ensure that ALSC visits all of the its members' sawmill licensees within a two and one-half to three year time frame.  ALSC inspectors then travel to the randomly selected sawmills on an unannounced basis and perform an inspection that includes the grading of randomly selected packages of that sawmill's lumber production to determine whether it is on-grade.  The ALSO also performs inspections alongside the inspectors

of its accredited agencies to make certain that these agencies are performing their critically important quality control function in a thorough and professional manner.

119.    In addition, ALSC inspectors regularly visit lumber retailers such as Home Depot and Lowe's to verify that lumber bearing the PS 20 structural grade stamp of one of its accredited lumber inspection agencies is in fact on-grade.  The ALSC staff also has the authority to randomly inspect imported lumber production at U.S. ports of entry that has been produced by European companies that have been licensed to produce structural grade lumber.

120.    In 2017, it was ALSC inspectors who uncovered significant levels of off-grade structural lumber being sold into the United States by several unscrupulous European sawmills who were then licensed to produce lumber meeting certain U.S. structural grades by one of the ALSC's accredited inspection agencies, the West Coast Lumber Inspection Bureau ("WCLIB"). The ALSC immediately demanded that the WCLIB take multiple steps to stop the flow of off-grade structural lumber into the United States.  When the WCLIB failed to meet ALSC's expectations, the organization was served with notice of a hearing at which the ALSC Board of Review would consider suspending the WCLIB's accreditation, which would have put a more than 60-year accredited agency of the ALSC out of business.  The WCLIB responded on multiple fronts and defended its prior efforts.  Ultimately, the ALSC did not suspend the WCLIB's accreditation, but did impose a one-year probation with conditions in May 2018 that the WCLIB successfully met.

121.    If a quality control regulatory system like that of the ALSC and its accredited lumber inspection agencies inspecting structural lumber sold in the United States existed with respect to structural plywood sold into U.S. markets, there is no question that advertising and sale of off-grade PS 1 stamped structural plywood would never have occurred. For this reason,

Plaintiffs have proposed the creation of such an organization to the PS 1 Standing Committee as part of a package of reforms aimed at permanently closing the gateway for huge volumes of off-grade structural plywood from Brazil flowing into U.S. markets which are the proximate cause of the damages that the Plaintiffs and Florida consumers have incurred. Importantly, PFS-TECO, TPI, and their accreditor, IAS, have all agreed to support these reforms.

122.    Although an ALSC-type system clearly warrants adoption by the PS 1 Standing Committee, which has the authority to do so, this potential improvement to the efficacy of the PS 1 standard in no way excuses A2LA from failing to conform its conduct to the governing ISO/IEC 17011 standard.

## X.    SUMMARY OF THE CASE.

123.    As a direct result of the systemic failure of FII as a PS 1 certifier, licensor and inspection agency, and its accreditor A2LA, Florida residents who live and work in or around buildings that incorporate falsely advertised PS 1 panels are exposed to the risk of serious injury or death because substantially off-grade Brazilian panels will fail in a hurricane, major wind storm or seismic event, due to the manufacture of each with veneer with inferior strength and mechanical properties.

124.    The importation of off-grade Brazilian structural plywood into the United States has increased substantially during the period of 2015 to the present.  The low prices charged for these off-grade Brazilian plywood products masquerading as PS 1 structural plywood have depressed the price of PS 1 structural panels in the United States below the prices that would prevail in a competitive market uncorrupted by cheap, counterfeit plywood that does not meet the PS 1  standard.

125.     The massive false advertising scheme that for years was facilitated by PFS-TECO and TPI should have ended with these certifying agencies' agreements to terminate their Brazilian plywood programs and the revocation of the PS 1 certificates that were fraudulently issued to dozens of plywood mills in Parana and Santa Caterina under those programs. Instead, the corrupt and scientifically bankrupt practices of FII and its accreditor, A2LA, have allowed the flow of off-grade plywood into the United States to continue unabated.

