**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

**Case No. 0:22-cv-60976-DSL**

U.S. STRUCTURAL PLYWOOD
INTEGRITY COALITION, an unincorporated
association, SCOTCH PLYWOOD CO., INC.,
an Alabama corporation, VENEER PRODUCTS
ACQUISITIONS, LLC, a Delaware limited
liability company doing business as
SOUTHERN VENEER PRODUCTS,
SOUTHERN VENEER SPECIALTY
PRODUCTS, LLC, a Georgia limited liability
company, HUNT FOREST PRODUCTS,
LLC, a Louisiana limited liability company,
FRERES LUMBER CO., INC., an Oregon
corporation, MURPHY COMPANY, an
Oregon corporation, SDS LUMBER LLC, a
Washington limited liability company, and
SWANSON GROUP, INC., an Oregon
corporation,

      Plaintiffs,

v.

AMERICAN ASSOCIATION FOR
LABORATORY ACCREDITATION, INC.,
a District of Columbia non-profit corporation,

      Defendant.

_____/


**DEFENDANT AMERICAN ASSOCIATION FOR LABORATORY
ACCREDITATION, INC.'S MOTION FOR SUMMARY JUDGMENT[1]**

---

[1] On March 21, 2024, A2LA filed a Motion to Exceed Page Limit for its *Daubert* Motion [DE 194] and requested an additional 7 pages for its Motion for Summary Judgment. Plaintiffs did not oppose the Motion. To date, an order has not been entered on A2LA's request.

## <u>REQUEST FOR ORAL ARGUMENT UNDER LOCAL RULE 7.1(b)(2)</u>

Defendant requests oral argument on its Motion for Summary Judgment. The principal reason for oral argument on this Motion is the complexity of the facts and legal issues raised. The oral argument for both sides is estimated to take a total of two hours.

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.      Overview ...................................................................................................................1

II.     The Parties, Plywood I, and Plywood II ....................................................................3

      a.      The Parties and Plywood I ...............................................................................3

      b.      Plywood II ........................................................................................................3

      c.      Accreditation background .................................................................................5

      d.      A2LA's Accreditation of FII ............................................................................6

MEMORANDUM OF LAW .....................................................................................................8

I.      Legal standard .............................................................................................................8

II.     Plaintiffs' claims under the Lanham Act fail as a matter of law and fact ...................8

    A.      Standing and the limits of a direct Lanham Act claim – Lexmark ....................9

      1.      Lexmark analysis ..................................................................................9

      2.      Plaintiffs lack standing under Lexmark as A2LA's accreditation of FII is beyond the reach of the Lanham Act ...............................................11

    B.      Plaintiffs cannot satisfy any of the elements of a Lanham Act claim .............13

      1.      The act of accreditation of FII does not constitute "commercial advertising or promotion." ...............................................................14

      2.      A2LA did not make a false statement .................................................16

      3.      Plaintiffs cannot prove that A2LA's accreditation of FII had a material effect on consumers' purchasing decisions .........................19

    C.      Plaintiffs contributory false advertising claim against A2LA is implausible, if not absurd, on its face .............................................................20

      1.      Plaintiffs cannot prove that FII violated the Lanham Act...................21

      2.      A2LA did not knowingly induce, or cause the conduct, or materially participate in any purported false advertising .....................................22

III.    Plaintiffs' negligence claim fails as a matter of law, as A2LA did not owe Plaintiffs a duty of care……………………………………………………………………………23

IV.     The Coalition lacks associational standing to sue on behalf of its members, and the other Plaintiffs lack standing to seek a permanent injunction...................................24

CONCLUSION ......................................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ambrose v. New England Ass'n of Sch. & Colleges, Inc.*,
   252 F.3d 488 (1st Cir. 2001) ...................................................................................24

*Armstrong v. Turner Indus., Inc.*,
   141 F.3d 554 (5th Cir. 1998) ...................................................................................27

*Baldino's Lock & Key Serv., Inc. v. Google, Inc.*, 624 F. App'x 81 (4th Cir. 2015) ...................20

*Beckwith v. Caliber Home Loans, Inc.*,
   No. 3:20-CV-00407-LCB, 2022 WL 1631972 (N.D. Ala. May 23, 2022),
   *appeal dismissed*, No. 22-12098-GG, 2022 WL 20209222 (11th Cir. Dec. 20,
   2022) ......................................................................................................................22

*Bolger v. Young Drug Prods. Corp.*,
   463 U.S. 60 (1983) ..................................................................................................14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................................8

*Citibank, N.A. v. Data Lease Fin. Corp.*,
   904 F.2d 1498 (11th Cir. 1990) ...............................................................................21

*City of Tuscaloosa v. Harcros Chemicals, Inc.*
   158 F. 3d 548 (11th Cir. 1998) ................................................................................21

*Clay Elec. Co-op., Inc. v. Johnson*,
   873 So. 2d 1182 (Fla. 2003) ....................................................................................23

*Connecticut State Dental Association v. Anthem Health Plans, Inc.*,
   591 F.3d 1337 (11th Cir. 2009) ...............................................................................25

*DeLong v. American Home Furnishings Alliance*,
   464 F. Supp. 3d 727 (E.D. Pa. 2020) .......................................................................24

*Dorsey v. Reider*,
   139 So. 3d 860 (Fla. 2014) .......................................................................................23

*Dunagan v. Illinois Inst. of Art Chicago, LLC*,
   No. 1:19-CV-00809, 2021 WL 1196494 (N.D. Ill. Mar. 30, 2021) ..........................24

*Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*,
   797 F.3d 1248 (11th Cir. 2015) ...............................................................20, 21, 22, 23

*Edward Lewis Tobinick, MD v. Novella*,
   848 F.3d 935 (11th Cir. 2017) ...........................................................................10, 14

*Enigma Software Group USA, LLC v. Bleeping Computer LLC*,
  194 F. Supp. 3d 263 (S.D.N.Y. 2016) ....................................................................16

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
  314 F.3d 48 (2d Cir. 2002) ....................................................................................16

*Foley v. Orange Cnty.*,
  No. 22-13864, 2024 WL 49134 (11th Cir. Jan. 4, 2024) .......................................22

*Foundation for Interior Design Education Research v. Savannah College of Art &
  Design*,
  39 F. Supp. 2d 889 (W.D. Mich. 1998), *aff'd*, 244 F.3d 521 (6th Cir. 2001) ...................17, 18

*Frompovicz v. Niagara Bottling, LLC*,
  313 F. Supp. 3d 603 (E.D. Pa. 2018) ....................................................................11

*Futuristic Fences, Inc. v. Illusion Fence Corp.*,
  558 F. Supp. 2d 1270 (S.D. Fla. 2008) ..................................................................15

*Gagliardi v. TJCV Land Trust*,
  889 F.3d 728 (11th Cir. 2018) ...............................................................................25

*Grieco v. Daiho Sangyo, Inc.*,
  344 So. 3d 11 (Fla. 4th DCA 2022) .......................................................................23

*Grunow v. Valor Corp. of Florida*,
  904 So. 2d 551 (Fla. 4th DCA 2005) .....................................................................23

*Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*,
  818 F. 2d 1530 (11th Cir. 1987) ............................................................................21

*Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*,
  910 F.3d 1186 (11th Cir. 2018) .............................................................................13

*Jackson v. Anheuser-Busch InBev SA/NV, LLC*,
  No. 20-CV-23392, 2021 WL 3666312 (S.D. Fla. 2021) .......................................26

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
  299 F.3d 1242 (11th Cir. 2002) .............................................................................19

*Kaufman, Englett & Lynd, PLLC v. Better Business Bureau of Central Florida,
  Inc.*,
  No. 6:12-CV-31-ORL-28KRS, 2013 WL 524931 (M.D. Fla. Feb. 13, 2013) ......15

*Keams v. Tempe Tech. Inst., Inc.*,
  110 F.3d 44 (9th Cir. 1997) ...................................................................................24

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ....................................................................8, 9, 10, 11, 13, 20, 23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................................8, 21

*Osmose, Inc. v. Viance, LLC*,
    612 F.3d 1298 (11th Cir. 2010) ...................................................................17, 19

*Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014), aff'd, 638 F. App'x 43 (2d Cir. 2016) ..........................19

*Shotz v. Cates*,
    256 F.3d 1077 (11th Cir. 2001) ........................................................................26

*Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers*,
    702 F.3d 1279 (11th Cir. 2012) ........................................................................13

*ThermoLife International, LLC v. BPI Sports, LLC*,
    No. 21-15339, 2022 WL 612669 (9th Cir. Mar. 2, 2022) .......................................11

*U.S. Structural Plywood Integrity Coal. v. PFS Corp.*,
    Case No. 19-62225-CIV (S.D. Fla. filed Sept 5, 2019) ............................3, 5, 15, 24

*Walker v. Darby*,
    911 F.2d 1573 (11th Cir. 1990) ..........................................................................8

*Warren Technology, Inc. v. UL LLC*,
    962 F.3d 1324 (11th Cir. 2020) ........................................................................18

*Warren Technology, Inc., v. UL LLC*,
    No. 1:18-CV-21019-UU, 2018 WL 10550930 (S.D. Fla. Oct. 31, 2018), *aff'd*,
    962 F.3d 1324 (11th Cir. 2020) ...................................................................18, 19

*Wilfred Acad. of Hair & Beauty Culture, Houston, Tex. v. S. Ass'n of Colleges & Sch.*,
    957 F.2d 210 (5th Cir. 1992) ............................................................................19

**Rules**

Fed. R. Civ. P. 56 ......................................................................................................1, 8

Fed. R. Civ. P. 56(a) ...................................................................................................8

Local Rule 41(a) ........................................................................................................22

Local Rule 56.1 ..........................................................................................................1

Pursuant to Federal Rule of Civil Procedure 56, Local Rule 56.1, and the Second Amended Scheduling Order [DE 170], Defendant, American Association for Laboratory Accreditation, Inc. ("A2LA"), moves for summary judgment on all of Plaintiffs' claims alleged in the Second Amended Complaint [DE 184].

