**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

**Case No. 0:22-cv-60976-DSL**

U.S. STRUCTURAL PLYWOOD
INTEGRITY COALITION, an unincorporated
association, SCOTCH PLYWOOD CO., INC.,
an Alabama corporation, VENEER PRODUCTS
ACQUISITIONS, LLC, a Delaware limited
liability company doing business as
SOUTHERN VENEER PRODUCTS,
SOUTHERN VENEER SPECIALTY
PRODUCTS, LLC, a Georgia limited liability
company, HUNT FOREST PRODUCTS,
LLC, a Louisiana limited liability company,
FRERES LUMBER CO., INC., an Oregon
corporation, MURPHY COMPANY, an
Oregon corporation, SDS LUMBER LLC, a
Washington limited liability company, and
SWANSON GROUP, INC., an Oregon
corporation,

      Plaintiffs,

v.

AMERICAN ASSOCIATION FOR
LABORATORY ACCREDITATION, INC.,
a District of Columbia non-profit corporation,

      Defendant.

_____/

**DEFENDANT AMERICAN ASSOCIATION FOR LABORATORY
ACCREDITATION, INC.'S OMNIBUS *DAUBERT* MOTION[1]**

---

[1]     In accordance with the procedure set forth in the Second Amended Scheduling Order [DE 170], A2LA files one omnibus *Daubert* Motion, which seeks to exclude all four of Plaintiffs' experts. On March 15, 2024, A2LA filed a Motion to Exceed Page Limit for its *Daubert* Motion [DE 193] and requested an additional 20 pages to address all four expert opinions and the lengthy case law and voluminous amount of evidence involved. Plaintiffs did not oppose an additional 10 pages. To date, an order has not been entered on A2LA's request.

## REQUEST FOR EVIDENTIARY HEARING UNDER LOCAL RULE 7.1(b)(2)

Defendant requests an evidentiary hearing on its Omnibus *Daubert* Motion. The principal reason for an evidentiary hearing on this Motion is the complexity of the opinions and the regression analysis employed to calculate Plaintiffs' damages. Defendant requests an all-day hearing on its *Daubert* Motion.

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .................................................................................................................1

MEMORANDUM OF LAW ................................................................................................2

I.       Legal standard ......................................................................................................2

II.      Motion to exclude Plaintiffs' experts' opinions on standard of care/liability ....................3

     A.     Anthony's expert opinions and testimony must be excluded .......................................5

         1.     Anthony is unqualified to opine on A2LA's accreditation of FII, and his opinions on A2LA's accreditation of FII are completely unreliable ..................5

         2.     Anthony's opinions based on the testing conducted by APA, Clemson University, and Blackwater on Brazilian plywood certified by PFS-TECO and TPI do not assist the trier of fact, and such tests are inherently unreliable ............................................................................................7

         3.     Anthony's opinion that FII had no basis to recertify Brazilian plywood mills without performing qualification testing is entirely unsupported and amounts to nothing more than his own ipse dixit .......................................10

         4.     Anthony's opinion that Brazilian plywood poses a significant life safety issue is based entirely on speculation and without empirical evidence to support it ...........................................................................................................11

     B.     Shupe's expert opinions and testimony must be excluded .........................................12

         1.     Shupe is unqualified to opine on A2LA's accreditation of FII, and his opinions on accreditation are unreliable .............................................................12

         2.     Shupe is not qualified to testify on FII's certifications of the Brazilian plywood mills ..........................................................................................13

         3.     Shupe's opinions based on the testing conducted by APA, Clemson University, Blackwater, and TPI on Brazilian plywood certified by PFS-TECO and TPI do not assist the trier of fact........................................................14

         4.     Shupe's opinions based on the Hart and Schimleck et al papers do not assist the trier of fact and must be excluded ........................................................18

         5.     Shupe's subjective beliefs of what the PS 1 standard should be is unreliable and irrelevant ................................................................................20

III.     Motion to exclude Plaintiffs' expert opinions on damages ..............................................21

     A.     Regression modeling............................................................................................21

     B.     Preliminary statement on Plaintiffs' damages ...........................................................23

     C.     Montzka's expert opinions and testimony must be excluded ......................................23

      1.    Montzka is not qualified to conduct a regression model ....................................23

      2.    Montzka's regression model is wholly unreliable and unsupported by economic theory..............................................................................................25

         i.    Montzka's regression model is not backed by economic theory .................25

         ii.    Montzka used outcome-driven, or "cherry-picked," variables ...................26

      3.    A regression model does not assist the trier of fact unless it proves causation .................................................................................................30

      4.    The Trademo data relied on by Montzka and Anderson is unvetted and unreliable ..............................................................................................31

    D.    Anderson's expert opinions and testimony must be excluded, as his opinions are unreliable and will not assist the trier of fact..............................................32

IV.    Cumulative expert testimony must be excluded ............................................35

CONCLUSION.................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>                                                                                       <u>**Pages(s)**</u>

*In re Abilify Prod. Liab. Litig.*,
   299 F. Supp. 3d 1291 (N.D. Fla. 2018)..................................................................20

*ADT LLC v. Vivint Smart Home, Inc.*,
   20-CV-23391, 2023 WL 3568117 (S.D. Fla. May 19, 2023)..................................31

*Arch Specialty Ins. Co. v. Balzebre*,
   No. 10-23775-CIV, 2013 WL 12061814 (S.D. Fla. Jan. 9, 2013)......................7, 14

*Calender v. NVR Inc.*,
   548 F. App'x 761 (3d Cir. 2013) ..............................................................................5

*Cordoves v. Miami-Dade Cnty.*,
   104 F. Supp. 3d 1350 (S.D. Fla. 2015) .....................................................................5

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)................................................2, 7, 10, 13, 14, 20, 21, 32

*Eberli v. Cirrus Design Corp.*,
   615 F. Supp. 2d 1357 (S.D. Fla. 2009) .................................................................3, 7

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*,
   402 F.3d 1092 (11th Cir. 2005) ............................................................................3, 20

*Feliciano v. City of Miami Beach*,
   844 F. Supp. 2d 1258 (S.D. Fla. 2012) .................................................................5, 11

*Goldstein v. Centocor*,
   No. 05-21515 cv, 2007 WL 61913 (S.D. Fla. Jan. 5, 2007) ...................................35

*Hunt v. McNeil Consumer Healthcare*,
   297 F.R.D. 268 (E.D. La. 2014)...............................................................................18

*Kaufman v. Pfizer Pharmaceuticals, Inc.*,
   2011 WL 7659333 ....................................................................................................20

*Mamani v. Sanchez Berzain*,
   No. 07-22459-CIV, 2018 WL 1090546 (S.D. Fla. Feb. 28, 2018) ......................7, 14

*McDowell v. Brown*,
   392 F.3d 1283 (11th Cir. 2004) ................................................................................14

*Multimedia Patent Tr. v. Apple Inc.*,
   No. 10-CV-2618-H (KSC), 2012 U.S. Dist. LEXIS 165928 (S.D. Cal. Nov.
   20, 2012) ...................................................................................................................32

**Cases**                                                                                       **Pages(s)**

*Navelski v. Int'l Paper Co.*,
    244 F. Supp. 3d 1275 (N.D. Fla 2017)................................................................21

*Paz v. Brush Engineered Materials, Inc.*,
    555 F.3d 383 (5th Cir. 2009) ............................................................................11

*Petersen v. Daimler Chrysler Corp.*,
    1:06-CV-00108-TC, 2011 WL 2491026 (D. Utah June 22, 2011) ..........................18

*PODS Enterprises, Inc. v. U-Haul Int'l, Inc.*,
    812CV01479T27MAP, 2014 WL 12628664 (M.D. Fla. June 27, 2014) ................14

*Quiet Tech. v. Hurel–Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) ..........................................................................3

*Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016)..21, 22, 26, 28, 29

*Riverside Apartments of Cocoa, LLC v. Landmark Am. Ins. Co.*,
    No. 618CV1639ORL40DCI, 2020 WL 8184710 (M.D. Fla. Dec. 4, 2020) ..........32

*Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*,
    No. 10-21511-CIV, 2010 WL 4225947 (S.D. Fla. Oct. 21, 2010) ...................34, 35

*United States v. Mikos*,
    No. 02 CR 137, 2003 WL 22922197 (N.D. Ill. Dec. 9, 2003)................................8

*Weisgram v. Marley Co.*,
    169 F.3d 514 (8th Cir. 1999), *aff'd*, 528 U.S. 440 (2000) ....................................10

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
    862 F. Supp. 2d 1322 (S.D. Fla. 2012), *aff'd*, 746 F.3d 1008 (11th Cir. 2014).........2, 3, 27, 30

**Rules**

Fed. R. Evid. 403 ......................................................................................................34

Fed. R. Evid. 702 ................................................................................1, 2, 3, 11, 12, 32

Fed. R. Evid. 703 ....................................................................................................2, 7

Local R. 7.1(a)(3).......................................................................................................35

Local R. 7.1(b)(2) ........................................................................................................0

Pursuant to Federal Rule of Evidence 702, Defendant, American Association for Laboratory Accreditation, Inc. ("A2LA"), moves to exclude the expert opinions of (1) Thomas Montzka ("Montzka"), (2) Dr. Roy C. Anderson ("Anderson"), (3) Ronald Anthony ("Anthony"), and (4) Dr. Todd Shupe ("Shupe").[2]

## INTRODUCTION

A2LA seeks to exclude all testimony of Plaintiffs' four expert witnesses. Shupe and Anthony provide liability related opinions on (1) whether PS 1 plywood produced by Brazilian mills and sold in the U.S. met the PS 1 standard and (2) whether A2LA's accreditation of Forestwood Industries, Inc. ("FII") as a product certification and inspection body fell below the standard of care. Montzka and Anderson provide damages related opinions. Montzka created a regression model, which purports to indicate the price difference (delta) between the price the Plaintiff mills sold PS 1 plywood during the 16-month damage period versus the price they claim they would have sold PS 1 plywood had there been no Brazilian PS 1 plywood in the U.S. market. Anderson assisted Montzka in gathering certain data but did not create the regression model.

All four of Plaintiffs' experts either rely on data complied by third parties or testing results performed by third parties. A2LA challenges the Plaintiffs' experts on one or more of the following grounds: (1) they lack the requisite qualifications to testify on certain matters; (2) they improperly rely on data that they are unable to verify as reliable or appropriate for experts to rely upon; and, (3) in the case of Montzka, that his regression model, as a result of his lack of qualifications and expertise, is unsound and unreliable, which leaves Plaintiffs with no means by which to prove that they sustained any damages. As discussed *infra*, most, if not all, of the Plaintiffs' most profitable

---

[2]     The instant action is substantially identical to a prior action brought by the same group of Plaintiffs (except for one that dropped out after it was acquired by Boise Cascade) against two certification bodies, PFS Corporation, dba PFS-TECO ("PFS-TECO"), Timber Products Inspection, Inc. ("TPI"), and their accreditation body, International Accreditation Service, Inc. ("IAS"). *See U.S. Structural Plywood Integrity Coal. v. PFS Corp.*, Case No. 19-62225-CIV, (S.D. Fla. filed Sept 5, 2019) ("*Plywood I*"). All four experts in this action provided expert opinions in *Plywood I*. Thus, this Motion refers to their deposition testimony in this action, which is referred to as *Plywood II*, along with their testimony in *Plywood I*.

five quarters was **during** the five quarters of the damage period, September 2021 through December 2022 ("damage period").[3]

## MEMORANDUM OF LAW

### I.   Legal standard

The admissibility of expert testimony is governed by the framework set out in Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322, 1327 (S.D. Fla. 2012), *aff'd*, 746 F.3d 1008 (11th Cir. 2014). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Federal judges perform a "gatekeeping role" to ensure that speculative and unreliable opinions do not reach the jury and may consider several factors in making this determination: "whether an expert's theory or technique can be and has been tested; whether the theory or technique has been subjected to peer review and publication; whether the known or potential rate of error is acceptable; and whether the expert's theory or technique is generally accepted in the scientific community." *Winn-Dixie*, 862 F. Supp. 2d at 1328 (internal citation omitted). In determining the admissibility of expert testimony under Rule 702, the Eleventh Circuit engages in a three-part inquiry:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

---

[3]   In order to save space and avoid going through a detailed factual background, which is unnecessary for this Motion and for this Court's determination of the exclusion of Plaintiffs' experts, we have not included such factual background in this Motion. However, for a detailed discussion on this action and *Plywood I*, *see* A2LA's Motion for Summary Judgment.