126.     Immediate and permanent injunctive relief is necessary to stop the importation of off-grade Brazilian plywood panels into U.S. markets from southern Brazil (Paraná and Santa Catarina).   Plaintiffs request that this Court enter preliminary and permanent injunctions requiring FII to revoke each of the certificates that it has issued to 17 plywood plants in southern Brazil that are falsely advertising their plywood panels as meeting the PS 1 standard and prohibiting A2LA from continuing to accredit FII as a certification and inspection agency serving the plywood industry in southern Brazil.

127.     Plaintiffs have hired the undersigned law firm to represent them in this matter and are obligated to pay their attorneys a reasonable fee for their services.

128.     All conditions precedent to the filing of this lawsuit have been performed, have occurred or have been waived.

## XI.     FIRST CLAIM FOR RELIEF

### Contributory False Advertising in Violation of the Lanham Act

### (Against Defendant FII)

129.     Plaintiffs reallege paragraphs 1 through 128.

130.     Beginning in or around April 2022, Defendant FII has certified and licensed producers of structural plywood in southern Brazil (the states of Paraná and Santa Catarina)

operating 17 plywood mills to stamp that plywood as complying with the PS 1 structural standard when it knew or should have known that none of these producers could consistently and reliably produce PS 1 compliant structural plywood from the loblolly and slash pine plantations growing in southern Brazil.

131.    Defendant FII made false statements of fact through certifications that authorized 17 Brazilian plywood producers to export plywood into Florida that FII knew or should have known did not meet the PS 1 structural grade standard.

132.    Defendant FII's misrepresentations of fact through false advertising were material because they were likely to influence purchasing decisions by builders and consumers who relied on the PS 1 stamp as warranting the fitness of the Brazilian plywood as meeting building code requirements for structural applications in residential and commercial construction including south Florida's rigorous building standards.  In fact, due to the extraordinarily fast-growing character of the loblolly and slash pine resource available to the Brazilian plywood producers in southern Brazil, it is not possible to consistently and reliably produce on grade PS 1 compliant structural plywood.

133.    Defendant FII's false statements persisted throughout the entire transit of off-grade Brazilian PS 1 stamped plywood from its point of departure in Brazil, through its ocean transit, through its delivery to a Florida port and then in interstate commerce throughout delivery to a retail outlet or distributor and then to the ultimate buyer, typically a builder or consumer.

134.    As a direct result of Defendant FII's actions, the Plaintiff companies, each of which sells PS 1 structural plywood on a nationwide basis including in Florida, suffered loss of sales of PS 1 plywood throughout the United States that were diverted to the purchase of off-grade Brazilian plywood imports that were falsely advertised as meeting the PS 1 standard.

43

135.    The actions of Defendant FII in certifying or authorizing the certification of plywood plants in southern Brazil to produce PS 1 structural plywood when in fact none of these plants could reliably and consistently produce on-grade structural plywood for the U.S. market has caused and will continue to cause substantial economic loss and damage to each of the Plaintiffs manufacturing consistent on-grade PS 1 structural plywood.

136.    Plaintiffs currently estimate that the massive volumes of off-grade plywood flowing into U.S. markets from southern Brazil since September 2021 have resulted in at least a $50 per 1,000 square feet average drop in the market price for PS 1 structural plywood in the United States.  On a collective basis, the nine U.S. plywood producers who are Plaintiffs in this action produce approximately 1.2 billion square feet of PS 1-09 structural plywood annually.

137.    At a $50 average loss per 1,000 square feet resulting from the massive false advertising of off-grade Brazilian plywood that was aided, abetted, and facilitated by Defendant's wrongful actions as alleged above, Plaintiffs have suffered losses of approximately $15 million in each of the nearly three quarters dating back to October 1, 2021.  Of these losses, approximately 72% is attributable to plywood certified by FII based on its relative market share before the imminent departure of PFS-TECO as a PS 1 plywood certifier in southern Brazil. Until appropriate injunctive relief is issued requiring Defendant FII to revoke its certifications of Brazilian plywood producers to manufacture PS 1-09 structural plywood, Plaintiffs will continue to suffer damages and irreparable harm in the form of lost market share and the devaluation of their products. By the anticipated June 2023 trial date in this case, plaintiffs conservatively estimate that they will have suffered approximately $105 million in damages, with the exact amount to be proven at trial.