## I.    <u>Overview</u>

Plywood bearing the PS 1 stamp is considered to be structural grade plywood suitable for use in the construction of buildings and homes. Plywood mills in Canada, Brazil, Chile, Uruguay, Russia, the U.S. and other countries produce PS 1 stamped plywood sold in the U.S. No authoritative body or court has ever determined that mills located in Brazil are incapable of producing PS 1 grade plywood or that they have exported inferior PS 1 plywood to the U.S. No construction failure in the U.S. has ever been attributed to the use of allegedly inferior PS 1 plywood imported from Brazil. PS 1 is a voluntary product standard promulgated by the National Institute of Standards and Technology ("NIST"). A standing committee for PS 1 ("PS 1 Standing Committee") is responsible for interpretation and for consideration of future proposals for amendments and revisions to the PS-1 Standard. PS 1 is not without controversy. There have been four different versions of it since 2000. The most recent change was in 2023, which replaced PS 1-19 with PS 1-22, after Plaintiffs petitioned the PS 1 Standing Committee for a heightened standard.

Plaintiffs are 8 U.S. mills who produce and sell PS 1 plywood. They claim that importation of PS 1 plywood from Brazil for a 16-month period from October 1, 2021, through December 31, 2022, caused a reduction in the price of their own PS 1 plywood by $75 million ("the damage period"), notwithstanding that their profits during this period were among the highest profits they had ever seen. They blame A2LA, a non-profit accreditation body, for these losses and seek to hold A2LA liable under the Lanham Act and principles of negligence.

As an accreditation body ("AB"), A2LA provides accreditation services, which is formal, third-party recognition of the competence of other organizations, which A2LA refers to as conformity assessment bodies ("CABs"), to perform specific tasks. An accredited CAB means that the CAB has demonstrated to the AB that they *are capable* of meeting the requirements of certain international accreditation standards known as ISO/IEC standards (short for International Organization of Standardization). The CAB that A2LA is alleged to have negligently accredited to the PS 1 standard is Forestwood International, Inc., ("FII"), which certified Brazilian mills as

capable of producing PS 1 grade plywood from August 2021 through February 2023. The PS 1 plywood produced by Brazilian mills bore FII's PS 1 stamp from August 2021 through February 2023. FII was dismissed *with prejudice* from this lawsuit after it withdrew its accreditation with A2LA and shut down its operations.

More on CABs and ABs in a moment. For now, it is important to know what A2LA does not do. A2LA does not sell, advertise, promote, endorse, or profit from the sales of any goods, services or products of any kind. It is in fact prohibited from doing these things by the ISO standards which govern it. A2LA charges a fee for its accreditation work (here, ≈$25k). To say A2LA (an AB) does not compete with the Plaintiff mills, which collectively generate hundreds of millions in annual sales revenues from plywood, is merely stating the obvious. That A2LA would have no plausible motive, economic or otherwise, to conspire with others responsible for the importation of allegedly substandard Brazilian plywood is also so patently obvious that it goes without saying. Plaintiffs' own Complaint fails to identify how A2LA can owe U.S. plywood mills (with which it has no relationship or connection of any kind) a duty of care to protect their financial interests.

Plaintiffs originally sought a preliminary mandatory injunction that would require A2LA to revoke FII's accreditation. But they agreed in early 2023 that their claim for such relief was moot because FII voluntarily withdrew its A2LA accreditation after A2LA suspended FII's accreditation. Yet, one of the plaintiffs—a made-for-litigation "coalition" comprised entirely of the Plaintiff mills—seeks permanent injunctive relief based on the metaphysical possibility that perhaps one day in the future, A2LA will accredit another CAB that certifies Brazilian plywood. Meanwhile, Brazilian PS 1 plywood is still imported to the U.S. by billion-dollar wood products conglomerates, which are both competitors and customers of the Plaintiffs.

What the foregoing demonstrates is that this manufactured lawsuit seeking $75 million from a non-profit AB is a show trial prosecuted in pursuit of the mills' real agenda—eliminating its Brazilian competition and, in the process, maligning and stigmatizing the good name and reputation of A2LA through a permanent injunction that unfairly calls into question its competency as an AB. But this show trial is missing important characters. Where are the Brazilian plywood mills that continue to export their product to the U.S. market? Where are the U.S. importers, like Boise Cascade, which sell by far most of the Brazilian plywood in the U.S. market and, unlike A2LA, compete with Plaintiffs? That has an obvious explanation, too. This particular show trial

requires, for purely business reasons, the omission of certain key characters, like the importers of Brazilian plywood, because these importers are also Plaintiffs' biggest customers, in addition to their direct competitors.

II.    **The Parties, *Plywood I*, and *Plywood II***

    ***a.  The Parties and Plywood I***

The instant action is substantially identical to a prior action brought by the same group of Plaintiffs (except for one that dropped out after it was acquired by Boise Cascade) against two certification bodies, PFS Corporation, d/b/a PFS-TECO ("PFS-TECO"), Timber Products Inspection, Inc. ("TPI"), and their accreditation body, International Accreditation Service, Inc. ("IAS"). *See U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, Case No. 19-62225-CIV, (S.D. Fla. filed Sept 5, 2019) ("*Plywood I*"). Generally speaking, an accreditation body accredits a certification body. A certification body certifies plywood mills. In *Plywood I*, FII's peer defendants were the certification bodies, PFS-TECO and TPI, and A2LA's peer defendant was the accreditation body, IAS. IAS is also the accreditation body for Plaintiffs' current certification body, APA. IAS settled with the Plaintiffs in February of 2020 [*Plywood I,* DE 146-1]—prior to Judge Altman's denial of Plaintiffs' motion for preliminary injunction and the remaining defendants' motions to dismiss and summary judgment. As such, Judge Altman never addressed, as part of *Plywood I,* whether Plaintiffs could state plausible claims against A2LA's peer defendant, IAS, or whether they could withstand a summary judgment motion had IAS been around to make one. In May 2021, Plaintiffs settled with TPI. *Plywood I* [DE 331]. PFS-TECO and Plaintiffs entered into a settlement agreement and stipulated injunction in May 2022. The stipulated injunction was entered on May 24, 2022. *Plywood I* [DE 465]. PFS TECO consented to entry of the Judgment, waived findings of fact and conclusions of law, and waived any right to appeal from this Judgment.

    ***b.  Plywood II***

On May 23, 2022, Plaintiffs filed a three-count Complaint against FII, a certification and inspection body, and A2LA, an accreditation body. [DE 1]. Counts II and III were against A2LA and alleged direct false advertising in violation of the Lanham Act and negligence. *See id*. On June 14, 2022, Plaintiffs filed their Motion for Preliminary Injunction requesting that the Court "require[e] defendant [A2LA] to revoke its accreditations of defendant FII . . . as a PS 1 product certification body and as a PS 1 inspection body." *See* Plaintiffs' Motion for Preliminary Injunction

[DE 30]. On November 11, 2022, Plaintiffs amended their Complaint to allege a claim against A2LA for contributory false advertising in violation of the Lanham Act. *See* [DE 99]. Again, on November 16, 2023, Plaintiffs amended their Complaint after FII was dismissed *with prejudice*. [DE 184]. The claims against A2LA arise from its accreditation of FII as an ISO/IEC 17065 product certification body pursuant to its scheme known as QMS-04 scheme for structural plywood. This accreditation permitted FII to certify Brazilian plywood mills, in accordance with their QMS-04 scheme, to the extent FII determined the mills were capable of producing PS 1 compliant plywood. FII certified certain Brazilian plywood mills to stamp plywood with the following FII stamp:



[DE 184 ¶ 15]. The mills affix the FII stamp to the plywood.

Plaintiffs are U.S. plywood manufacturers located in various states across the United States. FII was a certification and inspection body that certified plywood mills in Brazil[2] pursuant to PS 1-19. A2LA is a non-profit, peer reviewed,[3] voluntary accreditation company that accredits a wide array of roughly 4,000 organizations worldwide[4] pursuant to internationally recognized standards. [DE 58 ¶ 4]. Among the organizations A2LA accredits are Google, the National Guard, Sysco, and Tyson Foods. [DE 139 at 144:21–145:1]. It has 80 staff members, 250 contracted assessors, and roughly 250 volunteer technical experts. *Id*. at 145:21–23.

---

[2] Brazilian plywood has been imported into the United States for approximately 3 decades. [DE 139 at 66:5–10; 101:5–6].

[3] *See* [DE 139 at 146:15–148:13]. It is also peer reviewed by the NIST, which established the PS 1 Voluntary Product Standard, with respect to its ability to accredit certification bodies under ISO/IEC 17065. *Id*. at 148:5–13.

[4] A2LA accredits organizations across 50 countries. [DE 139 at 144:17–20].