*Id.* (quoting *Quiet Tech. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1340–41 (11th Cir. 2003)). The trial court's "gatekeeping function requires more than simply taking the expert's word for it." *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1362 (S.D. Fla. 2009) (internal quotations and citation omitted). The expert testimony "must be supported by appropriate validation—*i.e.*, **good grounds, based on what is known**." *Id.* (emphasis supplied) (internal quotations and citation omitted); *see also* Fed. R. Evid. 702, Adv. Comm. Note ("The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.")."[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (internal citation and quotations omitted). Notably, the party seeking to have the expert testimony admitted "bears the burden of demonstrating its admissibility by a preponderance of proof." *Winn-Dixie*, 862 F. Supp. 2d at 1327 (internal citation omitted).

## II.    Motion to exclude Plaintiffs' experts' opinions on standard of care/liability

Plaintiffs have two experts (Anthony and Shupe) who purport to opine on (1) A2LA's accreditation of FII as a product certification body and an inspection body, and (2) FII's certifications of Brazilian plywood mills under the PS 1 standard, including whether PS 1 plywood produced by Brazilian mills and sold in the U.S. met the PS 1 standard.

Anthony and Shupe are "wood guys." They are not experts on accreditation and are not qualified to opine on A2LA's accreditation of FII. Both Shupe and Anthony have never worked at an accreditation body, have never been involved in the accreditation of a certification body or inspection body (the two types of accreditations FII held), and have never served as an assessor in any capacity for accreditation purposes. Both Shupe and Anthony are wholly unqualified to provide accreditation standard of care opinions and any such opinions should be excluded.

As background, A2LA is a non-profit accreditation body established in 1978 and is among the largest accreditation bodies in the world. *See* Declaration in Support of A2LA's Response in Opposition to Plaintiffs' Motion for Preliminary Injunction [DE 58 ¶ 4]. It is the only independent 501(c)(3) accreditation company and has over 4,000 actively accredited certificates. *Id*. A2LA was one of the founding fathers of international accreditation activities and was included in the initial signings of the International Laboratory Accreditation Cooperation ("ILAC") Mutual Recognition Agreement ("MRA"), Asia Pacific Accreditation Cooperation ("APAC"), and Inter-American

Accreditation Cooperation ("IAAC"). *Id.* at ¶ 5. Accreditation is a formal recognition that an organization can perform specific tests, calibrations, certifications, etc., for which the organization has applied for and has been assessed for. *Id.* at ¶ 8. A company applying for accreditation is referred to by A2LA as a conformity assessment body, or "CAB." CABs apply for accreditation under various international standards, referred to as "ISO/IEC" standards. FII applied for accreditation as a certification body pursuant to ISO/IEC 17065 and as an inspection body pursuant to ISO/IEC 17020. FII was **not** accredited as a laboratory (ISO/IEC 17025). Thus, for purposes of A2LA's accreditation of FII, the only two ISO/IEC standards applicable are ISO/IEC 17065 (certification bodies) and ISO/IEC 17020 (inspection bodies).

Specifically, Plaintiffs' claims against A2LA are premised on FII's request to add PS 1-19[4] to their certification (ISO/IEC 17065) and inspection (ISO/IEC 17020) scopes of accreditation, which A2LA granted.

The PS 1 Standard is a voluntary product standard that "establishes requirements for the principal types and grades of structural plywood and provides a basis for common understanding among producers, distributors, and users of the product." *See* PS 1-19 Standard (**Attached to this Motion as Exhibit 1**). The purpose of the PS 1 Standard "is to establish nationally recognized requirements for products and to provide all concerned interests with a basis for common understanding of the characteristics of the products." *Id.* In August 2021, FII began certifying Brazilian plywood mills to the PS 1 standard.

In addition to their accreditation opinions, Shupe and Anthony opine that FII's should not have certified Brazilian plywood mills under the PS 1 standard because Brazilian plywood mills could not consistently produce PS 1 compliant plywood. While this opinion would have been attacked by FII, FII is no longer a party to the action; therefore, A2LA will also address the unreliability of Shupe and Anderson's opinions regarding their opinions on FII and Brazilian plywood.

---

[4] There have been different iterations to the PS 1 standard. The one at issue in this action is the 2019 version, which is referred to as PS 1-19.

A.     **Anthony's expert opinions and testimony must be excluded.**

1.     *Anthony is unqualified to opine on A2LA's accreditation of FII, and his opinions on A2LA's accreditation of FII are completely unreliable.*

By his own admission, Anthony is **not** an expert on accreditation. *See* Anthony's Dep. *Plywood II* at 72:23–73:4 (**Attached to this Motion as Exhibit 2**) ("Q. You're not an expert on accreditation of a certification body; are you? A. **No, I'm not.**") (emphasis supplied). Yet, he was hired by Plaintiffs provide "expert" opinions on A2LA's accreditation of FII as a product certification body and inspection body. *See* Anthony's Expert Witness Disclosure ¶ 3(e) (**Attached to this Motion as Exhibit 3**) (stating that he was engaged by Plaintiffs to provide expert opinions on "whether there was any basis for A2LA, on July 28, 2021, to accredit [FII] as a product certification body and inspection agency for PS 1-compliant plywood manufactured in Brazil."). Anthony opines, despite admitting he is not an accreditation expert, that: (1) A2LA's personnel had inadequate knowledge, competence, or understanding of the PS 1 Standard; and (2) no reasonably well-informed and competent accreditation body could conclude that FII was qualified for accreditation as a certification body under the PS 1 Standard. *See* Anthony's Expert Witness Disclosure, **Exh. 3** ¶¶ 12, 19.

An expert "may testify only about matters within the scope of his or her expertise." *Cordoves v. Miami-Dade Cnty.*, 104 F. Supp. 3d 1350, 1358 (S.D. Fla. 2015) (internal citation omitted); *see also Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) (internal quotations and citations omitted) ("Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony."); *Calender v. NVR Inc.*, 548 F. App'x 761, 763 (3d Cir. 2013) ("As the District Court found, the claim is essentially one for professional malpractice or negligence in the field of architecture. Pleading or demonstrating this claim would require expert testimony from an architect, engineer, or comparable licensed person."). "[E]xpert testimony regarding matters outside of the witness's expertise is inadmissible, even if the expert is qualified to testify about other matters." *Id.*

According to Anthony, he is a "wood guy" with no expertise in accreditation. During his deposition, he testified:

Q. You've never worked for an accreditation body. Correct?
A. **Never worked for one, no.**
Q. And you've never been a contracted assessor for an accreditation body. Right?

5

> A. **No.**
> Q. You've never had formal training to be an accreditation assessor. Correct?
> A. **No.**
> Q. You have never had formal training under ISO/IEC 17065. Correct?
> A. Formal training under 17065, **no.**
> Q. You never had formal training under ISO/IEC 17020. Correct?
> A. **No.**
> Q. You've never authored a publication on accreditation pursuant to ISO 17065 or 17020. Right?
> A. **No.**
> Q. Or you've never authored a publication related to accreditation; have you?
> A. **I don't believe so.**
> Q. Have you ever been involved in an accreditation of a certification body?
> A. **Not directly.**
> Q. Have you ever been involved in an accreditation of an inspection body?
> A. **No.**

Anthony Dep. *Plywood II*, **Exh. 2** at 70:19–71:20 (emphasis supplied). He further admitted that he cannot describe the accreditation process from start to finish and that he is not an expert on accreditation of a certification body:

> Q. You're not able to even describe the accreditation process from the start to finish; are you?
> A. No, **I'm not an expert on the accreditation process**, that's correct.
> Q. You're not an expert on accreditation of a certification body; are you?
> A. No, I'm not.

Anthony Dep. *Plywood II*, **Exh. 2** at 72:23–73:4 (emphasis supplied); *see also id.* at 76:16–22 ("Q. I understand that it's your opinion, but you cannot sit here today as an expert and testify as to what A2LA was required to do and was not required to do under their accreditation processes; can you? A. **No, I do not know the limitations of what an accreditation body can or cannot do.**") (emphasis supplied). He is accordingly unqualified to provide any opinions on A2LA's accreditation of FII as a product certification and inspection body. Further, his opinions related to A2LA's accreditation of FII are unreliable and misleading to the jury. *Cf.* Trace McInturff's Rebuttal Expert Witness Disclosure ¶ 5 (**Attached to this Motion as Exhibit 4**) ("A2LA's accreditation of [FII] was performed in accordance with the standard of care used amongst accreditation bodies within the accreditation community when presented with similar circumstances."). Thus, Anthony's accreditation opinions must be excluded.

      **2.**     ***Anthony's opinions based on the testing conducted by APA, Clemson University, and Blackwater on Brazilian plywood certified by PFS-TECO and TPI do not assist the trier of fact, and such tests are inherently unreliable.***

Anthony relies on testing of Brazilian plywood panels conducted by the APA in 2018, by TPI in 2018, by Clemson University in 2019 and by Blackwater Testing in 2021 for his opinion that the tests "demonstrate that on-grade PS 1 structural plywood cannot be consistently produced in Brazil . . . ." Anthony's Expert Witness Disclosure, **Exh. 3 ¶** 8. The testing allegedly revealed "substantial failure levels of the Brazilian plywood on the bending stiffness requirement for PS 1-compliant plywood, one of this structural building product's most important mechanical properties." Anthony's Expert Witness Disclosure, **Exh. 3 ¶** 5. As Anthony did nothing to assess the validity of the test results and merely regurgitated and accepted the results at face value, Anthony's opinions arising out of test results of third-party entities do not assist the trier of fact and must be excluded.