138.    Because this is an exceptional case, where FII has acted in the face of overwhelming publicly available evidence that its certification of the Brazilian plywood mills violates the Lanham Act, Plaintiffs are entitled to an award of exemplary damages as well as an award of their reasonable attorney's fees incurred in prosecuting this action.

## XII.   SECOND CLAIM FOR RELIEF

### Direct False Advertising in Violation of the Lanham Act

### (Against All Defendants)

139.    Plaintiffs reallege paragraphs 1 through 128.

140.    As alleged above, FII has repeatedly made false statements of fact by issuing certificates to plywood producers in southern Brazil representing that those companies regularly and consistently produce plywood meeting the PS 1 structural grade that is plainly referenced in the grade stamps that FII licenses to Brazilian plywood producers.  FII's misrepresentations of fact – that the Brazilian plywood producers claiming to produce on-grade PS 1 compliant plywood – were material because they were likely to influence purchasing decisions by builders and consumers who relied on the FII certification marks as demonstrating that plywood bearing the PS 1 grade stamp and the FII certification mark met the grade standard.

141.    Since December 2020, Defendant A2LA has certified FII as a certification and inspection agency authorized to provide quality assurance inspection and product certification services to plywood manufacturers certified to produce PS 1 structural grade plywood.

142.    As alleged above, A2LA made false statements of fact by issuing certificates to FII accrediting it as a certification and inspection agency qualified to provide quality assurance inspection and product certification services when it would not have qualified for that accreditation if A2LA had applied the applicable standards in a competent and professional

manner.  A2LA's misrepresentations of fact – that FII was technically competent to provide quality inspection and certification services related to licensees producing structural plywood – were material because they were likely to influence purchasing decisions by builders and consumers who relied on the A2LA accreditation mark as demonstrating that FII fully complied with the relevant standards governing its activities.

143.    The false statements of FII and A2LA persisted throughout the entire transit of off-grade Brazilian PS 1 stamped plywood from its point of departure in Brazil, through its ocean transit, through its delivery in substantial quantities to Florida and other U.S. ports and then in interstate commerce throughout delivery to a retail outlet or distributor and then to the ultimate buyer, typically a builder or consumer.

144.    As a direct result of Defendants' actions, the Plaintiff companies each suffered damages as alleged above.

145.    Under the circumstances, Plaintiffs are entitled to an award of exemplary damages as well as an award of their reasonable attorney's fees incurred in prosecuting this action.

146.    Until appropriate injunctive relief is issued requiring FII to revoke its certifications of Brazilian plywood producers to manufacture PS 1 structural plywood and/or requiring A2LA to revoke its accreditation to act as a certification and inspection agency related to structural plywood produced from southern Brazil, Plaintiffs will continue to suffer damages which are presently estimated to total $105 million as of a June 2023 trial, with the exact amount to be proven at trial.

## XIII.  **THIRD CLAIM FOR RELIEF**

### Negligence

### (Against All Defendants)

147.    Plaintiffs reallege paragraphs 1 through 128.

148.     Defendant FII was negligent in the following particulars:

   a.      Failing to perform rigorous and regular independent testing of southern Brazilian plywood producer licensees, which would have revealed their false advertising;

   b.      Failing in the face of the overwhelming evidence presented in the Related Litigation against PFS-TECO and TPI to rigorously investigate and then to take steps to revoke the certifications for southern Brazilian producers of noncompliant PS 1 structural plywood; and

   c.      Relying on the grandfathering of unreliable qualification testing performed by PFS-TECO and/or TPI to support the issuance of PS 1 certificates.