### c. Accreditation background

As an accreditation body, A2LA is governed by ISO/IEC 17011, which "specifies requirements for the competence, consistent operation and impartiality of accreditation bodies assessing and accrediting conformity assessment bodies." *See* ISO/IEC 17011, § 1 [*Plywood I*, DE 61-10]; [DE 58 ¶ 6]. Accreditation is a formal recognition that an organization can perform specific tests, calibrations, certifications, etc., for which the organization has applied for and has been assessed for. [DE 58 ¶ 8].

A2LA charges a fee for its services, irrespective of whether the applicant is accredited or not. *See* [DE 139 at 151:2–11]. The fee is not tied to the CAB's revenue or performance.[5] Accreditees agree to be bound by A2LA's "R102 Conditions for Accreditation." *Id*. at 165:25–166:10; 172:1–21. As a condition of A2LA providing accreditation services and as a condition of attaining and maintaining accreditation by A2LA, the applicant must agree to various conditions, which include, but are not limited to, maintaining impartiality and integrity; claiming that it is accredited only in respect of activities for which it has been granted a scope of accreditation and which are carried out in accordance with these conditions; *not using its accreditation to imply product approval by A2LA*; and endeavoring to ensure that no certificate or report, nor any part thereof, is used in a misleading manner. *See* R-102 Conditions for Accreditation [DE 144-1]. The accreditation process is supposed to be open and transparent and is dependent on the CABs being truthful. *See id*. In instances where the CAB is not truthful, A2LA will take appropriate action. *See* [DE 72 ¶ 10].

If an organization receives accreditation, it is given an expiration date of approximately two years after the initial assessment end date, at which point a renewal assessment is performed if the organization wishes to renew its accreditation for another two-year period. *See* Statement of Fact ("SOF") ¶ 5. A2LA conducts an annual desk review at the mid-term mark of the two-year cycle. *See* A2LA's R307 [DE 58-2 ¶ IX]. A2LA's ongoing review and assessment procedures actually exceed those required under ISO/IEC 17011. *See* [DE 139 at 158:5–8].

---

[5] In fact, A2LA's corporate representative testified that his organization would regard it as a conflict of interest to take a financial interest in the performance of its accreditees since it is not uncommon for them to accredit competing organizations. [DE 139 at 151:2–9].

### d. A2LA's Accreditation of FII

On December 17, 2019, FII applied to A2LA for accreditation as a certification body pursuant to ISO/IEC 17065 and inspection body pursuant to ISO/IEC 17020. *See* [DE 58 ¶ 21]. At the time, FII held valid accreditations from IAS as a product certification body for Formaldehyde Emissions, QMS-02, and as an inspection body for Formaldehyde Emission Standards for Composite Wood Production. *Id.* ¶ 22. Therefore, FII's application to A2LA was for a transfer of those accreditations. *Id.* On March 2, 2020, FII's accreditation was accepted by A2LA. FII was up for renewal of its accreditations on September 30, 2020. A2LA performed a full renewal assessment of FII on July 14–15, 2020, and on November 30, 2020. [DE 58 ¶ 24].

On July 16, 2021, FII submitted a request for a scope expansion to add its QMS-04 Scheme for PS 1 structural plywood to its product certification body (ISO/IEC 17065) and inspection body (ISO/IEC 17020) scopes of accreditation. This scope expansion is what is at issue in this action. *Id.* at ¶ 25. FII's QMS-04 "Product Certification Scheme" is applicable to "manufacturers of structural plywood that wish to obtain third party certification that their manufacturing processes and products meet the requirements of the voluntary product standard PS 1-19." *See* Product Certification Scheme for Structural Plywood [DE 116-1 at 281]. Each request for a scope expansion is handled on a "case-by-case basis." *See* SOF ¶ 17 [DE 198-1 at 58:4–21]. Mr. McInturff detailed the reasons why A2LA determined[6] it was able to treat the request as a scope expansion. [DE 139 at 116:1–117:25, 122:16–23, 124:7–10, 157:3–12] (explaining the reasons A2LA treated the request as a scope expansion as: A2LA's history with FII dating back to 2020; A2LA's prior accreditation of FII under ISO/IEC 17065; familiarity with FII's personnel and infrastructure; knowing A2LA would be back onsite at FII in 6–8 months to conduct a full renewal assessment; and reviewing FII's QMS-04 scheme which indicated they would have contracts in place before they certified). After A2LA's review, A2LA accepted the scope expansion and added it to FII's scopes of accreditation on July 28, 2021. [DE 58 ¶ 25]. FII began to certify Brazilian mills as capable of producing PS 1 compliant plywood in August 2021.

---

[6] Heidi Phillips, the A2LA assessor used to assess FII's prior accreditation under QMS-02, who was very familiar with their management system and organization, was the assessor who made this determination. [DE 139 at 118:1–12]. Ms. Phillips has done upwards of 1,000 assessments over the last 2 years. *Id.* at 160:13–18.

FII submitted their renewal application for accreditation on April 25, 2022, during this litigation. [DE 58 ¶ 26]. A2LA conducted an onsite assessment in New York in August 2022. [DE 90-2 ¶ 7]. It also conducted onsite inspections in Brazil in November 2022. *Id*. ¶ 10; [DE 139 at 161:8–12]. A2LA's corporate representative described the renewal process as *adversarial.* [DE 139 at 161:13–162:4]. FII's consultant described the renewal accreditation process as tense and demanding. Curt Bluefeld, FII's consultant with extensive experience in the accreditation process, testified that there were a lot of arguments and tension at the recertification audit in New York. SOF ¶ 25 [DE 198-4 at 110:5–14]. Further, Charles Zimmerman, FII's principal and president, testified that A2LA put Forestwood through the "ringer" by requiring burdensome and extensive paperwork in connection with the renewal of accreditation. SOF ¶ 26 [DE 198-5 at 279:24–280:18]. The voluminous and detailed renewal files bear this out. A2LA cited 12 non-conformities. [DE 139 at 167:9–14]. After granting extensions, FII had until December 31, 2022 to close the non-conformities by providing objective evidence of compliance. *Id*. at 168:17–23. Due to its failure to correct all non-conformities by the December 31, 2022 deadline, on January 1, 2023, FII's accreditation lapsed on January 1, 2023. *See* SOF ¶ 29 [DE 198-6]. FII had until February 2, 2023 to close the remaining non-conformity or FII's accreditation would be *enforced withdrawn*, *i.e.*, involuntarily revoked. *See* SOF ¶ 30. FII eventually closed out its remaining non-conformity and its accreditation was reinstated on January 24, 2023. *See* SOF ¶ 31 [DE 198-3]. However, following depositions of FII personnel in February of 2023, A2LA suspended FII's accreditation on February 13, 2023.[7] After FII voluntarily withdrew its accreditation, effective February 27, 2023, and permanently exited PS 1 plywood certification business. Plaintiffs' then pending motion for preliminary injunction was deemed moot. [DE 147]. The Court dismissed FII with prejudice by order dated August 28, 2023. [DE 169].

---

[7] In this instance, once A2LA became aware of objective evidence (*i.e.*, deposition testimony from FII key personnel and documents mainly in the form of emails sent to or received by FII that were not provided to it during the accreditation process and only became available in discovery) that raised serious concern about whether FII violated the conditions for accreditation as set forth in R102 [DE 144-1], R307 [DE 144-2], and R301 [DE 144-3], it immediately suspended FII's accreditation. *See* [DE 144 ¶ 7] (stating, in the suspension letter, that "[t]hroughout the course of the observed exhibits and testimony on February 8, 9, and 10, 2023 by various FII Industries staff, A2LA has now received objective evidence calling into question your organization's ability to meet conditions for accreditation . . . ," which it did not receive during the accreditation assessments).

The crux of Plaintiffs' Lanham Act claims is that A2LA knew or should have known that its certificate of accreditation was false. [DE 184 ¶ 1]. Plaintiffs further allege that A2LA, despite having no role or financial stake in the sale of Brazilian plywood, is, because it accredited FII, subject to contributory liability under the Lanham Act based on FII's intentional violations of the Act. With regard to their negligence claim, Plaintiffs have never alleged how A2LA could owe them a duty of care to protect their pecuniary interests.

## MEMORANDUM OF LAW

### I.    Legal standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," and the rule "should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party bears the initial burden to demonstrate the absence of a genuine dispute of a material fact. *Id. at* 322–23. When the moving party has carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must establish a genuine dispute as to the material facts by citing to the record materials. *See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### II.   Plaintiffs' claims under the Lanham Act fail as a matter of law and fact.

As an initial matter, Plaintiffs lack standing under the Lanham Act. Thus, A2LA begins with a summary of U.S. Supreme Court case *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014), which redefines the standing test for Lanham Act false advertising claims. With this background and context, this Court will clearly see that Plaintiffs cannot satisfy *Lexmark*'s zone of interests' test and that Plaintiff plywood mills' alleged harm to their plywood prices from the importation of Brazilian plywood does not have the requisite sufficiently close connection to A2LA's accreditation of FII. Therefore, Plaintiffs' claims do not fall within the purview of the Lanham Act.

Although the holding in *Lexmark* demonstrates why Plaintiffs have no standing under the Act to sue A2LA, following the standing section, A2LA will show why Plaintiffs' inability to meet the other elements of a false advertising claim also forecloses A2LA's liability under the Act.