An expert cannot "simply repeat or adopt the findings of other experts without investigating them." *Arch Specialty Ins. Co. v. Balzebre*, No. 10-23775-CIV, 2013 WL 12061814, at *2 (S.D. Fla. Jan. 9, 2013) (internal citation omitted); *see also Mamani v. Sanchez Berzain*, No. 07-22459-CIV, 2018 WL 1090546, at *4 (S.D. Fla. Feb. 28, 2018) (internal citation and quotations omitted) ("Rule 703 does not permit an expert to simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon."). In *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357 (S.D. Fla. 2009), the plaintiff brought claims against the airplane manufacturer and engine manufacturer following her husband's death while piloting the aircraft. The defendant's expert witness formulated his opinions on the cause of the engine failure by relying on flight testing conducted by another expert. *Id.* at 1364. The court explained that the defendant's expert made no findings of his own and merely adopted the other expert's conclusions regarding the flight tests. *Id.* at 1365. As such methodology does not satisfy the *Daubert* standard, the court precluded the defendant's expert from testifying on his opinion that was formulated based on the flight test conclusions of another. *Id.*

Here, like in *Eberli*, during his deposition in *Plywood I*, Anthony admitted that he did not perform any independent testing on Brazilian plywood to confirm the accuracy of the testing conducted by The Engineered Wood Association (APA), Clemson University, and Blackwater. Anthony Dep. *Plywood I*, Case No. 19-CV-62225-RKA [DE 351-2 at 46:5–9] (emphasis supplied)

("Q. Did you have any involvement with the APA's study of Brazilian plywood? A. No. You didn't do any independent testing on plywood to confirm the accuracy of the APA's testing, right? A. **I did not attempt to confirm the accuracy of the testing, that is correct**."); *id.* at 79:23–80:1 (emphasis supplied) ("Q. Okay. **You didn't do any independent testing** to confirm the accuracy of Clemson University's results, right? A. **No.**"); *id.* at 159:1–6; 159:20–24 (emphasis supplied) ("[Q.] [Y]ou did not do anything to confirm the accuracy of Blackwater's testing, right? A. Other than to discuss their testing procedure to determine that it was consistent with the uniform load test described in PS 1. . . . [Q.] **So you didn't do any independent testing to confirm the accuracy of the [Blackwater] testing data . . . ; is that right?** A. **Yes.**"); *see also* Anthony Dep. *Plywood II*, **Exh. 2** at 81:14–16 ("Q. You didn't do any testing on your own; right? I believe you testified to that in the prior case. A. That is correct."). Without conducting any analysis or verification of the data used, he acknowledged that he relied on the accuracy of the data generated by Clemson University in formulating his opinions. Anthony Dep. *Plywood I*, Case No. 19-CV-62225-RKA [DE 351-2 at 80:2–4] ("Q. Okay. So your opinions are relying on the accuracy of the data generated by Clemson, right? A. That's primarily correct."). Additionally, Anthony confirmed that plywood that bore the "FII" stamp, *i.e.*, produced by Brazilian plywood mills that were certified by FII, **was not tested**. Anthony Dep. *Plywood II*, **Exh. 2** at 22:16–20 ("Q. I think maybe your prior answer answered this question, but there's no testing after July of 2021 that you're aware of related to whether Brazilian plywood meets the PS 1 standard. Is that accurate? A. I believe that's accurate."). Accordingly, his opinions based on third-party test results of Brazilian plywood, conducted on plywood that was **not certified** by FII, must be excluded, as they do not assist the trier of fact and will only confuse the jury.

Even if Anthony's reliance on the third-party testing of Brazilian plywood was proper, the methodology and sampling used by the third-party entities are inherently unreliable and flawed. *See United States v. Mikos*, No. 02 CR 137, 2003 WL 22922197, at *4 (N.D. Ill. Dec. 9, 2003) (rejecting expert's reliance on samples where they were not randomly collected according to any scientific sampling methodology). First, APA only tested **five panels** of plywood for each of the Brazilian plywood mills that were examined (compared to the **hundreds of millions** of sq. ft. of plywood imported from Brazil and to the 1.157 billion square feet that, according to Plaintiffs' damages experts, was purportedly imported from Brazil during the damage period). *See* Anderson Dep. *Plywood II* at 36:15–37:13 (**Attached to this Motion as Exhibit 16**). In *Plywood I*, Anthony

admitted that the testing conducted on the five panels of plywood was undoubtedly a miniscule
sample size:

> Q. And then for the span-rated products that were tested by the APA, they tested
> five panels for each of these mills, right?
> . . .
> A. That's correct.
> Q. Okay. Would you agree with me that five panels is a small sample size?
> A. **Five panels is a small sample size**, yes. It is.
> Q. Okay. And then I want to divert your attention back to the Product Advisory. Do
> you understand -- and I'm going to highlight this first section -- it says, "Structural
> plywood -- soft panels imported from Brazil into the U.S. totaled 721 million square
> feet on a 3/8-inch basis since 2017." Did I read that accurately?
> A. I see that, yes.
> Q. Okay. So five panels out of – let's say five panels out of -- overall is an extremely
> small sample when you consider, just in 2017, there was 721 million square feet
> that came into the United States, right?
> A. Correct.

Anthony Dep. *Plywood I*, Case No. 19-CV-62225-RKA [DE 351-2 at 55:1–56:1] (emphasis
supplied); *cf.* PS 1-19 Standard, **Exh. 1** § 5.8.6.5 (requiring twenty tests taken from at least ten
panels to be evaluated for bending stiffness and ten tests taken from ten different panels to be
tested for bending strength). Anthony similarly agreed that the sample size tested by Clemson
University was small in comparison to the amount of plywood imported into the United Staes from
Brazil. Anthony Dep. *Plywood I*, Case No. 19-CV-62225-RKA [DE 351-2 at 88:14–22]. Further,
Anthony testified that none of the third-party entities tested plywood attributable to **all** of the
Brazilian plywood mills certified by PFS-TECO and TPI. Anthony Dep. *Plywood II*, **Exh. 2** at
26:17–19 ("Q. So not every mill had wood tested by APA, Clemson, Blackwater, or TPI. Is that
correct? A. That's correct."); *see also* id. at 20:25–21:5 ("Q. Okay. Have there been any other
testing since then that you are aware of related to whether plywood meets the PS1 standard -- the
Brazilian plywood meets the PS 1 standard? A. I have seen no data that suggested additional testing
has been done."). APA only tested plywood from seven Brazilian plywood mills; Clemson
University only tested plywood from seven Brazilian plywood mills; and Blackwater only tested
plywood from seven Brazilian plywood mills. *See* APA Report (**Attached to this Motion as
Exhibit 5**); Clemson Report (**Attached to this Motion as Exhibit 6**); Blackwater Report
**Attached to this Motion as Exhibit 7**).[5]

---

[5]     The Clemson University testing was conducted at Plaintiffs' direction.

Further, Brazilian plywood that was tested by APA, Clemson University, and Blackwater also **passed** the requirements set forth in the PS 1 standard. *See, e.g.*, Anthony Dep. *Plywood II*, **Exh. 2** at 29:13–17 ("Q. And some of that -- some of the mills under the Blackwater test passed and their product passed that bending stiffness test under PS 1. Is that accurate? A. It's accurate they passed the bending stiffness test."); *id.* at 21:6–10 ("Q. And in these four tests, testing data that you reviewed, some of the Brazilian plywood failed the bending and stiffness test and some of it passed. Is that accurate? A. Yes."). Accordingly, as the third-party test results are fundamentally unreliable, Anthony's opinions arising out of the third-party test results must be excluded.

> ### 3. *Anthony's opinion that FII had no basis to recertify Brazilian plywood mills without performing qualification testing is entirely unsupported and amounts to nothing more than his own ipse dixit.*

Anthony also opines on "whether there was any basis for [FII] to rely on the TPI/PFS-TECO qualification testing and inspection reports in recertifying Brazilian mills to produce PS 1-compliant structural plywood." Anthony's Expert Witness Disclosure, **Exh. 3** ¶ 3(c). It is Anthony's opinion that "[t]here was no basis on which to recertify these mills without performing the full complement of qualification tests in accordance with PS 1 testing requirements, with the panels selected in a manner to ensure that the panels being tested were in fact representative of the plywood panels that could be produced from the available resource."[6] Anthony's Expert Witness Disclosure, **Exh. 3** ¶ 10. However, Anthony has no basis or support for such opinion, other than it being his own opinion, or *ipse dixit*. The PS 1-19 standard did not require FII to re-test the Brazilian mills' plywood, where the Brazilian mills are transferring their certifications from one certification body to another, here FII. Anthony Dep. *Plywood II*, **Exh. 2** at 65:9–13 ("Q. You would agree with me that PS 1 and ISO 17065 to not preclude transfers of certifications. Right? A. I believe that's correct, as long as all of the requirements are met."). For years, Plaintiffs have been petitioning the PS 1 Standing Committee for more specific and stringent requirements.

Anthony's opinions on what the PS 1 standard *should* require or what certification bodies *should* be doing are entirely irrelevant and must be excluded.

---

[6]   His insistence on a representative sample size considering his reliance on testing with no selection methodology is, to put it mildly, ironic.

4.      ***Anthony's opinion that Brazilian plywood poses a significant life safety issue is based entirely on speculation and without empirical evidence to support it.***

An expert's opinion cannot be based upon "unsupported speculation." *Daubert*, 509 U.S. at 590; *see also Weisgram v. Marley Co.*, 169 F.3d 514, 519 (8th Cir. 1999), *aff'd*, 528 U.S. 440, (2000) (stating that expert testimony is nothing more than "patent speculation" when there is "no evidence in the record" to support it). "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009); *see also* Fed. R. Evid. 702 (stating that expert testimony must be "based upon sufficient facts or data").

It is Anthony's opinion that "there is a significant life safety issue resulting from noncompliant PS 1-stamped plywood," and "there is significant risk of catastrophic failure in particular applications utilizing PS 1-stamped plywood produced in southern Brazil." Anthony's Expert Witness Disclosure, **Exh. 3** ¶ 13. Yet, Brazilian plywood has been imported into the U.S. for 30 years, and Anthony—in addition to all of the Plaintiffs—testified that he was unaware of any failures as a result of Brazilian plywood:

> So you're not aware of a catastrophic failure of Brazilian plywood?
> A. No, I'm not.
> Q. Are you aware of a failure of Brazilian plywood after a hurricane?
> A. No.
> Q. Are you aware of any Brazilian – a failure of Brazilian plywood after an earthquake?
> A. No.

Anthony Dep. *Plywood I*, Case No. 19-CV-62225-RKA [DE 351-2 at 151:15–23]; *see also* Tyler Freres Dep. *Plywood II* at 39:17–25 (**Attached to this Motion as Exhibit 21**); Juan Medellin Dep. *Plywood II* at 110:6–14 (**Attached to this Motion as Exhibit 22**). In this case, he also testified that he did not investigate whether there have been any failures in the field associated with Brazilian plywood. Anthony Dep. *Plywood II*, **Exh. 2** at 70:13–18 ("Q. And here we don't know of any failures, the Brazilian plywood has been in the marketplace for a decade. Right? A. I have not seen reports of that because nobody provides me with the data and nor did I investigate that in this."). Therefore, Anthony's speculative opinions related to life safety issues associated with Brazilian plywood must be excluded.

**B.      Shupe's expert opinions and testimony must be excluded.**

      *1.      Shupe is unqualified to opine on A2LA's accreditation of FII, and his opinions on accreditation are unreliable.*

      To determine whether a witness is qualified to testify as an expert on a subject matter, the court is required to examine the expert's credentials. *See Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012). Here, Shupe opines that "A2LA had no reasonable basis on which to accredit [Forestwood] as either a product certification body under PS 1 or as an inspection agency under that standard." *See* Shupe's Expert Witness Disclosure ¶¶ 35–41 (**Attached to this Motion as Exhibit 8**). However, Shupe testified that he has **never** worked at an accreditation body or been a part of an accreditation under ISO/IEC 17065 or 17020:

> Q. You have never been a part of accreditation under ISO 17065; right?
> A. Under ISO 17065?
> Q. Correct.
> A. That's correct.
> Q. You have never been a part of an accreditation under ISO 17020; right?
> A. That's correct.
> . . .
> Q. You have never worked at an accreditation body; right?
> A. That is correct.
> Q. You haven't worked as an assessor in any capacity for accreditation purposes?
> A. That is correct.