149.    The negligence of Defendant A2LA created an environment that facilitated the intentional and/or negligent actions of FII as alleged above in the following particulars:

   a.      Failing to have any A2LA staff personnel with expertise in engineered wood products such as plywood;

   b.      Failing to utilize robust auditing procedures in accrediting FII as a certification and inspection agency authorized to license plywood mills to produce structural grade plywood;

   c.      Failing to independently investigate the reasons for the extraordinarily high failure rates found by testing performed by the APA, Clemson University, Blackwater, and TPI of panels produced by several of FII's Brazilian plywood licensees; and

   d.      Accrediting FII pursuant to ISO/IEC 17065 to certify plywood to the PS 1 standard when FII lacks the ability and accreditation to perform all of the required qualification tests required by the PS 1 standard.

47

150.    The certification, accreditation and licensure actions of Defendants alleged above have resulted in the continued import into the United States of massive quantities of off-grade structural plywood stamped as meeting the PS 1 grade standard by 18 plywood mills in southern Brazil (Paraná and Santa Catarina) when in fact none of these plants can reliably and consistently produce on-grade structural plywood for the U.S. market.   These massive flows of off-grade Brazilian plywood into the U.S. have caused and will continue to cause substantial economic loss and damage to each of the Plaintiffs manufacturing consistent on-grade PS 1  structural plywood.

151.    As a direct result of Defendants' actions, the Plaintiff companies each suffered damages as alleged above. Until appropriate injunctive relief is issued requiring FII to revoke its certifications of Brazilian plywood producers to manufacture PS 1  structural plywood and/or requiring A2LA to revoke its accreditation to act as a certification and inspection agency related to structural plywood produced from southern Brazil, Plaintiffs will continue to suffer damages presently estimated at $105 million through June 30, 2023 which will be specifically proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this court award the following relief:

1.    For preliminary and permanent injunctions requiring FII to immediately revoke the certifications of its Brazilian licensees to manufacture PS 1 structural plywood and requiring A2LA to revoke its accreditation of FII to provide PS1 product certification and inspection services to Brazilian plywood mills;

2.    On their First Claim for Relief, for an award of damages FII in the amount of single damages estimated at $105 million, which will be specifically proven at trial;

3.    On their Second Claim for Relief, for an award of damages against Defendants, jointly and severally, in the amount of single damages established at $105 million, which will be specifically proven at trial;

4.    On their Third Claim for Relief, for an award of damages against Defendants, jointly and severally, in the estimated amount of $105 million, which will be specifically proven at trial;

5.    For an award of prejudgment interest on all damages awarded;

6.    For an award of Plaintiffs' reasonable attorney's fees and costs incurred herein; and

7.    Granting such other and further relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiffs demand a trial by jury as to all issues triable of right by a jury.

Date: May 23, 2022.

Respectfully Submitted,

**NICKLAUS & ASSOCIATES, P.A.**
*Attorneys for Plaintiffs*
4651 Ponce de Leon Boulevard, Suite 200
Coral Gables, Florida 33146
Telephone:  (305)460-9888
Facsimile:   (305)460-9889


By: *s/ Edward R. Nicklaus*
**EDWARD R. NICKLAUS, ESQ.**
Florida Bar No.:  138399
edwardn@nicklauslaw.com


**HAGLUND KELLEY LLP**
*Attorneys for Plaintiffs*
2177 SW Broadway
Portland, OR 97201
Telephone:  (503) 225-0777
Facsimile:  (503) 225-1257


By:*s/Michael E. Haglund*
**MICHAEL E. HAGLUND, ESQ.**
Oregon Bar No. 772030
 (*Admitted Pro Hac Vice*)
Mhaglund@hk-law.com

49

**ERIC BRICKENSTEIN, ESQ**.
Oregon Bar No. 142852
Email: ebrickenstein@hk-law.com
(*Admitted Pro Hac Vice*)
**CHRISTOPHER T. GRIFFITH, ESQ**.
Oregon Bar No. 154664
Email: cgriffith@hk-law.com
(*Admitted Pro Hac Vice*)