**A.  Standing and the limits of a direct Lanham Act claim – *Lexmark***

*1.  Lexmark analysis*

The Lanham Act was intended by Congress to redress injury from unfair competition resulting in injury to sales or reputation to persons engaged in commerce, including, as alleged here, injury proximately caused by "false advertising." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014) ("The Lanham Act includes a detailed statement of its purposes, including, as relevant here, "pro-tect[ing] persons engaged in [commerce within the control of Congress] against unfair competition" . . .  "a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."). Prior to *Lexmark,* courts were divided on whether a false advertising claim could only be brought by a defendant's direct competitor.

Lexmark is a seller of laser printers and toner cartridges that need to be periodically replaced. *Id.* at 121. With respect to the sale of replacement cartridges, Lexmark's direct competitors were third-party remanufacturers of used Lexmark toner cartridges, which directly competed with Lexmark's own sales of replacement cartridges to its customers. *Id.* The plaintiff in *Lexmark*, Static Control Components, Inc. ("Static"), was a leading supplier of the component parts that were used in the refurbished cartridges sold to Lexmark customers by cartridge remanufacturers. *Id.* Among other allegations of false advertising, Static alleged that Lexmark targeted it by sending correspondence to most of the cartridge remanufacturing companies advising them that it was illegal to sell refurbished Lexmark cartridges, and specifically that it was illegal to use Static's products to refurbish those cartridges. *Id.* at 123. When Static sued Lexmark for false advertising under the Lanham Act, Lexmark asserted that Static had no standing because the two were not in direct competition. *Id.*

The Supreme Court concluded that the zone of interests' test and a proximate cause analysis supplied the limits on who may sue under the Lanham Act. *Id.* at 137. The zone of interests' test focuses on unfair competition by those engaged in commerce and requires that a plaintiff allege that, as a result of a violation of the Act, it suffered an injury to sales or reputation by others engaged in commerce. *Id.* at 131–32. The *Lexmark* Court found the test was clearly satisfied by Static. *Id.* at 137. The question before the Court really came down to proximate cause, and whether Static's harm had a *sufficiently close connection* to Lexmark's conduct. *Id.* at 137–38.

The Supreme Court noted that the classic Lanham Act claim is where one competitor directly injures another competitor by making a false or misleading statement about its own goods (or the competitor's goods) and induces one competitor's customer to switch to the other competitor, leading to injury to its sales and/or reputation. *Id.* at 136. In some *unique* circumstances, the lost sales will equally harm others in the supply chain, as was the case with Static and their remanufacturing customers. *Id.* at 137–38. If a Lanham Act claim was rigidly limited to direct competitors (remanufacturers of replacement cartridges in the case of *Lexmark*) without consideration of the effects downstream (suppliers of the remanufacturers, like Static), then the harm from unfair competition Congress sought to address could be frustrated. *See id.* at 137. The Supreme Court concluded that a proximate cause analysis informed by the harm the statute seeks to remedy justifies extending the limits of the Act to others in the supply chain who will sustain something very close to a 1:1 relationship in the harm suffered [as the Supreme Court noted, if Static's remanufacturer clients sold 10,000 fewer replacement cartridges because of the false advertising, it logically follows that Static would sell 10,000 fewer microchips component parts to that remanufacturer for those refurbished cartridges]. *See id.* at 139. The "relatively unique circumstances" in *Lexmark* revealed that the remanufacturers were not "more immediate victims" than Static which was also specifically targeted by the false advertisement, and that the Act's proximate cause requirement was satisfied. *See id.* at 137, 140. At the same time, the Supreme Court noted that the general tendency is not to stretch proximate cause beyond the direct victim or "beyond the first step" (*e.g.*, the remanufacturers in *Lexmark*). *See id.* at 139. The reference to "beyond the first step" refers to generally barring suits on proximate cause grounds based on harm that is **"too remote"** from the alleged violator's conduct. *See id.* at 133.

False advertising under the Lanham Act requires commercial advertising by a defendant engaged in commerce which is intended to influence consumers to buy their goods (or not buy the goods of their competitors). *See Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935 (11th Cir. 2017). A2LA is not engaged in selling PS 1 plywood and it is not alleged to be trying to influence consumers' choices with respect to their purchases of PS 1 plywood. And it goes without saying that A2LA is not being sued for making false statements for the purpose of trying to influence anyone to use their accreditation services, at the expense of the Plaintiffs (who are obviously not accreditors). The harm Plaintiffs allege and attribute to A2LA is simply beyond—in fact, it is

completely disconnected from—the zone of interests that the Act protects and is too remote to satisfy the Act's statutory proximate cause requirement.

*Lexmark* focused on Static's standing under the Lanham Act, as a party one step removed from the party in direct competition (the cartridge remanufacturers) but still an immediate victim of a false statement by Lexmark. The Supreme Court did not address or analyze (or need to address or analyze) the case in terms of what constitutes a false statement or other elements of a Lanham Act claim.

### 2. *Plaintiffs lack standing under Lexmark as A2LA's accreditation of FII is beyond the reach of the Lanham Act.*

In addition to *Lexmark* (discussed in detail *supra*), *ThermoLife International, LLC v. BPI Sports, LLC*, No. 21-15339, 2022 WL 612669 (9th Cir. Mar. 2, 2022), which relies on *Lexmark*, is instructive on the issue of standing and proximate causation. ThermoLife was in the business of selling certain compounds to be used in sports nutrition supplements while BPI produced its own dietary supplements. *Id.* at *2. Citing *Lexmark,* the court concluded that proximate causation may be established when "there is likely to be something very close to a 1:1 relationship between a plaintiff's lost sales and the sales diverted to a defendant" and ultimately found that a 1:1 relationship did not exist. *Id.* (internal citation and quotations omitted). The court held that ThermoLife's allegations were too speculative to establish proximate cause because ThermoLife operated at a different level of the supply chain than BPI. *Cf. Frompovicz v. Niagara Bottling, LLC*, 313 F. Supp. 3d 603, 613 (E.D. Pa. 2018) (stating that because "there is no intervening causal agent between Defendant Land's conduct—the 'deceptive' sale to bottlers—and Plaintiff's diminished sales to bottlers . . . ," the plaintiff alleged "a viable theory of proximate harm from Defendant Land's actions").[8]

As an accreditation body, A2LA's role was limited to determining whether FII demonstrated to it that it was capable of **competently** carrying out specific tasks, which it determined in accordance with the ISO standards and its internal procedures. *See* SOF ¶ 3. ABs, like A2LA, are not oversight bodies. An AB's accreditation is in no way a guarantee that one of its accreditees is doing its job and faithfully fulfilling its role in the process that ultimately leads to the stamping of plywood by a certified mill as PS 1 compliant. *See* [DE 139 at 172:22–173:6];

---

[8]     Tort law concepts of negligence should be considered when analyzing whether there is proximate causation under the Lanham Act. *See Frompovicz*, 313 F. Supp. 3d at 613.

McInturff Declaration in Support of Response in Opposition to Plaintiffs' Motion for Preliminary Injunction [DE 58 ¶ 19] ("Outside the annual review and renewal, A2LA does not conduct ongoing review, assessment, or oversight of the accredited organization during the two-year period . . . ."). While the initial step is A2LA's accreditation of FII as a product certification body, FII is the entity certifying the Brazilian plywood mills as capable of producing PS 1 plywood and authorizing those mills to use the FII stamp as an indication that their plywood is PS 1 complaint. [DE 139 at 182:21–24, 145:24–146:2]; *see also* McInturff Declaration in Support of Reply [DE 72 ¶ 10] ("A2LA is not involved in the physical certification stamping process, including how and when the certification stamps are affixed to specific products and how, thereafter, the stamps are represented, advertised or marketed or otherwise explained to any third parties that may rely on these stamps."). Notably, as a condition of A2LA providing accreditation services and as a condition of attaining and maintaining accreditation by A2LA, the applicant (here, FII) agrees to various conditions, which include that its accreditation is carried out in accordance with the delineated conditions, is **not used to imply product approval by A2LA,** and that it will endeavor to ensure that no certificate or report, nor any part thereof, is used in a misleading manner. *See* Conditions for Accreditation R102 [DE 144-1]. A2LA does not charge royalties or financially benefit in any way from accrediting CABs like FII. [DE 139 at 150:19–151:9]; *see also* McInturff Declaration in Support of Motion to Dismiss [DE 57 ¶ 12] (emphasis supplied) ("A2LA derives **no benefit**, economic or otherwise, from the sale of plywood, including any bearing a PS-1 stamp.").

 Unlike A2LA who is clearly not in commercial competition with Plaintiffs, the Brazilian plywood mills producing PS 1 plywood (and using the FII stamp to indicate compliance with the PS 1 standard) are in direct competition with the Plaintiffs. Further, the Brazilian mills sell their goods to U.S. importers/distributors, like Boise Cascade, who is also a competitor of the Plaintiffs. SOF ¶ 40 [DE 198-9 at 11:12–21; 21:9–22:7]. Once the Brazilian plywood is imported to the U.S., companies like Boise Cascade sell the Brazilian plywood marked with the PS 1 stamp to U.S. distributors, which then may sell to wholesalers and retailers before the plywood ultimately reaches the consumers (*e.g.*, builders). The evidence is uncontroverted that the Brazilian plywood mills, the U.S. mills (including Plaintiffs) and U.S. importers/distributors, like Boise Cascade, are Plaintiffs' actual competitors—as they are both vying and competing for the same consumer dollars. To the extent any of these parties made false advertisements about PS 1 plywood from

Brazil for economic benefit or gain or knowingly enabled others to do so for their own economic benefit or gain, they would potentially fall within the ambit of the Lanham Act.[9] To the extent such parties' actions injured the sales of the Plaintiffs, they could, under *Lexmark*, be regarded as the proximate cause of any purported damages Plaintiffs suffered. *Compare* [DE 139 at 150:19–22] (Trace McInturff stating that the accreditation fee it charged FII was $25,439) *with* [DE 184] (Plaintiffs seeking $75 million dollars in damages).