Shupe Dep. *Plywood II* at 52:25–53:7; 61:19–24 (**Attached to this Motion as Exhibit 9**). He has also never been involved in putting together an accreditation team to perform an accreditation assessment. *Id.* at 72:11–14 ("Q. Have you ever been involved in putting together an accreditation team to perform an accreditation? A. No."). Shupe believes he is qualified to serve as an expert on accreditation because he was the head of an accredited **laboratory** under ISO/IEC 17025. Shupe has never applied for accreditation as a product certification body under ISO/IEC 17065 and has never had to use ISO/IEC 17065. *Id.* at 74:22–75:6 (emphasis supplied) ("Q. Who else is involved? Have you ever been a part of this process on the accreditation side? A. I've never worked for an accreditation agency. Q. You never applied for accreditation under ISO 17065; right? A. That is correct. Q. And you've never had to use ISO 17065 listen; right? A. No. **I've never had to use it.**"). Shupe has not provided consulting work on accreditation, has not provided expert testimony on accreditation, and has not written any articles on accreditation. *Id.* at 9:24–10:4; 10:18–20;

11:15–17. Therefore, Shupe is in no position to offer opinions on A2LA's accreditation of FII as a product certification body and inspection body pursuant to ISO/IEC 17065 and 17020.

In addition to being unqualified, Shupe's opinions related to accreditation are completely unreliable. An Advisory Committee Note on Federal Rule of Evidence 702 provides:

> If the witness is relying solely or primarily on experience, then the witness **must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.** The trial court's gatekeeping function requires more than simply "taking the expert's word for it." . . . The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable.

(emphasis supplied) (internal citations omitted). Although Shupe attempts to rely on his "experience directing an ISO 17025-accredited laboratory" to support his opinions, Shupe's opinions are devoid of any explanation of how his experience directing an ISO/IEC 17025-accredited laboratory led him to conclude that A2LA's accreditation of FII as a product certification body was purportedly "improper." Notably, ISO/IEC 17025 governs organizations performing laboratory activities while ISO/IEC 17065 governs organizations certifying products, processes, or services in conjunction with a specific certification scheme. *See* Declaration in Support of A2LA's *Daubert* Motions, ¶¶ 5–6 (**Attached to this Motion as Exhibit 10**). Expertise in ISO/IEC 17025 accreditation does not translate to expertise in ISO/IEC 17065 accreditation. *Id*. ¶ 15 ("Suggesting that one's experience with ISO/IEC 17025 somehow qualifies them as competent, let alone an expert, in ISO/IEC 17065 is incompatible with ISO/IEC 17011's position on competency and expertise."). Therefore, since Shupe does not, and cannot, explain *why* and *how* his experience with ISO/IEC 17025 supports his opinions on A2LA's accreditation of FII pursuant to ISO/IEC 17065, his opinions are unreliable and must be excluded.

### 2.     *Shupe is not qualified to testify on FII's certifications of the Brazilian plywood mills.*

Shupe criticizes FII for not having prior experience with the PS 1 standard, for accepting transfers of previous certifications from TPI and PFS-TECO, and for the manner in which FII reviewed the certification tests performed by TPI and PFS-TECO. In *Plywood I*, Shupe admitted that he is not an expert on the PS 1 standard. Shupe Dep. *Plywood I*, Case No. 19-CV-62225-RKA [DE 351-12 at 81:10-12] ("Q. And you would agree with me that you're not a PS 1 expert? A. That's correct."). He also does not have any experience with product certification and inspection.

He has never provided consulting work on product certification, expert testimony on product certification, and has not published any articles on product certification or the PS 1 standard. Shupe Dep. *Plywood II*, **Exh. 9** at 10:21–23 ("Q. Have you provided any expert testimony on product certification under ISO 17065? A. No."); *id.* at 11:13–23 ("Q. And you haven't published any articles on product certification under ISO 17065; correct? A. That is correct. Q. Have you published any articles on the PS1-19 standard? A. No."); *id.* at 10:2–4. Therefore, Shupe clearly unqualified to opine on FII's certifications.

> ### 3.   *Shupe's opinions based on the testing conducted by APA, Clemson University, Blackwater, and TPI on Brazilian plywood certified by PFS-TECO and TPI do not assist the trier of fact.*

As previously stated, an expert cannot simply regurgitate the findings of another without attempting to assess the validity of the underlying data relied upon. *See Arch Specialty Ins. Co. v. Balzebre*, No. 10-23775-CIV, 2013 WL 12061814, at *2 (S.D. Fla. Jan. 9, 2013); *Mamani v. Sanchez Berzain*, No. 07-22459-CIV, 2018 WL 1090546, at *4 (S.D. Fla. Feb. 28, 2018); *PODS Enterprises, Inc. v. U-Haul Int'l, Inc.*, 812CV01479T27MAP, 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014) (internal citations omitted) ("Dr. Leonard's blind acceptance of and reliance on one-sided data from U-Haul, his failure to apply any analytical methodology whatsoever, and his parroting of the generic definition urged by U–Haul render his post–1998 opinions unreliable and therefore inadmissible."). Further, under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (internal citation omitted). Scientific testimony is subject to exclusion when a large analytical leap must be made between the facts and the opinion. *Id.* (internal citation omitted).

Shupe opines that "the high failure rates of the Brazilian plywood for bending stiffness or deflection, as found by the APA, Clemson University and Timber Products Inspection in its own surveillance testing in 2018, show that the Brazilian plywood tested was not manufactured with sufficiently dense southern yellow pine veneer to consistently meet the PS-1 requirements for bending stiffness or deflection." Shupe Expert Witness Disclosure, **Exh. 8** ¶ 9. Shupe's opinions that Brazilian plywood cannot consistently meet the PS-1 requirements are based entirely on the third-party testing identified in his report, which did not even test FII certified plywood, as the testing was conducted before FII began certifying in Brazil. Shupe Dep. *Plywood II*, **Exh. 9** at

33:6–12 ("Q. Your opinions that are based off of these -- the testing that were done by APA, Clemson, and TPI, they're based off of those evaluations alone; right? You didn't do anything independently to -- you didn't test any of the plywood yourself; right? A. That's correct. I did not do any plywood testing."); *see also id.* at 23:24–24:1 ("Q. And all of the testing that was conducted was on PFS-TECO and TPI plywood; right? A. I believe so, yes."). Shupe did not conduct any independent testing on the plywood that was tested by these third-party entities and did not attempt to verify the test results. *Id.* at 21:22–24 ("Q. You didn't do any testing on the plywood that was tested by APA; correct? A. That is correct."); *Id.* at 23:21–23 ("Q. And you didn't do any testing on the plywood that was tested by Clemson; correct? A. No. I was not involved in that testing."); Shupe Dep. *Plywood I*, Case No. 19-CV-62225-RKA [DE 351-12 at 83:19–22] ("Q. Okay. But you didn't do anything to independently verify the results of the APA testing to support your opinions, is that right? A. That's correct."). Relying blindly on the third-party test results identified in his report, Shupe could not identify **<u>any aspect</u>** of the methodology used during the testing that was conducted, including how the panels were sampled, who determined the sample size, how the sample size was determined, what controls were put in place, who determined the parameters for testing, and the failure rates for each test:

> Q. Do you know which type of random sampling was used in these studies?
> A. **<u>No, I do not.</u>**
> Q. Who determined the size of the wood sample that was tested?
> A. In these APA, Clemson test, who decides the number of panels to be tested?
> Q. Yes.
> A. **<u>I have no idea.</u>**
> Q. Do you know who determined how that sample size was appropriate?
> A. **<u>I don't know. I was not a part of those tests. I don't know what went into the methodology.</u>**
> Q. Do you know who determined the thicknesses that would be tested and why?
> A. **<u>I do not know who made those decisions.</u>**
> Q. But you're relying on those tests in formulation of your opinions; right?
> A. Pardon?
> Q. **<u>You're relying on those tests on APA, Clemson, TPI testing in formulation of your opinions in your expert witness disclosure in this action; right?</u>**
> A. **<u>Yes.</u>**
> Q. Do you know what controls were put in place to make sure the sample was random and to avoid sample selection bias?
> A. It's been quite some time since I've read those reports, but -- so I don't have the answer to that question.
> . . .

15

Q. Who determined the sample size? Do you know who determined that the sample size was statistically appropriate and capable of producing a valid representative of all Brazilian PS1 plywood?

A. **I don't know who was involved in selecting sample sizes.**

. . .

Q. What was the statistical methodology of the random sampling that was employed by APA, Clemson University, TPI? And if you know what it is, if you can explain it in detail or point me to somebody who should be able to explain it?

A. Yeah. **I don't know.** And I would point you to the authors of those reports.

Q. Do you know whether the methodology in the studies control for PS1 that was attributable to each mill, and then extrapolates that to -- and then extrapolates the results as to each mill?

A. I don't recall. It's been some time since I looked at those reports.

. . .

Q. So as to APA, Clemson, TPI, Blackwater testing, do you know who determined the parameters for the testing in each of those tests?

A. **I do not.** When you say parameters, you mean what individual tests were selected?

Q. Yes.

A. No. **I do not know who selected that.**

Q. Do you know the percentage of the tested samples in -- for example, we'll start with the APA testing that did fail.

A. I do not recall the specifics. It's been some time since I've seen that report.

Q. **Do you know the percentage in the Clemson University report of –**

A. **No.**

Q. **Of the testing sample that did not fail?**

A. **No.**

Q. **Do you know the percentage of the testing sample in the Blackwater report that did not fa[i]l?**

A. **Not offhand, no.**

Q. **Do you know the percentage of the tested sample in the TPI report that did not fail?**

A. **No, not offhand.**

Shupe Dep. *Plywood II*, **Exh. 9** at 35:2–36:10; 36:18–23; 37:3–20; 39:7–40:4 (emphasis supplied); *see also id.* at 24:2–10 (emphasis supplied) ("Q. So plywood is usually measured by thousand square feet on 3/8 basis; right? A. Yes. Q. Do you know using that metric how much wood was tested? A. **No. I don't have that offhand.** Q. Do you know over what period of time the wood that was tested was stamped? A. No.· I was not -- **no. I do not know that.**"). In fact, when asked to identify the number of Brazilian plywood mills that were tested in the APA study, he indicated that he could not recall. *Id.* at 20:19–23. When asked to identify which mills were tested in the APA study, he similarly responded that he could not recall. *Id.* at 20:24–21:1. According to

Plaintiffs' experts, Brazilian imports amount to one billion square feet per year. Anderson Dep. *Plywood II*, **Exh. 16** at 36:15–37:13.