Plaintiffs do not allege that A2LA's act of accreditation diverted Plaintiffs' sales of PS 1 plywood to A2LA because that would be completely absurd. It is entirely undisputed that A2LA is not in the business of stamping plywood or in the business of selling plywood. A2LA does not certify plywood; it only determined the capability of FII to act as a certification body in accordance with FII's QMS-04 scheme. SOF ¶ 42. In light of the uncontroverted facts about the role A2LA played, that it is not on any level competing with **anyone** involved in the sale of PS 1 plywood, and does not stand to lose or gain by anyone who is involved in the sale of PS 1 plywood, A2LA's accreditation could not be the proximate cause of Plaintiffs' alleged damages under the Lanham Act. A2LA is, in accordance with *Lexmark,* entitled to judgment as a matter of law that its act of accreditation of FII did not proximately cause Plaintiffs' alleged damages.[10]

### B. Plaintiffs cannot satisfy any of the elements of a Lanham Act claim.

Aside from standing, to prevail on the Lanham Act claim, Plaintiffs must establish that "(1) the defendant's statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) [the plaintiff] has been, or likely will be, injured as a result of the false or misleading statement." *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1196 (11th Cir. 2018) (quoting *Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers*, 702 F.3d 1279, 1294 (11th Cir. 2012)). In addition to these elements, the Eleventh Circuit holds that the conduct must constitute "commercial advertising or promotion." To establish "commercial advertising or promotion,"

---

[9] The purpose of this section is to merely demonstrate why A2LA does not fall within the ambit of the Lanham Act. A2LA is not suggesting these parties are committing Lanham Act violations by selling PS 1 plywood imported from Brazil.

[10] In an effort to conserve space and avoid redundancy, A2LA's arguments related to damages will only be included in A2LA's *Daubert* Motion [DE 200], which would also be dispositive of Plaintiffs' claims.

Plaintiffs must establish that the conduct constitutes "(1) commercial speech; (2) by a defendant **who is in commercial competition** with the plaintiff; (3) for the purpose of **influencing consumers** to buy defendant's goods or services; and (4) the representations . . . must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (internal citations and quotations omitted) (emphasis supplied).

A2LA details in the following sections that Plaintiffs' Lanham Act also fails because: (1) A2LA's conduct does not constitute "commercial advertising or promotion" because (a) A2LA's accreditation of FII is not commercial speech, (b) A2LA is not in commercial competition with Plaintiffs, (c) the accreditation of FII was not for the purpose of influencing consumers to buy A2LA's product, and (d) A2LA's accreditation of FII was not disseminated to the relevant purchasing public to constitute advertising; (2) A2LA's accreditation of FII was not a false statement; and (3) A2LA's accreditation of FII did not have a material effect on consumers purchasing decision. If the Court finds that Plaintiffs fail to establish **any one** of the foregoing elements, or sub-elements, Plaintiffs' Lanham Act claim fails.

> 1. *The act of accreditation of FII does not constitute "commercial advertising or promotion."*

a) A2LA's accreditation is not commercial speech. Commercial speech is "expression related solely to the **economic interests** of the speaker and its audience." *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (internal citation and quotations omitted) (emphasis supplied); *see also Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (identifying "economic motivation" as a factor to consider in determining commercial speech).

The evidence discussed *infra* reflects that A2LA's accreditation of FII was not economically motivated. *See* [DE 139 at 150:19–22] (A2LA charged a nominal ~ $25,000 fee for its accreditation work over the course of 3 years). Plaintiffs even conceded the absurdity of such a notion. Freres, the corporate representative of the Coalition, admitted that he cannot think of an economic motive or a reason A2LA would have to facilitate the importation of substandard plywood from Brazil. SOF ¶ 48 [DE 198-7 at 45:22–24]; [DE 198-2 at 32:15–25]. Therefore, the evidence demonstrates that A2LA's accreditation of FII is too attenuated and disconnected from the sale of plywood to be regarded as *commercial speech* for purposes of Lanham Act.

b) A2LA's accreditation cannot be regarded as commercial competition. Analogous to this case, in *Kaufman, Englett & Lynd, PLLC v. Better Business Bureau of Central Florida, Inc.*, No.

6:12-CV-31-ORL-28KRS, 2013 WL 524931 (M.D. Fla. Feb. 13, 2013), a law firm sued the defendants under the Lanham Act and alleged that the defendants' (the Council of Better Business Bureaus, Inc. and the Better Business Bureau of Central Florida, Inc.) representations were misleading and made in breach of the defendants' accreditation agreement with the plaintiff. The court found that the law firm and the BBB were obviously not in commercial competition with one another, and the alleged misrepresentations did not constitute "commercial advertising or promotion" under the Lanham Act. *Id.* at *4. Therefore, the court dismissed the Lanham Act claim with prejudice. *Id.* at *4 n.7.

Here, A2LA is a nonprofit corporation that "provides a wide range of accreditation services" and is quite obviously not in commercial competition with Plaintiffs. *See* [DE 58 ¶ 7]. Its competitors are other accreditation bodies like IAS. [DE 139 at 145:14–16] (Trace McInturff testifying that IAS, another accreditation body, is a competitor of A2LA). Plaintiffs, on the other hand, are in the business of selling plywood and collectively sell nearly a billion dollars a year in plywood. *See* Joint Statement of Undisputed Facts [DE 197 ¶ 2]; SOF ¶ 47. A2LA and Plaintiffs are clearly not vying or competing on any level for the same consumer dollars. Freres admitted that A2LA is not a competitor of Plaintiff, Freres Lumber Company. [DE 139 at 200:20–21]. Similarly, Medellin, on behalf of Plaintiff Southern Veneer, stated that he did not regard certification bodies like FII, which unlike A2LA, have a direct relationship with the Brazilian plywood mills, as competitors of Plaintiffs. *Plywood I*, [DE 261-1 at 66:15–20]. Because Plaintiffs are not in any form of commercial competition with A2LA, which is not in the plywood business and has no stake in it, their conduct cannot be regarded as commercial advertising or promotion and Plaintiffs' Lanham Act claim fails.

c) A2LA's accreditation of FII was not made for the purpose of influencing consumers to buy A2LA's services at the expense of Plaintiff's sales. The Lanham Act is inapplicable if the advertising was **not** made for the purpose of influencing consumers to buy the defendant's goods or services at the expense of the plaintiffs. *See Futuristic Fences, Inc. v. Illusion Fence Corp.*, 558 F. Supp. 2d 1270, 1279 (S.D. Fla. 2008). Here, there quite obviously is no evidence that A2LA accredited FII to encourage consumers of PS 1 plywood to purchase accreditation services from A2LA. It is undeniable that A2LA does not have any motivation or stake in influencing consumers of Brazilian plywood (which does not bear any A2LA identification markers) to purchase accreditation services from A2LA. SOF ¶ 51 [DE 198-7 at 45:18–24]. Nor does it have any reason

to divert PS 1 plywood sales from Plaintiffs or otherwise influence purchasers of plywood to not purchase PS 1 plywood from the Plaintiffs. [DE 139 at 151:24–152:5]; *see also* SOF ¶ 51[DE 198-7 at 46:11–21].

d) A2LA's accreditation of FII was not disseminated sufficiently to the relevant purchasing public to constitute advertising. The "touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Enigma Software Group USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 293 (S.D.N.Y. 2016) (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002)). "Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement." *Fendi USA, Inc.*, 314 F.3d at 57.

Here, it is completely illogical to suggest that A2LA's accreditation of FII was widely disseminated so A2LA (a non-profit accreditation body with no stake in plywood sales) could penetrate the plywood market. Beyond the fact that A2LA is not involved in the plywood market, the PS 1 stamp affixed to the Brazilian plywood that is being imported into the U.S. does not identify A2LA as the accreditor of FII. *See* [DE 139 at 201:9–15] (Trace McInturff testifying at the preliminary injunction hearing: "Q. That was going to be my next question is even the mills themselves, the plaintiff, don't even know who the accreditation company is because it's so far removed, correct? A. Generally, yeah. Q. **And the stamp doesn't say who the accreditation company is, correct? A. Correct.**") (emphasis supplied). Skipper, another Plaintiff representative, explained that promotion of plywood focuses on the certification body, and no one requests the name of the accreditation body. SOF ¶ 39 [DE 198-8 at 122:5–23]. In fact, Plaintiffs could neither name the accreditation body that accredited FII (*i.e.*, A2LA) nor the accreditation body that currently accredits Plaintiffs' certification body, APA (*i.e.*, IAS). [DE 139 at 210:9–15]. Thus, no reasonable jury could find that A2LA's accreditation of FII was a part of an organized campaign by it to penetrate the plywood market, and the accreditation of FII cannot be considered "commercial advertising or promotion."