Further, Shupe admits that there is "nothing inherently wrong with using trees from Brazil to produce plywood" and was not surprised to learn that plywood mills in Uruguay and Argentina, which neighbor the Brazilian mills certified by FII, produce and export plywood to the United States using the same species of pine that is used in Brazil. Shupe Dep. *Plywood II*, **Exh. 9** at 19:13–22. In fact, Shupe admits that there are ways to consistently produce PS 1 compliant plywood in Brazil using Metriguard technology, and that he is **unaware** of whether the Brazilian plywood mills have implemented such techniques subsequent to the testing conducted in 2018-2021:

> Q. In paragraph 23 of your report, you reference a Metriguard technology. **Do you know whether the Brazilian plywood mills that were certified by Forestwood have or use Metriguard?**
> A. **I do not know**, but I would assume that they do not because if they used it and used it correctly, then the vast majority of this situation could have been minimized.
> Q. But the test that you're referring to were conducted, I believe, before 2020. **So you don't know whether since that time, the Brazilian plywood mills are using that technology; right?**
> A. **That's correct. I'm not aware.**

*Id.* at 40:5–17 (emphasis supplied).[7] Therefore, presuming that Shupe's reliance on the third-party testing results was proper, which it was not, extrapolating those out-of-date test results and applying them in this action is entirely inappropriate and further demonstrates the unreliability and misleading nature of Shupe's opinions.

As Shupe's opinions arise out of inherently unreliable third-party test results, which he made no attempt to validate and merely accepted at face value, Shupe's opinions related to such testing must be excluded to avoid misleading the jury.

---

[7]     Metriguard is a technology that Plaintiffs admit, if being used by the Brazilian plywood mills, Brazilian plywood could consistently meet the PS 1 standard. *See* Thomas Skipper Dep. *Plywood II* at 78:6–9 (**Attached to this Motion as Exhibit 11**) ("And to the extent that some mills started using Metro Guard equipment in 2022 or 2023, they're more capable of producing PS 1 compliant? A. That is correct.").

#### 4.      *Shupe's opinions based on the Hart and Schimleck et al papers do not assist the trier of fact and must be excluded.*

Shupe blindly relies on two articles—(1) Hart, Differences in Juvenile Pinus taeda (Loblolly Pine) Grown in Santa Catarina, Brazil and the Southern United States, TAPPI Engineering, Pulping & Environmental Conference, October 2009 ("Hart Article") and (2) Schimleck, et al, Classifying Wood Properties of Loblolly Pine Grown in Southern Brazil Using NIR-H Hyperspectral Imaging, Forests 2020 ("Schimleck Article")—to support his opinion on "[t]he effects of silvicultural treatments and site conditions on southern yellow pine mechanical properties in southern Brazil and the U.S. South." Shupe's Expert Witness Disclosure, **Exh. 8 ¶** 8; *see also* Hart Article (**Attached to this Motion as Exhibit 12**); Schimleck Article (**Attached to this Motion as Exhibit 13**). He has done **nothing** to independently verify the information in these articles–and is unsure if the articles are even peer reviewed.

Case law is clear that "[w]hen a testifying expert relies upon another's conclusions, facts, or data, the expert must have a familiarity with the methods or reasoning used." *Petersen v. Daimler Chrysler Corp.*, 1:06-CV-00108-TC, 2011 WL 2491026, at *4–5 (D. Utah June 22, 2011) (internal citation omitted) (finding that the purported expert did not "have the requisite familiarity, knowledge, or technical judgment of the methods or reasoning applied by [the other expert] to be allowed to present opinions based on the [report generated by the other expert] to the jury. If [he] did so, he would effectively be serving as nothing more than a mouthpiece for [the other expert]"); *see also Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014) (emphasis supplied) ("The crucial issue is whether Dr. Sanford independently evaluated or verified the opinions upon which he relies. Dr. Sanford conceded in his deposition that he did not read most of the material cited in the opinions nor verify the data referenced therein. Thus, it is clear that Dr. Sanford **did not undertake the kind of independent evaluation** that Daubert and Rule 702 require. **He merely parroted the opinions and conclusions of other experts whose testimony is shielded from cross examination.** The Court cannot allow Dr. Sanford's testimony into evidence without abdicating its role as gatekeeper.").

Here, Shupe has accepted the Hart and Schimleck articles at face value and did not independently investigate the silvicultural practices of the Brazilian plywood mills certified by FII or attempt to verify the information set forth in the Hart and Schimleck articles, which do not analyze PS 1 plywood from any of the Brazilian plywood mills certified by FII. Shupe Dep.

*Plywood I* at [DE 351-12 47:14–20]. Shupe admitted that he "did nothing to verify the data" analyzed in the Hart Article. Shupe Dep. *Plywood II*, **Exh. 9** at 18:11–14. In *Plywood I*, he similarly testified that he did not examine the materials or methodology used in the Schimleck Article:

> Did you do any investigation into the site conditions of the wood grown as a part of this -- this study outlined in this article?
> A. **No, I did not.**
> Q. Okay. Did you do any investigation into the research -- excuse me, strike that. Did you do any investigation into the rainfall that was received by these trees utilized in this research study?
> A. **No, I did not.**
> Q. Did you do anything to investigate how Mr. Schimleck and crew fertilized the trees that were utilized in this research study?
> A. **No, I did not. I just relied upon the materials and methods that were provided.**
> Q. Okay. Now, did you do anything to investigate the stand density of the trees that were grown and used as part of this research paper?
> A. **No.**
> Q. What about -- did you do any investigation into the pruning of these trees?
> A. **No.**
> Q. What about how -- the genetics of the trees?
> A. **No.**
> Q. What about the soil?
> A. **No.**
> Q. And then -- one second. What about the pruning?
> A. **No.**
> Q. And did I -- and what about fertilization?
> A. **No.**

Shupe Dep. *Plywood I*, Case No. 19-CV-62225-RKA [DE 351-12 at 76:10–77:18] (emphasis supplied). When asked basics questions about the Hart and Schimleck articles, Shupe could not respond and repeatedly stated "he does not recall offhand":

> Q. What was the specific test result or the conclusion in this paper written by Lawrence Schimleck?
> A. I don't recall offhand.
> . . .
> Q. Do you know how many trees were tested in this or to support this article?
> A. I don't recall offhand. It's been several months since I've looked at this.
> Q. Do you know what sampling methodology was used?
> A. I don't recall offhand.
> . . .
> Q. Do you know how many trees were tested in the Hart article?
> A. I do not recall that level of detail.

Shupe Dep. *Plywood II*, **Exh. 9** at 43:5–8; 44:15–21; 46:20–22. These are the very types of opinions the Court, in its gatekeeper role, should exclude. Shupe did not have familiarity or knowledge of the research conducted by Hart and Schimleck, did nothing to verify their methodology, and could not even recall the basic aspects of the articles when asked about them during his deposition. An expert is not permitted to merely serve as a conduit for hearsay, as Shupe seeks to do here. *See Mamani*, 2018 WL 1010582, at *3 n.6 (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("But, while Rule 703 affords expert witnesses a degree of flexibility with respect to the rule against hearsay, 'a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.' ")).

> **5.      Shupe's subjective beliefs of what the PS 1 standard should be is unreliable and irrelevant.**

Here, Shupe opines that a heightened standard, "which is the uniform practice of the APA" *should* be the industry standard. . . ." Shupe's Expert Witness Disclosure, **Exh. 8** ¶ 27. However, such opinion is nothing more than his personal belief, and should be excluded from trial.

"[A]s gatekeeper for the expert evidence presented [at trial], the Court must ensure that any extrapolations" by an expert "are based on more than just the *ipse dixit* of [the] expert." *In re Abilify Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1371 (N.D. Fla. 2018); *Cook v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (internal citation and quotations omitted) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."); *Kaufman v. Pfizer Pharmaceuticals, Inc.*, 2011 WL 7659333 at *6; (S.D. Fla. Aug. 4, 2011) (excluding opinions of regulatory expert where her opinions amount to nothing more than her "personal belief").

Shupe opines that "the industry standard that should prevail in the certification of plywood producers to manufacture PS-1 structural plywood should be based upon comprehensive laboratory testing of sample sets of plywood panels that are randomly selected and reasonably representative of the population of panels to be tested." Shupe's Expert Witness Disclosure, **Exh. 8** ¶ 25. It is his "opinion that the standard in the industry for ongoing inspection and testing by the agencies certifying PS-1 plywood producers should be consistent with the model currently utilized

by the APA . . . ." *Id.* ¶ 26. However, Shupe's opinions on what should be the "industry standard" is nothing more than his own *ipse dixit* and, as he admits, involves practices not required under the PS 1 standard:

> Q. So it's your opinion that the APA model should be the industry standard; correct?
> A. That's correct.
> . . .
> You understand that the PS1 standard does not require ongoing inspections and product testing; right?
> A. Yes. I understand that.
> Q. And then if we keep going to -- so the APA standard requires more than what the PS1 standard requires; right?
> A. Yes. I think it goes above and beyond, and I think it's a very good process.

Shupe Dep. *Plywood II*, **Exh. 9** at 41:16–18; 42:2–10. Accordingly, Shupe's opinions on his personal belief of what the standard should be, should be excluded from trial.

## III.   Motion to exclude Plaintiffs' expert opinions on damages[8]

### A.   Regression modeling

A linear regression analysis is a common tool used to determine the effect of independent variables on a dependent variable. *See Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1299 (N.D. Fla 2017) (explaining that linear regression is an analytical tool used to examine the relationship between independent and dependent variables). The basic regression method is simple: "isolate the effect of one variable (the 'independent variable') on another variable (the 'dependent variable') by holding all other potentially relevant variables (the 'control variables') constant." *Id.* at 396. Additionally, "a regression analysis must be the product of a consistently followed methodology" and "must control for the 'major factors' that might influence the dependent variable." *Id.* "[T]o be admissible, a regression analysis must be the product of a consistently followed methodology. . . . for the purposes of *Daubert*, the practice of the art must yield to predictable and justifiable methodology." *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).

---

[8]    This Motion is also based on a Rebuttal Report of Dr. Zhang, which he authenticated and adopted as a part of his deposition testimony. Dr. Zhang's Dep. *Plywood II* at 70:18–71:7 (**Attached to this Motion as Exhibit 14**); *see also* Montzka Dep. *Plywood II* at 47:7–9 (**Attached to this Motion as Exhibit 15**) ("Q. Is [Dr. Zhang] the most qualified that you've ever come across from an academic standpoint? A. Of the limited sample I have, absolutely, yes.").

Regression modeling is perhaps most commonly seen in antitrust cases where a plaintiff is trying to attribute a price increase to an anticompetitive behavior. The premise underlying what is referred to as a reduced form (price) model is that in any particular market there are identifiable supply and demand factors that explain price. These factors by in large are always present. For example, while the cost of labor may vary based on other economic conditions, it is always a factor that will impact pricing. Economists, in building regression models, come up with *variables* that account or control for the cost of goods or services sold, including labor costs. Generally speaking, in a reduced form (price) model, there will be supply and demand variables (around ten to fourteen variables) that *explain* the price. Two qualified economists would identify, perhaps with minor variations, the same supply and demand variables. Montzka Dep. *Plywood II*, **Exh. 15** at 51:3–16. A scientifically sound model will stand the test of time, meaning it will explain prices in 2018 just as well as it will in 2024. When regression modeling is used in antitrust cases, economists examine the effect of the anticompetitive conduct on price. The anticompetitive conduct is in essence an additional variable that is considered in conjunction with the other supply and demand variables that generally indicate the price of a good.