2. *A2LA did not make a false statement.*

As to the first element for false advertising under the Lanham Act, the advertisement must be literally false or misleading. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010). The alleged false statement is A2LA's accreditation of FII. Specifically, Plaintiffs allege "A2LA

made false statements of fact through its issuance of accreditations under the ISO/IEC standards that FII was qualified to inspect and certify plywood to the PS 1 standard despite the fact that A2LA knew or should have known that FII lacked the required qualifications." [DE 184 ¶ 131].

The issuing of a certificate of accreditation, following the technical and laborious process of accreditation, could only be a false statement under the Lanham Act if the accreditation process was undertaken in a fraudulent manner. Accreditation is a process by which an authoritative body gives formal recognition that a Conformity Assessment Body (CAB) [like FII] fulfills specified requirements and has demonstrated to the AB that it is capable of competently carrying out specific tasks. *See* [DE 58 ¶ 8]; [DE 184 ¶ 114]. It is not a guarantee by the accreditation body that the inspection/certification body will act in conformity with the conditions within its accreditation. *See* [DE 139 at 172:22–173:6]. The accreditation is necessarily based, to a large extent, on veracity and fulsomeness of the information that the accreditee provides and trusting that the accreditee will provide full and complete disclosure. *See* Conditions for Accreditation R102 [DE 144-1]. Accreditation decisions are made on a case-by-case basis. SOF ¶ 17 [DE 198-1 at 58:4–21]. As one of the Plaintiff corporate representatives who serves on the PS 1 Standing Committee testified, the PS 1 standard requires certain discretionary calls. SOF ¶ 22 [DE 198-2 at 49:8–50:21]. So, while an AB, which does not act fraudulently or in bad faith, can make the wrong discretionary call or an error in judgment that leads to the issuance of a certificate of accreditation that, in retrospect, should not have been issued,[11] such is plainly not an actionable false statement under the Lanham Act. *See Foundation for Interior Design Education Research v. Savannah College of Art & Design*, 39 F. Supp. 2d 889, 893 (W.D. Mich. 1998), *aff'd*, 244 F.3d 521 (6th Cir. 2001) ("There is probably no area of the law where deference is as necessary is it is when a court reviews the decision of an accreditation association . . . . Accrediting associations are specifically given deference "because of the professional judgment these associations must necessarily employ in making accreditation decisions." *Id.* at 894 (internal citation and quotations omitted).

Analogous to the facts of this case, in *Warren Technology, Inc. v. UL LLC*, 962 F.3d 1324 (11th Cir. 2020), a manufacturer of heaters sued Tutco, LLC and UL LLC. UL is a Nationally

---

[11] Despite this argument regarding the deference accorded to an accreditation body, A2LA stands by its accreditation of FII based on the information it knew at the time of A2LA's accreditations and is not saying that its accreditation of FII was the wrong discretionary call or an error in judgment. And, whether or not A2LA properly accredited FII does not bear on its entitlement to judgment as a matter of law.

Recognized Testing Laboratory accredited by OSHA to certify products' compliance with safety standards. *Id.* at 1326. The plaintiff's claims were based on the allegation that, despite UL's certification of Tutco's heaters as compliant, Tutco's heaters do not comply with the UL 1995 standard. *Id.* The district court dismissed the plaintiff's claims with prejudice because the plaintiff failed to show that UL's interpretation of the UL 1995 standard or Tutco's use of the UL-granted certification mark was an actionable misrepresentation. *Id.* On appeal, the Eleventh Circuit explained that "[d]etermining the conformance of a product with a UL standard obviously requires UL to interpret the standard, just as conformance with a statute requires a court to interpret the statute." *Id.* The court stated that "[i]t does not follow . . . that even a misinterpretation of UL 1995 is a falsity—or, a 'deceptive act' within the meaning of the Lanham Act—rather than a matter of opinion . . . , provided it was made in good faith and in accordance with OSHA's criteria for independence, procedural regularity, etc." *Id.* (internal citations omitted). It was up to UL, not the competitor, "to police the mark," and "if UL failed to police its mark appropriately, then the remedy . . . would be cancellation of its mark." *Id.* at 1329. The Eleventh Circuit, therefore, affirmed the dismissal of the plaintiff's complaint with prejudice. *Id.*

The district court's analysis in the same case, *Warren Technology, Inc., v. UL LLC*, No. 1:18-CV-21019-UU, 2018 WL 10550930 (S.D. Fla. Oct. 31, 2018), *aff'd*, 962 F.3d 1324 (11th Cir. 2020), is also instructive on the issue that courts generally do not interfere with an organization's interpretation of its own voluntary standards. The Southern District of Florida in *Warren Technology* "agree[d] with Defendants that Warren has adduced no convincing authority that it has the right to challenge UL's interpretation of its own standards in the context of claims for Lanham Act false advertising, FDUTPA, and common law unfair competition." *Id.* at *8. It explained that "permitting Warren's claim to go forward **would open the floodgates** to third-party interpretation of voluntary safety standards, which would 'make the safe standard itself meaningless and untethered to any standard.'" *Id.* at *9 (internal citations omitted) (emphasis supplied). It also "would create a **dangerous precedent** in which a plaintiff could use voluntary safety standards as a **sword against its competitors** by alleging a self-serving interpretation of such standards and asserting that any other interpretation is misleading or deceptive." *Id.* at *10 (emphasis supplied); *see also Wilfred Acad. of Hair & Beauty Culture, Houston, Tex. v. S. Ass'n of Colleges & Sch.*, 957 F.2d 210 (5th Cir. 1992).

Plaintiffs admit that A2LA had no reason to act fraudulently. SOF ¶ 51 [DE 198-2 at 32:22–33:1] (Ken Pratt testifying: "Q. You have no reason, as we sit here right now, to think that A2LA defrauded Florida consumers in accrediting FII or injured plaintiffs in Florida, do you? A. I don't."). Plaintiffs cannot prove that A2LA knowingly made a false statement of fact within the ambit of the Lanham Act because A2LA's accreditation of FII is accorded great deference. Accordingly, Plaintiffs' direct false advertising claim under the Lanham Act fails as a matter of law because its act of accreditation is not literally false or misleading within the ambit of the Lanham Act.

> 3.  *Plaintiffs cannot prove that A2LA's accreditation of FII had a material effect on consumers' purchasing decisions.*

The Eleventh Circuit has explained that "[e]ven if an advertisement is literally false, the plaintiff must still establish materiality." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010). To establish materiality, the plaintiff must demonstrate that "the defendant's deception is likely to influence the purchasing decision." *Id.* (internal citation omitted). For example, a plaintiff may show that "the defendants misrepresented an inherent quality or characteristic of the product." *Id.* (internal citation omitted). Case law is clear that "[t]he materiality requirement is based on the premise that not all deceptions affect consumer decisions." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002).

Plaintiffs claim that A2LA's alleged "misrepresentations of fact," *i.e.*, the accreditation of FII, "were material because they were likely to influence purchasing decisions by builders and consumers who relied on the A2LA accreditation mark as demonstrating that FII fully complied with the relevant standards governing its activities." [DE 184 ¶ 143]. However, there is no evidence to support that any consumers *actually* relied on A2LA's **accreditation** of FII and did so in a way that caused them to purchase Brazilian PS 1 plywood, thereby injuring or diverting potential sales of Plaintiffs' PS 1 plywood. Plaintiffs have not, and cannot, identify even one consumer that was allegedly deceived by A2LA's accreditation of FII. *Plywood I* [DE 261-1 at 71:4–15]; SOF ¶ 51 [DE 198-13 at 101:24–102:9]; SOF ¶ 51 [DE 198-7 at 40:20–24]; *see also Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 419 (S.D.N.Y. 2014), aff'd, 638 F. App'x 43 (2d Cir. 2016). As such, it is complete speculation to suggest how often, if ever, consumers of plywood relied upon A2LA's **accreditation** of FII.

For the foregoing reasons, summary judgment should be granted in A2LA's favor on Plaintiff's direct false advertising claim under the Lanham Act, as the record demonstrates that, as a matter of law, A2LA did not and could not have engaged in false advertising and caused Plaintiffs' purported damages.

**C.  Plaintiffs contributory false advertising claim against A2LA is implausible, if not absurd, on its face.**

To prevail on a contributory false advertising claim, a plaintiff must prove (1) that a third party directly engaged in false advertising that injured the plaintiff; **and** (2) that the defendant contributed to that conduct either through knowing inducement, or causing the conduct, or by materially participating in it. *See Baldino's Lock & Key Serv., Inc. v. Google, Inc.*, 624 F. App'x 81 (4th Cir. 2015); *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) ("This means that the plaintiff must allege that the defendant had the necessary state of mind—in other words that it "intended to participate in" or "actually knew about" the false advertising."). The facts in *Duty Free* are instructive on the limits of a contributory Lanham Act claim, just as the facts in *Lexmark* are instructive on the limits of a direct Lanham Act claim.