The basic regression method speaks in terms of a *dependent* variable and the *independent* variables that explain it. In antitrust cases, as in this case, the *dependent* variable is almost always price, and the *independent* variables are those supply and demand factors that typically explain price plus the addition of an *independent* variable to account for the alleged anticompetitive conduct. In this case, that additional independent variable (aka explanatory independent variable) is the reduction of PS 1 plywood in the U.S. market assuming that no PS 1 plywood was imported from Brazil. Although constructing a regression model is highly technical, complicated, and requires expertise in econometrics and statistics, the goal of the regression model is, at the end of the day, fairly straightforward: isolate the effect of one *independent* variable (PS 1 volume in the U.S. market) on the *dependent* variable (price) by holding the other ten to fourteen *independent* variables constant. The term regression is used because when you control for other *independent* variables that explain price, one "regresses" the influence of the selected *independent* variable (the volume of PS 1 plywood in the U.S. market for a certain period of time) on the *dependent* variable (price). The number associated with that influence is called a "coefficient."

The fundamental goal of regression analysis is to establish and reaffirm a causal relationship between the *dependent* variable and the *independent* variables. *Reed Const. Data Inc.*

*v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 397 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016). A common explanation of the purpose behind regression modeling involves attributing location as the reason why rent for apartments in Manhattan exceeds rent for apartments in Queens and converting a statement of correlation into one of causation, *i.e.*, specifically whether location accounts for the pricing differential. The regression model does this by comparing the prices of apartments (the *dependent* variable) of the same size, with the same number of bathrooms, amenities, etc. (the control, *independent* variables), across different locations. Regression analysis formalizes that method by using observations that relate price to relevant supply and demand variables.

**B.      Preliminary statement on Plaintiffs' damages**

Using Montzka's regression model, Anderson's Expert Witness Disclosure purports to indicate the price delta for the damage period for each Plaintiff mill. This delta (based on Montzka's regression analysis) is used to show that the prices in each quarter would have been higher but for the importation of Brazilian structural plywood. Anderson did not look at Plaintiffs' actual profits during the damage period. Anderson Dep. *Plywood II* at 105:18–23 (**Attached to this Motion as Exhibit 16**). His disclosure leaves out that the damage period resulted in some of the highest plywood prices that the individual mills have seen since 2017. For example, Hunt Lumber's profit and loss statement recorded record breaking prices for 2021 of ███ per thousand square feet on a 3/8th basis ("$/M") and ███ $/M for 2022 compared to ███ $/M in 2020 and ███ $/M in 2019. Despite its knowledge that Brazilian plywood was being imported into the U.S., Hunt forecasted that it would sell at ███ $/M for 2021 but exceeded that forecast by close to ███ $/M. *See* Richard LeBlanc Dep. *Plywood II* at 81:2–9 (**Attached to this Motion as Exhibit 17**). Further, in 2022, Hunt forecasted ███ $/M but exceeded the forecast again. *Id.* at 17–23. Despite claiming a delta in what prices would be without Brazilian plywood imports, LeBlanc testified that Hunt's net income for 2022 was in fact ███ million, which compared extremely favorably to Hunt's net income for each of 2017 through 2021. *Id.* at 81:10–16.

**C.      Montzka's expert opinions and testimony must be excluded.**

*1.      Montzka is not qualified to conduct a regression model.*

Montzka has a B.S. and a M.S. in forestry/forest management and is not an economist. His purported qualifications are based on taking some econometric classes as a part of his graduate

coursework. However, these courses did not cover the required knowledge and skills needed to conduct regression modeling in this case. *See* Dr. Zhang Rebuttal Report ¶ 9 (**Attached to this Motion as Exhibit 18**). Montzka admitted his lack of qualifications as follows:

> Q. What I'm interested in, from an educational standpoint or a certification standpoint, have you had any additional training or certification in building econometric models?
> A. No, nothing in terms of education or training, only -- only continuing experience.
> Q. Have you -- and by -- we understand econometric models includes regression models, correct?
> A. Correct.
> Q. **And none of your material has ever been peer-reviewed, has it?**
> A. **No.**
> Q. And I think you covered that in Plywood 1. What -- have you served as an expert witness in a litigation case or another legal case where you were qualified as an expert on regression modelling?
> A. No.

Montzka Dep. *Plywood II*, **Exh. 15** at 38:23–39:14 (emphasis supplied). Ironically, it is Montzka's own work in this litigation that demonstrates that he is unqualified to build a fundamentally sound and scientifically reliable regression model. The first time Montzka conducted a forest product or (more specifically structural plywood) price modeling was in *Plywood I*, which he admitted **completely failed** when applied in *Plywood II*.[9] *Id.* at 60:4–6 (Montzka testifying: "the biggest problem with those initial data sets is that the explanatory power of the model failed"). Montzka's *Plywood I* model had ten independent variables and his *Plywood II* model had twelve or thirteen independent variables but only one independent variable was used in both.[10] *Id.* at 65:5–9. In comparison, Dr. Zhang's regression models for *Plywood I* and *II* used the same independent variables except that his *Plywood II* model included a Covid variable. *Id.* at 48:24-49:8. Had Montzka built a reliable regression model in *Plywood I*, that same model would have and should have been applicable and useable in *Plywood II* with the inclusion of a Covid variable, as the two cases differ from a damage standpoint only in terms of the damage periods measured (*Plywood I*

---

[9]     The failure of his Plywood I model was not recognized by Montzka until after the *Plywood I* litigation concluded.

[10]     Montzka claims that the variables were similar because he used a modified version of the variable, aka a transformed variable, but admits that all his transformed variables were based on his own *ipse dixit*. Montzka Dep. *Plywood II*, **Exh. 15** at 65:16–19. But his claim that the variables were similar is simply not accurate. Dr. Zhang's Rebuttal Report, **Exh. 18** ¶ 85(d).

– 2019 and 2020 vs. *Plywood II* – 2021 and 2022). Montzka's lack of qualifications and expertise in building reliable regression models is also reflected in the fact that he has never built a reduced form price model, which is one of the most widely used types of regression model in economics, and the only type of model that makes sense to use here, since the *dependent* variable is plywood price. Montzka Dep. *Plywood II*, **Exh. 15** at 52:21. His lack of qualifications is further illustrated by the fact that he is not aware of certain fundamentals in econometrics. For example, he is not aware of the use of the technique used to analyze *degrees of freedom per variable* as a check on a regression model and has never used the technique of *differencing* non-stationary variables. *Id.* at 106:4–11; 111:4–9. Montzka also does not know the difference between supply and critical supply factors and demand and critical demand factors, and he does not test for stationary versus non-stationary variables. *Id.* at 82:6–8; 96:21–97:2; 111:15–16; *see also* Dr. Zhang Rebuttal Report, **Exh. 18** ¶¶ 12, 20. Further, Montzka has never been qualified as an expert witness by any court and admitted that Dr. Zhang is the most qualified person that he has ever come across in the context of regression modeling. Montzka Dep. *Plywood II*, **Exh. 15** at 39:10–14; 46:10–47:9.

Therefore, Montzka's expert opinions and testimony must be excluded since he is not qualified to conduct a regression analysis.

### 2. *Montzka's regression model is wholly unreliable and unsupported by economic theory.*

#### i. Montzka's regression model is not backed by economic theory.

It should go without saying a regression model must be based on established economic theory. Dr. Zhang Rebuttal Report, **Exh. 18** ¶ 17. Montzka admits that his regression model is not based on any recognized economic theory. Montzka Dep. *Plywood II*, **Exh. 15** at 50:9–53:2. In this case, the appropriate regression method is a reduced form price model. Dr. Zhang Rebuttal Report, **Exh. 18** ¶¶ 19–21. Montzka has never built such a model. Montzka Dep. *Plywood II*, **Exh. 15** at 52:21 (Montzka testifying: "I have not done a reduced form plywood model.").

A reduced form model (on the price of a forest product) should start with a properly described supply function and demand function. *See* Dr. Zhang Rebuttal Report, **Exh. 18** ¶ 19. This is done by finding the right supply factors (or supply drivers), demand factors (or demand divers), and policy variables. *See id.* ¶ 20. Supply factors are not the same as supply (quantity) or quantity supplied. *See id.* Not only did Montzka not identify critical supply and demand factors, but he was also completely unfamiliar with these fundamental economic theory concepts. Montzka

Dep. *Plywood II*, **Exh. 15** at 96:21–97:2. Further, he used supply quantity (also called quantity supplied) as an independent variable, which is completely uncalled for and unacceptable. This is a clear indication that he was unaware of the critical distinction between supply and supply factors. Although Montzka tried to build something akin to a reduced form price model, even if he was not aware of it, he did so without accounting for the most critical components—critical supply and demand factors. Dr. Zhang Rebuttal Report, **Exh. 18** ¶¶ 20–21. This alone rendered his regression model irreparably flawed and unreliable.

Further, Hotelling's Lemma is a fundamental economic concept that informs the building of a supply function. Hotelling's Lemma states that the rate of an increase in maximized profits with respect to a price increase is equal to the net supply of the good. This is to say, a firm's output supply of a product (such as plywood) is a function of its product price, and unit input costs, including log cost, wage rate, and cost of capital. Without controlling and accounting for unit input costs, it was not possible for Montzka to apply Hotelling's Lemma. This explains why Montzka had to admit that he did not apply Hotelling's Lemma, which renders his analysis scientifically unsound and whatever results it produced completely unreliable and irrelevant. Dr. Zhang Rebuttal Report, **Exh. 18** ¶ 11; Montzka Dep. *Plywood II*, **Exh. 15** at 106:19–107:7.

Since Montzka's regression model is not backed by any economic theory, it is inherently unreliable.

ii.    <u>Montzka used outcome-driven, or "cherry-picked," variables.</u>

To be admissible, "a regression analysis must examine an appropriate selection of data." *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016). In other words, "[w]hen constructing a benchmark statistic, the regression analyst may not **'cherry-pick' the time-frame or data points so as to make their ultimate conclusion stronger**." *Id.* (emphasis supplied) (internal citation omitted). Rather, "some passably scientific analysis must undergird the selection of the frame of reference." *Id.*

Montzka admitted that a regression model must be tethered to an economic theory but then astonishingly admitted that his model was not tethered to any formal economic theory. Montzka Dep. *Plywood II*, **Exh. 15** at 51:17-25; 74:6-17.[11] He labeled what he did as an "investigative analysis" with the predetermined goal of correlating Brazilian plywood imports and price:

---

[11]    Montzka's analysis produced a patently arbitrary and completely unexplainable result with respect to his calculation of damages for the Western U.S. mills with respect to the third quarter

Q. And that's based on your *ipse dixit*, or that decision is --
A. No. It was more based on my philosophy of what I understood the charge was in this mission. And so my *ipse dixit* informed that because **I was setting out not to build an economic model around the theory of the firm but to do an investigative analysis** of the data set from 2004 to 2022 and see if prices could be related to factors that are relevant to it and if Brazil imports end up being an explanatory variable as part of that price movement.

*Id.* at 51:17-25; 97:12–22 (emphasis supplied). A regression model unmoored to sound economic theory, and which is the product of "cherry-picking," is unreliable and also will not satisfy *Daubert*'s requirement that the results grow naturally and directly out of research the expert conducted independent of the litigation as opposed to opinions developed expressly for the purpose of testifying. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322, 1333 (S.D. Fla. 2012), *aff'd*, 746 F.3d 1008 (11th Cir. 2014).