In *Duty Free,* DFA, which operated duty free stores in airports, claimed it was harmed by Estee Lauder's refusal to do business with it, which impeded DFA's ability to bid for tenant space in airports. 797 F.3d  at 1256. It further alleged that its direct competitors seized on DFA's lack of a relationship with Estee Lauder, while touting their own relationships with Estee Lauder, in competing for store space at various airports. *Id.* at 1257. The alleged false advertisement consisted of DFA's competitors making this point—that Estee Lauder did not do business with DFA but did business with them—to the airport authorities who were the ones to select which duty-free merchant would be awarded a lease at the airport. *Id.* at 1267. DFA asserted a contributory Lanham Act claim against Estee Lauder, seeking to hold Estee Lauder liable for the alleged false statements made by DFA's competitors about its lack of relationship with Estee Lauder. *Id.* at 1274.

The Eleventh Circuit addressed, as a matter of first impression, whether the Lanham Act includes within its ambit a contributory liability claim, which it noted was a judicially developed doctrine. *Id.* at 1274. After noting that the Lanham Act creates a federal cause of action for unfair competition, it examined, among other things, the purpose of the Act and found that it does provide for contributory liability when a third party directly engaged in false advertising and the defendant

*knowingly* induced or participated in disseminating the false advertisement. *Id.* at 1275. The Eleventh Circuit recognized that this determination would necessarily examine the extent to which plausible inferences could be drawn from the facts alleged about the defendant's intent and motivation to *knowingly* participate in the dissemination of a false advertisement. *Id.* at 1278. In the case of *Estee Lauder*, the Eleventh Circuit concluded that "the complaint [did] not come close to alleging the necessary facts" to allow a plausible inference to be drawn that Estee Lauder knowingly or intentionally participated in any of the alleged false statements made by DFA's competitors.[12] *Id.* at 1274. The Eleventh Circuit rejected the notion that the continued sales of Estee Lauder products to DFA's competitors and that Estee Lauder's otherwise carrying on an ordinary business relationship with DFA's competitors was *sufficiently related* to the alleged false or misleading statements made by DFA's competitors to establish a plausible basis for contributory liability. *Id.* at 1279.

Here, however, there is no conceivable, never mind plausible, reason or motive that A2LA would have to knowingly induce or participate in the dissemination of an alleged false statement made by FII. *Cf. City of Tuscaloosa v. Harcros Chemicals, Inc.* 158 F. 3d 548, 569 n.29 (11th Cir. 1998) ("If the Plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.") (citing *Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*, 818 F. 2d 1530, 1534 (11th Cir. 1987) (Plaintiffs have produced no evidence that defendant was motivated to, participated in or benefitted from a conspiracy)); *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97 (1986)) (if plaintiff's theory about conspiracy to violate antitrust laws is economically senseless or irrational and without any **rational economic motive** to conspire, no reasonable juror could find in favor of plaintiff).

### 1. *Plaintiffs cannot prove that FII violated the Lanham Act.*

With respect to the first element of a contributory false advertising claim—demonstrating that a third party committed a Lanham Act violation—Plaintiffs cannot prove that FII directly engaged in false advertising that injured Plaintiffs because FII has been dismissed from this action with prejudice. [DE 169]. The dismissal with prejudice operated as an adjudication on the merits of the claims asserted against FII. *See Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498,

---

[12] Plaintiffs allege that A2LA knew or should have known that its accreditation of FII was false. [DE 184 ¶ 131]. The Eleventh Circuit rejected that a "knew or should have known" standard is insufficient to establish contributory liability under the Lanham Act. *Duty Free Americas, Inc.,* 797 F.3d at 1279.

1501–02 (11th Cir. 1990) (internal citations and quotations omitted) ("The district court's order dismissing Data Lease's third-party complaint against the directors with prejudice, entered by stipulation of the parties pursuant to Rule 41(a), is a 'final judgment on the merits.' . . . It is clear that a stipulation of dismissal with prejudice . . . at any stage of a judicial proceeding, normally constitutes a final judgment on the merits which bars a later suit on the same cause of action."); *Beckwith v. Caliber Home Loans, Inc.*, No. 3:20-CV-00407-LCB, 2022 WL 1631972, at *11 (N.D. Ala. May 23, 2022), *appeal dismissed*, No. 22-12098-GG, 2022 WL 20209222 (11th Cir. Dec. 20, 2022) (internal citations omitted) ("In the Eleventh Circuit, '[t]he law is clear that if a suit has been dismissed with prejudice pursuant to a settlement, this is a final judgment that will ground a procedural bar.' "); *Foley v. Orange Cnty.*, No. 22-13864, 2024 WL 49134, at *2 (11th Cir. Jan. 4, 2024) (internal citation and quotations omitted) ("Our precedent establishes that dismissal of a complaint with prejudice satisfies the requirement that there be a final judgment on the merits.").

Even if FII was not dismissed with prejudice from this action, Plaintiffs cannot prove that FII directly engaged in false advertising that injured Plaintiffs. First, FII does not sell plywood and is not in commercial competition (directly or indirectly) with Plaintiffs; in other words, in no form or fashion do FII and Plaintiffs compete or vie for the same consumer dollars as the Plaintiffs. Plaintiffs also cannot prove that FII's certification of the Brazilian plywood mills was false, as there is no evidence that the mills certified by FII did not produce PS 1 complaint plywood. In fact, no plywood bearing the FII stamp has been tested to determine compliance with the PS 1 standard. SOF ¶ 53 [DE 198-14 at 22:16–20]. Plaintiffs' largest customers (and direct competitors) have absolutely no concerns about the structural integrity of PS 1 plywood imported from Brazil and, though aware of this litigation, continue to purchase Brazilian PS 1 plywood and resell Brazilian plywood to its U.S. customers. SOF ¶ 56 [DE 198-9 16:9–14; 17:4–25; 19:5–11]. Therefore, Plaintiffs cannot prove that FII was directly engaged in false advertising (through the use of its stamp) that injured Plaintiffs, and thus, the contributory Lanham Act claim against A2LA necessarily fails.

> 2. *A2LA did not knowingly induce, or cause the conduct, or materially participate in any purported false advertising.*

As to the second element—knowing participation by A2LA in the dissemination of a false statement by FII—Plaintiffs obviously do not have any evidence to demonstrate that A2LA "contributed to [any alleged false advertising] either through knowing inducement, or causing the

conduct, or by materially participating in it." *See Duty Free Americas*, 797 F.3d at 1277; [DE 139 at 183:13–25] ("Q. Did A2LA knowingly participate or enable at any point in time, knowingly participate or knowingly enable such a scheme at any point in time? A. [Trace McInturff] No. Not at all."); *see also id.* at 182:18–20 ("With respect to the supply chain, if you will, of plywood, does A2LA have any involvement in that supply chain? A. [Trace McInturff] No. Not at all."); SOF ¶ 51 [DE 198-2 at 32:22–1] (Ken Pratt testifying: "Q. You have no reason, as we sit here right now, to think that A2LA defrauded Florida consumers in accrediting FII or injured plaintiffs in Florida, do you? A. I don't."); SOF ¶ 51 [DE 198-7 at 45:22–24]. In terms of having a motive or reason to conspire with FII, the court need only ask: to what end? A2LA did not gain or lose financially when it accredited FII and it did not gain or lose financially when it suspended FII's accreditation or when FII withdrew its accreditation. *Lexmark* and *Duty Free* elucidate who is (and is not) within the ambit of a direct or contributory Lanham Act claim. A2LA is clearly not within the ambit of either. No reasonable or rational trier of fact could find in favor of Plaintiffs on their contributory Lanham Act claim.

### III.    Plaintiffs' negligence claim fails as a matter of law, as A2LA did not owe Plaintiffs a duty of care.

To assert a cause of action for negligence, a plaintiff must show a "duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks." *Clay Elec. Co-op., Inc. v. Johnson,* 873 So. 2d 1182, 1185 (Fla. 2003). "The duty element of negligence is a **threshold legal question**; if no legal duty exists, then no action for negligence may lie." *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 22 (Fla. 4th DCA 2022) (internal citation and quotations omitted) (emphasis supplied). To determine whether the defendant has a duty to exercise reasonable care, the focus is on "whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others." *Dorsey v. Reider*, 139 So. 3d 860, 863 (Fla. 2014) (internal citation omitted). "The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her, for without a duty running **directly** to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." *Grieco*, 344 So. 3d at 23 (quoting *Grunow v. Valor Corp. of Florida*, 904 So. 2d 551, 556 (Fla. 4th DCA 2005)) (emphasis supplied). Under Florida law, "a party **has no legal duty** to prevent the misconduct of **third persons**." *Dorsey*, 139 So. 3d at 864 (emphasis supplied). Plaintiffs' Second Amended Complaint

does not allege the duty A2LA owed to the Plaintiffs, even though the absence of such allegations was previously brought to their attention in A2LA's motions to dismiss. [DE 184].

To mask the infirmity of their negligence claim, Plaintiffs suggest a parade of horribles, including "catastrophic" construction failures, that will result from use of Brazilian PS 1 plywood. However, Brazilian PS 1 plywood has been imported into the US for nearly 30 years. None of the Plaintiffs nor their experts were able to identify **a single** failure in the field of PS1 plywood imported from Brazil. *Plywood I*, [DE 351-2 at 151:15–23]; SOF ¶ 54 [DE 198-7 at 39:17–25]; SOF ¶ 54 [DE 198-12 at 110:6–14]. Regardless, accreditation bodies like A2LA do not even owe a duty of care to the end user or customer, never mind the Plaintiffs. *See Dunagan v. Illinois Inst. of Art Chicago, LLC*, No. 1:19-CV-00809, 2021 WL 1196494, at *5 (N.D. Ill. Mar. 30, 2021) ("Courts have repeatedly declined to impose a tort duty to students on accreditors with respect to their accreditation decisions."); *Ambrose v. New England Ass'n of Sch. & Colleges, Inc.*, 252 F.3d 488, 499 (1st Cir. 2001); *Keams v. Tempe Tech. Inst., Inc.*, 110 F.3d 44, 47 (9th Cir. 1997) ("[A]ppellants are unable to identify a single decision wherein any court in the United States has held that accrediting agencies, such as ABHES and ACCSCT, owe a tort law duty to students who attend the schools accredited by those agencies.").