When, as here, a regression model is the result of a predetermined outcome where *independent* variables are selected and dispensed until a mix is found that can be used to justify the objective-driven result, such model is unmoored to sound economic theory. This is an example of "cherry-picking" variables, although seldom is it done in such a blatant and reckless manner as Montzka did here. Montzka defined "cherry-picking" as "purposely picking variables that are going to go and bring [him] to a preconceived outcome." Montzka Dep. *Plywood II*, **Exh. 15** at 107:20–22. Yet, that is exactly what he did in starting with roughly 500 combinations of over 100 independent variables (which he admitted he came up with based on his own *ipse dixit*) and then, based on his *ipse dixit*, eliminating those variables that did not support his predetermined outcome and keeping or transforming those which did.[12] Montzka Dep. *Plywood II*, **Exh. 15** at 81:1–9; 88:5–89:22; 56:20–25; 57:13–17 ("Q. Filtering, eliminating, adding, whatever it is, is that based on your *ipse dixit* as to what you think is, you know, appropriate, what you think is significant, insignificant, doesn't fit, what have you? A. Yeah."); *id.* at 65:16–19. Dr. Zhang analogized what

---

of 2022. Anderson Dep. *Plywood II*, **Exh. 16** at 85:3–16 (regarding both witnesses' inability to explain the $106 delta calculation).

[12]     A transformed variable can be a valid technique when the circumstances require. An example of a legitimately transformed variable is taking a logarithm. However, transforming or constructing a variable to achieve a predetermined, desired outcome is a form of cherry-picking. An example of a constructed variable to achieve a predetermined outcome is lagging a variable for multiple quarters or using a moving average of it when there is no rationale or theoretical support for doing either. Lagging a variable for five quarters, as Montzka did, is reckless and unacceptable and can only be explained if the lagging was necessary to achieve the predetermined outcome.

Montzka did as a physician coming up with 500 different diagnoses before "supposedly" getting to one he could cure. Dr. Zhang Rebuttal Report, **Exh. 18** ¶ 10(e). Montzka's own experience with his Plywood I model, which he had to completely ditch, demonstrates that a regression model unmoored to a recognized economic theory produces a fundamentally flawed regression model that does not work. Montzka Dep. *Plywood II*, **Exh. 15** at 58:22–59:24.

The cherry-picking of variables is easily unmasked. For starters, models in both *Plywood I* and *Plywood II* analyzed data going back to the mid-2000s (2007 in *Plywood I* and 2004 in *Plywood II*). With the exception of a variable to account for Covid in the Plywood II model, the independent variables should have been the same in both models, but they were not. Montzka Dep. *Plywood II*, **Exh. 15** at 51:3–16. Ninety percent of the independent variables he used in *Plywood II* differed from the independent variables he used in *Plywood I*. Dr. Zhang Rebuttal Report, **Exh. 18** ¶ 85(d). This occurred as a result of the failure of the *Plywood I* model when applied to the later damage period in *Plywood II*, requiring Montzka to go in search of variables and/or modify and construct variables that would achieve the predetermined outcome—a model that would predict the price differential of plywood in the absence of Brazilian plywood in the U.S. market. It is remarkable that Montzka's *Plywood II* model, which extended through 2022, in contrast to his *Plywood I* model, which extended only through 2019, did not control for the effects of Covid, which economists do as a matter of routine through use of what is called a Covid dummy variable. Montzka Dep. *Plywood II*, **Exh. 15** at 61:21–62:3; Dr. Zhang Dep. *Plywood II*, **Exh. 14** at 76:22–77:8. Montzka says he relied on his own *ipse dixit* in not including a Covid variable. Montzka Dep. *Plywood II*, **Exh. 15** at 96:14–17.

The "cherry-picking" of independent variables is also evident from the use of nonsensical lagged variables. *Id.* at 88:5–89:22. Mr. Montzka used two GDP change variables, one lagged 4 quarters and the other lagged 5 quarters. The damage period in *Plywood II* consists of the five quarters ending in 2021 and covering all of 2022. Montzka used GDP lagging a year in one case and a year and a quarter in another case. While GDP is an appropriate independent [demand factor] variable to use in a reduced price form model, a lagged GDP variable is not unless there is an articulated economic theory-based reason for doing so. But there is not. Dr. Zhang Rebuttal Report, **Exh. 18** ¶ 29. As Dr. Zhang so aptly put: does anybody else or any economist really think that the price of plywood today has anything to do with GDP four and five quarters ago? Montzka literally

admitted that his basis for lagging these two GDP variables was based on nothing but his own *ipse dixit*. Montzka Dep. *Plywood II*, **Exh. 15** at 75:18–76:3.

Further, "cherry-picking" is not just a matter of selecting variables but also consists of ignoring or omitting obvious and major ones. *See Reed*, 49 F. Supp. 3d at 403 ("Omitted-variable problems—as the name suggests—arise when important control variables are left out of the model. Imagine trying to calculate the effect of location on the price of an apartment without considering the size of the apartments in the sample. One might end up with what looks like a correlation between location and price, but the result would be meaningless because the entire effect could just as easily be explained by the fact that larger apartments are concentrated in certain locations."). Here, it defies economic theory that a reduced form price model would not include plywood production costs, such as log costs, labor costs, and capital costs. Dr. Zhang Rebuttal Report, **Exh. 18** ¶ 25. Montzka did not include these cost variables. Montzka Dep. *Plywood II*, **Exh. 15** at 75:16–19. No forest economist would ever assume that the production cost of a forest product (such as plywood) is irrelevant to its price. Ignoring these production costs is tantamount to assuming that these costs have no bearing on price. An econ 101 student probably understands that the cost of production directly bears on price, which, in turn, directly bears on sales. Montzka's explanation for not including these cost variables, admittedly based only upon his *ipse dixit*, necessarily reflects one of four things: (1) his lack of qualifications and experience to create a reliable and sound regression model, (2) his intentional omission of major factors, (3) his "cherry-picking" of variables to produce a predetermined result, or (4) a combination of (1)–(3). Montzka Dep. *Plywood II*, **Exh. 15** at 75:16–19; *see also Reed*, 49 F. Supp. 3d at 401 ("Thus, a regression that excludes 'major' variables is inadmissible . . . .").

In addition to "cherry-picking" variables, Montzka's models also face multicollinearity issues. Multicollinearity is an econometric term that is used to identify results from a regression model that reveals its unreliability. As noted above, regression models attempt to identify the effect of an explanatory independent variable (here, the absence of Brazilian plywood in the U.S. market) on a dependent variable (here, the price of plywood). Multicollinearity results when the explanatory independent variable is highly correlated with one or more of the other independent variables. *See Reed*, 49 F. Supp. 3d at 404. For example, if A is the explanatory independent variable (plywood supply here) and it is highly correlated with two of the other control independent variables, B and C, it becomes impossible to determine the influence of A versus B versus C or

any combination thereof on the dependent variable (price). *Id.* Multicollinearity can be diagnosed by checking correlation coefficients between *independent* variables (in the correlation matrix). Dr. Zhang Rebuttal Report, **Exh. 18** ¶¶ 76–77.

Montzka never bothered to check whether his *Plywood II* model was plagued by multicollinearity. Montzka Dep. *Plywood II*, **Exh. 15** at 77:10 (Montzka testifying: "I had not tested for multicollinearity"). It was not until he received Dr. Zhang's Rebuttal Report that he learned that eight of his independent variables were highly correlated. Dr. Zhang Rebuttal Report **Exh. 18,** Table 6. In an otherwise sound regression model, not the case here, multicollinearity can, in some cases, be overcome through legitimate adjustments to the model. It is not just the fact that Montzka's model suffered from multicollinearity that presents additional reliability concerns, but it is also his failure to recognize and check heteroskedasticity. Montzka Dep. *Plywood II*, **Exh. 15** at 76:25–77:3; Dr. Zhang Rebuttal Report **Exh. 18** ¶ 75. Although, in theory, adjustments can be made to reduce the effects of, or eliminate, multicollinearity and heteroskedasticity, the adjustments that would be necessary here would completely obliterate Montzka's model (the cure would be as fatal as the disease).

In sum, the fact that Montzka did not build a reliable regression model from the very beginning is evident from the failure of his *Plywood I* model when applied to *Plywood II*.[13] A sound, reliable regression model predicts the past as well as the future. When, as here, a model is applied to a subsequent period of time, it will have to be updated to include current data sets and to control for extraordinary occurrences (like Covid), but the fundamental components of the model (its selection and use of independent variables) remain constant. Montzka admitted his *Plywood I* model failed. He also admitted his *Plywood II* cannot be used to predict the future and, in so doing, admitted that his *Plywood II* is also flawed and unreliable. Montzka Dep. *Plywood II*, **Exh. 15** at 110:2–5. Montzka's "methodology"—like the rest of his approach—was outcome-determinative and completely bereft of intellectual rigor or integrity and must be excluded.

### 3. *A regression model does not assist the trier of fact unless it proves causation.*

It is a well-established theory of economics that:

---

[13]     Empirical test conducted Dr. Zhang confirmed that his *Plywood II* model failed miserably in *Plywood I* and vice versa.

> Causality cannot be inferred by data analysis alone; rather, one must infer that a causal relationship exists on the basis of an underlying causal theory that explains the relationship between the two variables. Even when an appropriate theory has been identified, causality can never be inferred directly. One must also look for empirical evidence that there is a causal relationship.

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 862 F. Supp. 2d 1322, 1331, 1332 (S.D. Fla. 2012), *aff'd*, 746 F.3d 1008 (11th Cir. 2014) (internal citation omitted) (finding that "since Dr. Pacey does not establish causation, the probative value of her evidence is substantially outweighed by the danger of misleading the jury under [Federal Rule of Evidence] 403").

Montzka admitted that corroborative or empirical evidence is a desired sanity check on the results of any regression model but rather curiously was unable to think of any such sanity check that could be applied to his model. Montzka Dep. *Plywood II*, **Exh. 15** at 111:1–3; 126:7–13. Yet, he also testified that his models only show a correlation relationship and **do not show causation**. Montzka Dep. *Plywood I* [DE 351-14 at 61:23–62:2] (emphasis supplied) ("Q. Okay. So before we get into the specific 24 variables. Would you agree with me that your models, they only show a correlation relationship? **It doesn't show causation? A. Correct; yes.**"); *see also* Montzka Dep. *Plywood II*, **Exh. 15** at 41:8–12. Therefore, since Montzka does not provide any empirical evidence and his models do not establish causation, which is the purpose of regression modeling, his regression models will not assist the trier of fact in any regard and must be excluded.

### 4.    *The Trademo data relied on by Montzka and Anderson is unvetted and unreliable.*

Both Montzka and Anderson rely quite heavily on data compiled by Trademo, which purportedly compiles, for a fee, information on imports derived from bills of lading. Anderson has never seen such a bill of lading. Anderson Dep. *Plywood II*, **Exh. 16** at 55:18–22. He is unaware of its use other than when he and Montzka used it in *Plywood I. Id.* at 51:5–10. Montzka indicated that Anderson acquired the Trademo data. Montzka Dep. *Plywood II*, **Exh. 15** at 7:24–25. Montzka has also not seen a bill of lading. *Id.* at 8:3–4. He is unaware of anyone ever vetting and confirming that the data compiled by Trademo matches up with the actual bills of lading on which the data compilations are purportedly based. *Id.* at 8:14–9:3. He has never worked with them before. *Id.* at 9:16–18. He has no knowledge of whether Trademo compilations have ever been accepted by any court as a predicate for an expert's opinion. *Id.* at 9:19–23.