By analogy, in *DeLong v. American Home Furnishings Alliance*, 464 F. Supp. 3d 727 (E.D. Pa. 2020), the plaintiff alleged that the non-profit defendants negligently issued and promoted voluntary furniture safety standards of a dresser (that met those standards) that caused her son's death when it fell onto him. The plaintiff argued that the defendants negligently breached their duty of care to end-users in promulgating the standard that set forth stability requirements. *Id.* at 729. Applying Florida law, the court recognized that the defendants "govern nothing" and found that Florida courts would not impose a duty on trade associations' product users. *Id.* at 730, 731 (internal quotations omitted). If A2LA does not owe a duty of care to consumers of plywood, then, *a fortiori,* they owe no duty of care to protect the economic and business interests of sellers of plywood with whom they have no connection or relationship.

## IV.    The Coalition lacks associational standing to sue on behalf of its members, and the other Plaintiffs lack standing to seek a permanent injunction.

The Coalition is nothing more than a name the individual Plaintiff mills gave themselves to falsely give the impression that they are acting in the public interest. They do not claim to speak for the U.S. plywood industry as a whole. The largest members of the U.S. plywood industry are

not even part of this litigation. The Coalition's goal—the elimination of Brazilian PS 1 plywood from the U.S. market—is antagonistic to the interests of companies like Boise Cascade, which import Brazilian plywood and then sell it to U.S. based distributors, wholesalers and retailers. Ironically, the Coalition lost a member Plaintiff mill (Coastal Plywood) when Boise Cascade purchased Coastal Plywood and caused Coastal Plywood to dismiss its claims in this litigation. SOF ¶ 57. The Plaintiff mills collectively seek $75 million from A2LA based on an alleged diminution in the price they sold plywood during the damage period (just a 16-month period) as a result of the availability of Brazilian PS 1 plywood in the US market, notwithstanding the record profits they made during the damage period.

Similar to this case, in *Connecticut State Dental Association v. Anthem Health Plans, Inc.*, 591 F.3d 1337 (11th Cir. 2009), the association sought declaratory and injunctive relief but also requested compensatory and punitive damages on behalf of its members. As an association cannot proceed on behalf of its members when claims for monetary relief are involved, the Eleventh Circuit concluded that the association could not establish all of the requirements for associational standing and, thus, could not sue under ERISA. *Id.* at 1354. Here, the Coalition was purportedly created to address its members' concerns regarding Brazilian plywood that allegedly does not meet the PS 1 standard entering the U.S. market. Plaintiffs' Second Amended Complaint seeks both permanent injunctive relief and $75 million dollars in damages. [DE 184 at 47–48]. Although Plaintiffs testify that the Coalition is not seeking money damages, its allegations indicate otherwise, and it was established for no other reason than to redress its alleged injuries as a result of Plywood I and this lawsuit. Thus, since the Coalition seeks damages, it cannot remain a party in this action. *See* [DE 139 at 212:15–213:12] (admitting as an exhibit at the preliminary injunction hearing Plaintiffs' Initial Disclosures, which indicate that Plaintiffs seek documents supporting individual damages claims of the plaintiff companies).

Additionally, Plaintiffs cannot seek permanent injunctive relief when the need for any injunctive relief has completely dissipated, and Plaintiffs have an adequate remedy at law. *See Gagliardi v. TJCV Land Trust*, 889 F.3d 728, 734 (11th Cir. 2018) ("When the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury."). Further, "[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief **only** if the party alleges . . . a **real and immediate**—as opposed to a merely conjectural or hypothetical—threat of future injury." *Shotz v.*

*Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (emphasis supplied) (internal citations omitted); *see also Jackson v. Anheuser-Busch InBev SA/NV, LLC*, No. 20-CV-23392, 2021 WL 3666312, at *9 (S.D. Fla. 2021) (internal citations and quotations omitted) (if a plaintiff seeks prospective relief, such as declaratory and injunctive relief, he must "allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future").

Here, Plaintiffs do not have a **real and immediate** threat of future injury to warrant permanent injunctive relief in this action. As represented in Defendants' Combined Response to Motion to Reopen Case, FII "ceased **all** operations . . . " and "has not sought (and will not seek) any product certification, inspection, or testing accreditations from any other accreditation agency." [DE 153 ¶ 4] (emphasis supplied); [DE 166 at 3]. The parties stipulated that "the relief sought in Plaintiffs' Motion for Preliminary Injunction [ECF No. 30] against A2LA and FII is now **moot** . . . ." [DE 147 ¶ 7] (emphasis supplied).

The *sine qua non* for imposing injunctive relief is that irreparable injury will be suffered unless the injunction issues. *See Jackson v. Anheuser-Busch InBev SA/NV, LLC*, Case No. 20-CV-23392, 2021 WL 3666312 (S.D. Fla. 2021) (Bloom) (if a plaintiff seeks prospective relief, such as declaratory and injunctive relief, he must "allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future."). The Coalition cannot enjoin A2LA from accrediting any other PS 1 certification bodies on the metaphysical possibility that some day in the future A2LA may accredit another CAB under the PS 1 standard.

Moreover, an injunction against A2LA would be meaningless. Brazilian plywood has been imported to the U.S. for roughly 3 decades, entering the U.S. market long before A2LA accredited FII and continues to enter the U.S. market even though FII is no longer accredited by A2LA. *See* SOF ¶ 44 [DE 198-9 at 16:9–14] (Boise Cascade's representative testifying: "Have you ever – since 2010, that rough time frame you gave me, did you ever cease purchasing PS1 plywood from Brazil? A. No."). Tyler Freres also admitted during his deposition that the most direct way to stop Brazilian plywood from coming into the U.S. market is to seek injunctive relief against the Brazilian plywood mills, which Plaintiffs decided not to do. SOF ¶ 45 [DE 198-7 at 34:6–12]. The second most effective way would be to enjoin the U.S. importers, like Boise Cascade, from importing Brazilian PS 1 plywood but Plaintiffs cannot, for purely their own financial self-interest, seek to enjoin their own customers. *See* SOF ¶ 45 [DE 198-10 at 54:11–25] ("Q. And so as far as you know, there was never any attempt to get an injunction against those two distributors who

26

were the two ones who were primarily responsible for bringing in that Brazilian plywood, was there? A. No, I agree with that., Q. You agree with me it's a pretty good idea if you want to stop them, the best way to stop that flow is to go get -- go to the two people -- the two distributors who were bringing that in; right? A. Right."); SOF ¶ 45 [DE 198-11 (Swanson) at 55:16–21]. According to Southern Veneer's Corporate Representative, Mr. Medellin, substandard Brazilian plywood will continue to flow into this country until "U.S. importers and distributors of Brazilian plywood" are prevented from doing so. [DE 35 ¶ 5].

Plaintiffs have therefore manufactured a lawsuit which seeks permanent injunctive relief against a non-profit AB while ignoring, for business reasons, the parties they believe are doing the most harm. Regardless, it is evident and undeniable the injury Plaintiffs seek to prevent (importation of Brazilian plywood) will continue and not be addressed by issuing a permanent injunction based purely on conjecture about what A2LA might theoretically do in the future. *Lujan v. Defs. of Wildlife,* 504 U.S. 555 (1992) (Plaintiff must establish that it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision"). The relief sought by Plaintiffs, at the end of the day, would address a non-existent threat of harm by A2LA by calling into question its competency as an AB and, in the process, would unfairly stigmatize A2LA and malign its good name and reputation when there is no reason to believe that the alleged conduct in question will be repeated if not enjoined. *See Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 563 (5th Cir. 1998) (to satisfy the standing requirement, a plaintiff seeking injunctive or declaratory relief must show a likelihood of future violations of their rights by the defendant).

<u>**CONCLUSION**</u>

This Court should enter summary judgment in A2LA's favor on all of Plaintiffs' claim and grant A2LA attorneys' fees under the Lanham Act.

Dated: March 29, 2024                    Respectfully submitted,

*/s/ Peter R. Goldman*
Peter R. Goldman
Florida Bar No. 860565
Nina C. Welch
Florida Bar No. 118900
Danna Khawam
Florida Bar No. 1025114

Zackary B. Weiss
Florida Bar No. 1040682
**NELSON MULLINS**
100 S.E. 3rd Avenue, Suite 2700
Fort Lauderdale, FL 33394
Telephone: (954) 745-7060
Fax: (954) 761-8135
peter.goldman@nelsonmullins.com
stacy.brown@nelsonmullins.com
nina.welch@nelsonmullins.com
danna.khawam@nelsonmullins.com
zack.weiss@nelsonmullins.com
*Counsel for Defendant A2LA*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 29, 2024, a true and correct copy of the foregoing document was filed electronically with the Clerk of Court and served on all counsel of record through the Court's CM/ECF system.

By: */s/ Peter R. Goldman*
Peter R. Goldman