There is no evidence that the bills of lading would indicate any specifics about plywood shipped from Brazilian mills, including whether it was PS 1 stamped and, if so, how much of it was PS-1 stamped. Boise Cascade's representative, who imports millions of square feet of Brazilian plywood, did not know whether this type of information would be indicated in a bill of lading. Roger Fossett Dep. *Plywood II* at 23:3–18 (**Attached to this Motion as Exhibit 19**).

There are two ways in which Anderson and Montzka could have ascertained the veracity and accuracy of information compiled by Trademo. First, they could have selected an appropriate sample of bills of lading and compared them to the Trademo data compilations. In this way, they would be able to satisfy themselves and demonstrate to the Court that the information compiled by Trademo tracks the information contained in the bills of lading and what details (if any) are specified about plywood imports. That was obviously not done. Alternatively, they could demonstrate that other experts routinely rely on Trademo compilations, which also was not done. *See ADT LLC v. Vivint Smart Home, Inc.*, 20-CV-23391, 2023 WL 3568117, at *21 (S.D. Fla. May 19, 2023) (excluding the opinion under Rule 702 and *Daubert*—"This critical step was not taken here. Dr. Matolo did not review the ADT formula or any of the dealer agreements to ensure that, from an economics perspective, it was the type of data routinely relied on by other experts in performing this type of formulation."); *Multimedia Patent Tr. v. Apple Inc.*, No. 10-CV-2618-H (KSC), 2012 U.S. Dist. LEXIS 165928, at *34 (S.D. Cal. Nov. 20, 2012) (generic industry data is not tethered to the facts and circumstances and therefore any damages testimony based on the industry data should be excluded); *Riverside Apartments of Cocoa, LLC v. Landmark Am. Ins. Co.*, No. 618CV1639ORL40DCI, 2020 WL 8184710, at *3 (M.D. Fla. Dec. 4, 2020) (excluding expert report where expert did not vet report he relied upon, made no effort to independently verify its findings, and cannot provide an opinion concerning its accuracy).

Because Plaintiffs' damage model is completely dependent on the Trademo data, the reliability and accuracy of which cannot be demonstrated and cannot be assumed, Plaintiffs damage model must be excluded under Federal Rule of Evidence 702 and *Daubert*.

### D. Anderson's expert opinions and testimony must be excluded, as his opinions are unreliable and will not assist the trier of fact.

Anderson was retained to opine on the damages allegedly suffered by Plaintiffs during the 16-month damage period from the importation of allegedly defective structural plywood from Brazil. For the most part, Anderson's role boils down to collaborating with or supporting Montzka

on certain matters then doing simple multiplication of numbers provided to him by Plaintiffs and Montzka. Specifically, Anderson multiplied Plaintiffs' aggregated sales volume by Plaintiffs' estimated price increase had there been no Brazilian plywood on the U.S. market to determine Plaintiffs' total damages. The prices at which the Plaintiffs sold PS 1 plywood is not based on their actual sales price figures but an unweighted composite plywood sheathing price listed in the Random Lengths trade publication. In other words, for each Western U.S. mill, Anderson used the Random Lengths published price for plywood sheathing in the Western U.S. market without regard to whether those Plaintiffs sold at or near that price and without regard to how much of the component types of sheathing that make up the composite price were sold by each of the mills. The same was done for the mills part of the Southern U.S. market. This resulted in 16 types of sheathing for the Western U.S. market and 15 types for the Southern U.S. market. The composite price for the Southern U.S. market includes 15 types of sheathing prices ranging from $610 on the low end to $1360 on the high end [per thousand square feet on a 3/8s basis]. Anderson just averaged these 15 prices without weighting them based on how much of each of the 15 types of sheathing each mill actually sold during the damage period. *See* Random Lengths Panel Pricing Guide (**Attached to this Motion as Exhibit 20**); Anderson Dep. *Plywood II*, **Exh. 16** at 102:12–14. Had Plaintiffs all testified that they relied on the composite price, then Anderson's use of it would *fit*. Each plaintiff, however, considered different prices published in Random Lengths in setting the price of their plywood, like Hunt whose corporate representative looked at kiln dried prices (not the sheathing composite Anderson used) for the west part of the Southern U.S. and also price changes over a 3-week period. LeBlanc Dep. *Plywood II*, **Exh. 17** at 45:8–46:2; *see also* Random Lengths Panel Pricing Guide, **Exh. 20**. Anderson's use of an unweighted composite price, without regard to the actual prices Plaintiffs sold during the damage period or what they considered in Random Lengths in setting their own prices, renders his damage model arbitrary.

PFS-TECO ceased certifying mills as of May 31, 2022, and TPI ceased certifying mills as of August 31, 2021. Plaintiffs' damage model was initially a matter of applying its regression model to the damage period and zeroing out Brazilian plywood (estimated to be 1.157 billion square feet on a 3/8s basis). Completely zeroing out Brazilian plywood during the damage period attributed 100% of the Brazilian supply in the U.S. during the damage period to A2LA's accreditation of FII. When the first of the Plaintiffs were deposed, they each acknowledged that the damage period would still include Brazilian PS 1 plywood produced by mills certified by PFS-

TECO and TPI. *See* Tyler Freres Dep., *Plywood II* at 137:6–138:7 (**Attached to this Motion as Exhibit 21**); Juan Medellin Dep., *Plywood II* at 96:23–98:21 (**Attached to this Motion as Exhibit 22**). Anderson and Montzka then revised their original damage calculations to reflect that only a portion of the Brazilian plywood in the U.S. market in the first three quarters of the damage period could be attributable to mills certified by FII.

The manner in which Anderson and Montzka apportioned the Brazilian supply during the damage period to FII and non-FII mills was incomplete and arbitrary. They relied on unverified data Trademo (discussed *infra*) and assumptions made about that data. They also assume that all plywood reflected in the Trademo data constituted PS 1 stamped plywood sheathing that directly competed with their own sales of plywood sheathing while acknowledging that the bills of lading for Brazilian plywood imports would be the only indication of this and that they never checked any bills of lading. *See* Anderson Dep. *Plywood II*, **Exh. 16** at 55:18–22 ("Q. Have you seen bills of lading that correspond with those shipment dates? Have you actually put eyes on them? A. I have not looked at an actual bill of lading."); *id.* at 62:6–11 ("Q. So the answer is: Yes, you are assuming that those particular mills that you looked at to come up with these proportions and volumes, that the only thing they shipped from Brazil to the U.S. is PS1-stamped plywood, correct? A. That's correct."); *id.* at 64:12 ("A. We assumed it was 100 percent sheathing."). They also failed to consider how profitable Plaintiffs were during the damage period. *Id.* at 105:18–23 ("Q. Did you look at the actual – actual figures for any of the plywood mills for 2021 and '22 in terms of profits, how profitable they were? A. Profits? Q. Yes. A. I did not look at that, no."). There is no evidence that bills of lading break down the plywood by grade, width or any other type or metric.

Anderson's assumption that all plywood imports from Brazil are PS 1 grade is contradicted by empirical evidence. Boise Cascade testified that from 2020–2023, it purchased a total of █████ ██████ square feet of Brazilian plywood and only ████ was PS 1 grade. Fossett Dep., *Plywood II*, **Exh. 19** at 21:9–22:7. Boise also testified that ███% of the ████ ████ square feet was not sold in the U.S. *Id.* at 24:5–13. This empirical evidence contradicts Anderson and Montzka's assumption that everything imported from Brazil is PS 1 grade. Not only does Anderson make an assumption that everything reflected in Trademo is PS 1 plywood, but he also assumes that it all directly competes with the different types of plywood products and sheathing sold by Plaintiffs. Anderson and Montzka collaborated and/or relied on each other to varying extents and one's opinion must be considered in evaluating the reliability of the other's opinion and their combined opinion. Both

opinions are deeply flawed and problematic. *Daubert's* reliability threshold necessarily examines the totality of the circumstances.

## IV.    Cumulative expert testimony must be excluded.[14]

Federal Rule of Evidence 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the . . . needless presentation of cumulative evidence." Expert testimony may be needlessly cumulative where there is "substantial overlap" between the areas on which two experts will testify. *Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, No. 10-21511-CIV, 2010 WL 4225947, at *2 (S.D. Fla. Oct. 21, 2010) (internal citations omitted). "Unnecessarily similar and cumulative expert testimony may create the risk that a jury will resolve differences in expert opinion by 'counting heads' instead of by giving fair consideration to the quality and credibility of each expert's opinions." *Id.* (internal citation omitted). Accordingly, this Court "is charged with eliminating or reducing duplicative experts and/or testimony." *Goldstein v. Centocor*, No. 05-21515 cv, 2007 WL 61913, at *2 (S.D. Fla. Jan. 5, 2007) (excluding duplicative expert testimony). Here, Anthony and Shupe both provide opinions regarding the PS 1 standard, the bending stiffness and strength of plywood produced by the Brazilian mills, and A2LA's accreditation of FII as a product certification and inspection body. Even though neither Anthony nor Shupe have any expertise in accreditation of product certification and inspection bodies, they provide nearly identical accreditation opinions on A2LA's accreditation of FII. Anthony and Shupe should be prohibited from testifying as to the same topics, as their opinions are needlessly cumulative and, as a result, will undoubtedly mislead the jury. The expert opinions of Montzka and Anderson also substantially overlap, as they both rely on Montzka's regression models. Anderson's opinions that arise out of Montzka's regressions models may improperly legitimize the models in the eyes of the jury. Accordingly, should this Court not exclude all of Plaintiffs' experts, the Court should preclude the experts from testifying to the same opinions on the same topics.

---

[14]    As the expert opinions of Anthony and Shupe overlap, arguments made to exclude Anthony equally apply to and further support the exclusion of Shupe's expert opinions and vice versa. In addition, as Montzka and Anderson almost exclusively rely on Montzka's regression model and unvetted Trademo data, any arguments made to exclude Montzka is also applicable to A2LA's motion to exclude Anderson as Plaintiffs' damages expert and vice versa.

## CONCLUSION

This Court should exclude the reports, opinions, and testimony of Montzka, Anderson, Anthony, and Shupe.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), counsel for A2LA certifies that they have conferred in a good faith effort to resolve the issue raised herein. Counsel for Plaintiffs indicated Plaintiffs object to the relief sought.

Dated: March 29, 2024                                Respectfully submitted,

                                                     */s/ Peter R. Goldman*
                                                     Peter R. Goldman
                                                     Florida Bar No. 860565
                                                     Nina C. Welch
                                                     Florida Bar No. 118900
                                                     Danna Khawam
                                                     Florida Bar No. 1025114
                                                     Zackary B. Weiss
                                                     Florida Bar No. 1040682
                                                     **NELSON MULLINS**
                                                     100 S.E. 3rd Avenue, Suite 2700
                                                     Fort Lauderdale, FL 33394
                                                     Telephone: (954) 745-7060
                                                     Fax: (954) 761-8135
                                                     peter.goldman@nelsonmullins.com
                                                     stacy.brown@nelsonmullins.com
                                                     nina.welch@nelsonmullins.com
                                                     danna.khawam@nelsonmullins.com
                                                     zack.weiss@nelsonmullins.com
                                                     *Counsel for Defendant A2LA*

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2024, a true and correct copy of the foregoing document was filed electronically with the Clerk of Court and served on all counsel of record through the Court's CM/ECF system.

                              By: */s/ Peter R. Goldman*
                                  Peter R. Goldman